IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JUL 10 1997

Michael N. Milby, Clerk of Court

| | | |
|---|---|---|
| ROBERT JOE McSPADDEN | § | |
| Petitioner | § | |
| V. | § | CIVIL ACTION No. B-94-289 |
| GARY L. JOHNSON, Director | § | |
| Respondent | § | |

## PETITIONER'S ANSWER TO RESPONDENT'S MOTION
## FOR SUMMARY JUDGEMENT WITH BRIEF IN SUPPORT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Robert Joe McSpadden, Petitioner Pro se and files this Petitioner's Answer to Respondent's Motion for Summary Judgement with Brief in Support. In support thereof, petitioner would respectfully show the court the following:

I

JURISDICTION

This court has jurisdiction over the subject matter and parties pursuant to 28 U.S.C.§§ 2241,2254.

II

DENIAL

The petitioner denies each and every allegation of fact made by

-1-

012

respondent, except those supported by the record and those specifically admitted herein.

The respondent continues to make **obfuscatory** allegations and statements. The court has ruled that petitioner has exhausted all state remedies; December 12, 1996 and de novo March 31, 1997. respondent advances the 1996 Anti terrorist act as applying. United States Constitution Article 11 § 9, no bill of attainder or ex post facto law shall be passed. In February 1997, the Supreme Court ruled 9 - 0 (in a Florida case) that a retroactive law **cannot** be effective and is UnConstitutional.

Respondent also claims that petitioner has to serve 20 years to be eligible for parole, Tex.Penal Code 42.08(b), offenses committed September 1, 1987 through August 31, 1991 by 70th Legislature, must serve one-fourth or **15** years whichever is less.

III

BRIEF IN SUPPORT

1. Petitioner denied due process.

-ARRAIGNMENT-

Petitioner was not allowed to attend arraignment. Attorney Banks left him in holding cell for over four (4) hours and then petitioner was returned to jail with no meeting with Banks . Exhibit 1, page 2, line 8, Banks states he had a meeting afterwards, see exhibit 2, page 1, line 6 & 12, the meeting was 4 days later.

-VOIR DIRE-

Petitioner was only allowed 20 minutes for voir dire, the

-2-

court records will reflect that and also, exhibit 1, page 4, para.3, line 2, Banks statement as to time limit. RATLIFF V. STATE, 690 SW2d 597,600(Tex.Cr.App.1985) the court of criminal appeals held that one (1) hour for defense counsel to question venire members was unreasonable and prohibited counsel from exercising preemptory challenges intelligently. KNOX V. COLLINS, 928 F2d 657 (5thCir.1991) denial or impairment of right to exercise preemptory challenges is reversible without showing of prejudice.U.S.C.A. Const. Amend. 14.

Conduct of voir dire is left to discretion of trial judge, exercise of that discretion, however, is limited by essential demands of fairness. T.K.'s VIDEO INC. V. STATE, 832 SW2d 174(Tex.App.-Ft.Worth 1992) defendant's constitutional right to counsel includes right of counsel to question members of the jury panel to exercise preemptory challenges intelligently. Vernon's Ann.Tex.Const.art.1§10, if not allowed to question panel about attitudes on sexual matters, harm is shown. THOMAS V. STATE, 658 SW2d 175 (Tex.Cr.App. 1983) the court held that defendant was unduly restricted by 45 minute time limit imposed.

-WITNESSES-

The rule of witnesses was in effect and during the trial, Larry Corkill and Teresa Carmona continuously made trips in and out of the courtroom, and talked to the witnesses. Exhibit 1, page 9, para.5, line 1 thru 6 & 8. U.S. V. SANTOS, 932 F2d 244(3rdCir.1991) "Plain Error" is defined as those errors that seriously affect fairness, integrity, or public reputation of judicial proceedings; they are errors that undermine fundamental fairness of trial.

-CONTINUANCE

-3-

Melanie McSpadden was a surprise witness, unknown to defense until called to the stand. She gave testimony, not about the charge being tried, but, testified to unadjudicated extraneous sexual offense with no supporting or corroborating evidence, and defendant was denied continuance to obtain rebuttal witness that would have testified to the facts that Melanie had told and retold this story in different context and different offenders and had recanted several times. HILL V. STATE, 852 SW2d 769(Tex.App.-Ft.Worth 1993) erroneous admission of victim's testimony concerning uncharged extraneous sexual offenses was reversible error in prosecution as testimony served no other purpose than as proof of defendant's bad character and that alleged offense was consistent therewith. V.T.C.A.,Penal Code § 21-11(a)(1); Rules of Crim.Evid.,rule 404(b); Rules App.Proc.Rule 81(b)(2). Also Melanie wasn't with defendant within 2 years of the alleged dates of the attacks. Jane Wright would also testify that in September 1990, a telephone conference between herself, Juanita McSpadden, Melanie McSpadden, Teresa Carmona, Carrie Carmona, and Sherry Corkill took place in which the above allegation was discussed and that at that time both Wright and Juanita questioned all 4 of the girls as to any sexual misconduct by the defendant, all 4 of them denied any attacks or misconduct of a sexual nature by the defendant. Melanie again recanted her story of rape and claimed that it was a now deceased Uncle that had done it. Exhibit 3, page 2, para. 3. HARDIN V. ESTELLE, 484 F2d 944(5thCir.1973) denial of compulsory process of witnesses are reversible error. WASHINGTON V. TEXAS, 388 U.S. 14, 87 S.Ct. 1920(1967) accused has the right to have compulsory process for obtaining witnesses in his favor. U.S.C.A.Const.Amend. 6, 14.

-4-

0/5

The right to offer testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense. Exhibit 1, page 9, para.1, lines 2 thru 6 and para. 3.

-TRIAL FOR MULTIPLE OFFENSES-

U.S. V. GOLLETT, 939 F2d 255(5thCir.1991) conviction may be reversed for denial of mistrial omly if court abuses discretion. To justify reversal of conviction for improper admission of evidence, defense must show that in context of whole trial the evidence was so prejudicial that it had a substantial impact on the verdict. In this allegation, respondent claims there is no record of 3 or more offenses tried in one trial. Even though severance was in effect, petitioner was actually tried for 91-CR-887-C and 91-CR-888-C, exhibit 4, and exhibit 1, page 7, lines 3 thru 5 and also exhibit 5. Even though they are separate charges and indictments and 91-CR-888-C was later used to bargain with, exhibit 1, page 10,para.2. Tex.R.Crim.Evid. rule 402, irrelevant evidence inadmissible , Rule 404(b) extraneous offenses. KESSLER V. STATE, 850 SW2d 217, 219(Tex.App.-Ft.Worth 1993) Defendant has the right to be tried for offense for which charged and not for collateral crime. JESSUP V. STATE, 853 SW2d 141(Tex.App.-Ft.Worth 1993) Victim's testified that defendant had sexually abused her on other occasions **was not admissible.** Evidence that defendant had abused daughter on other occasions **was not** admissible in sexual assault prosecution to overcome aversion to notion that parents would sexually abuse their children. Rule of Crim Evid. rule 402 and 404(b).

Also, Carrie Carmona testified that defendant had exposed himself and grabbed her breasts, 91-CR-889-C the third charge and

-5-

CutePDF - www.tesla.com

indictment, exhibit 6, also used to bargain (illegally and unConstitutionally) and block defendant's right to appeal. Exhibit 1, page 7, para.11, and exhibit 1, page 8, para.2, lines 3 to 5, and exhibit 1, page 10, para. 3.   ALVARADO V. STATE, 775 SW2d 851,856(Tex.App.- San Antonio 1989) evidence of extraneous sexual offense against a minor is limited to evidence between defendant and complainant; evidence of extraneous sexual offenses between defendant and other person **is not** admissible.   The erroneous admission of so much hearsay testimony can only be characterized as fundamentally unfair.   ALEXANDER V. STATE, 753 SW2d 401,402(Tex.Cr.App.1988) evidence of extraneous sexual offenses was not admissible to show un natural attention to children or to demonstrate continuing course of conduct.   Tex.R.App.P.rule 81(b)(2).   COURET V. STATE, 792 SW2d 106 general rule is that accused is entitled to be tried for offense for which charged and **not** for some collateral charge.

-INEFFECTIVE ASSISTANCE OF COUNSEL-

If Attorney Banks had taken more time with defendant he would have become more knowledgeable in the facts of the case. The defendant knew nothing of the progress of the case or investigation of facts or what the actual basis of the indictments.   Banks would have contacted **all** of the state's witnesses not just one. Exhibit 1, page 3, #1, M.C.Newland was or portrayed herself to be a psychologist and had several counseling sessions with the defendant and other people involved.   Exhibit 3, page 2, bottom.   Astin and Callier would have testified that defendant was fully employed during the entire time of the allegations.   Also to the good

-6-

017

character of defendant. Exhibit 1, page 3, para.#2 see also exhibit 7, Attorney Hall's rebuttal of Banks allegations. Witness Garner, if contacted would have corroborated employment and character of defendant, not an alcoholic nor drinker. SHELTON V. STATE, 841 SW2d 526(Tex.App.-Ft.Worth 1992) failure to call witnesses with alibi testimony, clearly this failure made counsel ineffective if not incompetent in this instance counsel's conduct establishes **both** elements of ineffective assistance of counsel. Ex parte YBARRA,629 SW2d 943(Tex.Cr.App.1983) Defense Attorney **must** have a firm command of the facts as well as governing law before he can render effective assistance, has a responsibility to seek out and interview potential witnesses, failure to do so is to be ineffective if not incompetent where the result is that any viable defense available to accused is not advanced. Did not conduct an independent investigation of the facts of the case, and as a consequence was ineffective in cross examination and presented no evidence in defendant's behalf. Attorney has a professional duty to present **all** available testimony and other evidence to support the defendant. Exhibit 9, page 4, para. 2 & 3. HAYNES V. STATE, 790 SW2d 824 Attorney **must** have a firm command of facts, make an independent investigation of facts, and **cannot** be sloughed off to an investigator. U.S.C.A.Const.Amend.6

Defense counsel's failure to investigate equals deprived defendant of effective assistance of counsel. Exhibit 9, page 4.

BUTLER V. STATE, 716 SW2d 48(Tex.Cr.App.1986) defendant may be deprived of effective assistance of counsel where attorney fails to make an independent investigation of facts.

-7-

CibPDF - www.fenhz.com

-INTERVIEWING STATE's WITNESSES

Exhibit 1, page 4, para. 1, Banks admits that Travis Bodenhamer was the only state's witness he interviewed (if a telephone call is an interview). U.S. V. SANTOS, 932 F2d 244(3rdCir.1991) "Plain Error" is defined as those errors that seriously affect fairness, integrity, or public reputation of judicial proceedings; they are errors that undermine fundamental fairness of trial. Ex parte LILLY Jr., 656 SW2d 490(Tex.Cr.App.1983) counsel has the responsibility to seek out and interview potential witnesses, and failure to do so is ineffective, if not incompetent, where the result is that viable defense available to accused is not advanced. Where at the time of trial, counsel knew little of the facts of the case, had not consulted with defendant about the case, and had done no independent investigation or preparation for the trial, and did not investigate the scene of the offense, nor interview all of the state's witnesses, defendant was denied effective assistance and was entitled to habeas corpus relief.

-INADEQUATE PREPARATION AND INCORRECT ADVICE-

Attorney Banks gave no advice other than to take a jury trial, as the judge couldn't grant probation, but a jury could. In most cases probation cannot be granted in aggravated sexual assault cases.

-FAILURE TO ACT ON QUESTIONS AND ERRORS POINTED OUT-

Exhibit 1, page 5 & 6, para.#4, doctor's physical evidence showed no damage to the victim, irrespective of her description of the pain and repeated alleged attacks. Exhibit 10, page 1, para.4 & 5, the physical evidence does not support the testimony.

-8-

CtMPDF - www.fevia.com

That Juanita Corkill testified that defendant had assaulted her and raped her (spousal rape) on occasion during the marriage. This was more extraneous offenses and Banks didn't object. Exhibit 1, page 5, para. 3.

-NO ADVICE AT POST TRIAL MEETINGS-

Exhibit 1, page 10 para. 4 & 5, Banks knowing that by Corkill testifying to **both** 91-CR-887 & 888-C and Carmona testifying to 91-CR-889-C that what the Assistant District Attorney Valle was doing was illegal, unethical, and unConstitutional. Ex parte AXEL, 757 SW2d 369(Tex.Cr.App.1988) not only is trial counsel the best source for an unknowing defendant to learn of his appellate rights, it is counsel's duty as an attorney to give it so that his client will gain a full understanding of relevant considerations in determining whether to pursue an appeal as well as procedural requisites for giving notice of appeal. Vernon's Ann.Tex.C.C.P. article 26.04(a). Informing a defendant of his right to appeal is part and parcel of further advice **required by counsel in order to allow defendant to make an informed decision.** Const.Amend.6.

Until permitted to withdraw, trial counsel, whether retained or appointed, has the duty, obligation, responsibility to consult with and fully to advise client concerning meaning and effect of judgement rendered by court, his right to appeal from that judgement. U.S.C.A. Const. Amend. 6

Ex parte GALLEGOS, 511 SW2d 510 factors to be considered include; 1. the amount of time spent in preparation of the defense, 2. whether advice was given which would promote an understanding of the law in relation to the facts, 3. whether the advice was

-9-

reasonably competent , 4. whether the advice permits an informed and conscious choice, 5. whether the lawyer attempted to ascertain if the plea was voluntary and knowing. See exhibits 11 & 12.

-PROSECUTORIAL MISCONDUCT-

Exhibit 1, page 10, para. 1, line 1 thru 3, the trial record will show the exact words and phrases used, but, Banks here admits that it happened and he objected for the record. Tex.R.Crim.Evid.615, in criminal cases, evidence of the beliefs or opinions of a witness on matters of religion is not admissible for the purpose of showing that by reason of their nature his credibility is impaired or enhanced. Valle questioned defendant about showing proof of his military career, and paramedic and police careers, knowing full well that defendant had no identification on him. This was done to obfuscate the information and call the defendant into question as to character.

Pro se complaint is held to less strict standards than applied to complaint prepared by attorney. As petitioner is unschooled in the law, he prays that the honorable court will understand.

WHEREFORE PREMISES CONSIDERED, petitioner prayerfully asks the Honorable Court to issue an order granting him "RELIEF" sought.

Executed this 4 th day of July, 1997.

/s/ *Robert Joe McSpadden*

Robert Joe McSpadden

600096   Clements

9601 Spur 591

Amarillo, Texas,79107

## UNSWORN DECLARATION

I Robert Joe McSpadden, 600096, being presently incarcerated in Clements Unit of TDCJ-ID, Potter County, Texas, do declare under penalty of perjury that the foregoing is true and correct.

Executed on this 4 th day of July, 1997.

*Robert Joe McSpadden*

## CERTIFICATE OF SERVICE

I hereby certify that on this the 4 th day of July, 1997, a true and correct copy of the foregoing Petitioner's Answer to respondent's Motion For Summary Judgement, with Brief In Support was mailed to:

Jeremy T. Hartman

Asst. Attorney General

P.O.B. 12548 Capital Station

Austin, Texas 78711

*Robert Joe McSpadden*
Robert Joe McSpadden

Petitioner

021

June 22, 1992

Mr. Gilbert R. Lazo
Office of the General Counsel
State Bar of Texas
Suite 205
2302 South 77 Sunshine Strip
Harlingen, Texas 78550

      Re:   S2069200029  Robert Joe McSpadden - Robert J. Banks

Dear Mr. Lazo:

      After having read Mr. McSpadden's grievance, I am of the opinion that it does not constitute a complaint recognizable by the Texas Disciplinary Rules of Professional Conduct. However, in order to lay this matter to rest, I am providing the following information.

      On or about July 24, 1991 Mr. McSpadden was indicted in cases numbered 91-CR-887-C, 91-CR-888-C and 91-CR-889-C. See copy of Indictments attached hereto, marked Exhibits "A", "B" and "C", and made a part hereof. Arraignment on the Indictments was set for September 12, 1991.

      Subsequent to September 2, 1991 I was contacted by Mr. Edward Pace who stated to me that Mr. McSpadden had requested that he contact me and request that I visit Mr. McSpadden at the Cameron County jail. Mr. Pace further advised me that Mr. McSpadden had said that his present lawyer, Mr. Glen Barnard, was not diligently pursuing his case.

      On or about September 6, 1991, I telephoned Mr. Barnard. Upon speaking with Mr. Barnard, he advised me that he had not entered his appearance in the criminal cases and did not represent Mr. McSpadden, although he had visited Mr. McSpadden several times at the jail and had discussed representation. He further advised me that he had previously represented Mr. McSpadden in recent divorce proceedings. Inasmuch as he was having some difficulty in getting paid for his previous representation, he was not anxious to take on the expenses that the current representations would involve.

EXHIBIT  1

Mr. Gilbert R. Lazo
June 22, 1992
Page Two

On or about September 9, 1991 I met with Mr. McSpadden at the Cameron County jail. Until that time, I had only a passing acquaintance with Mr. McSpadden. Mr. McSpadden assured me that the State did not have any evidence of criminal acts on his part. He claimed that the whole thing was a conspiracy between his ex-wife, her lawyer (Mr. Otis Klar) and Judge Euresti to "take him to the cleaners". I informed Mr. McSpadden that I would represent him at the Arraignment hearing scheduled for September 12, 1991. I further requested that he set down in writing his version of the incidents charged.

I appeared at the Arraignment hearing on behalf of Mr. McSpadden on September 12, 1991. After the hearing, I again met with Mr. McSpadden to review his version of the incidents charged. At that meeting, Mr. McSpadden gave me the written statement I had previously requested. See copies of Robert McSpadden Statement marked Exhibits "D" and "E" attached hereto, and made a part hereof.

On September 16, 1991 I conferred with Mr. Joe Valle, the Assistant District Attorney assigned to prosecute the charges against Mr. McSpadden. Mr. Valle permitted me open-file discovery. I reviewed the evidence, witness statements, etc. Mr. Valle intended to present to the juries. The State's case had been well prepared. As in most cases of this type, the credibility of the witnesses would be the deciding factor. At this time, Mr. Valle offered a plea bargain of fifteen years Texas Department of Corrections time in return for a guilty plea to one of the three charges on which Mr. McSpadden had been arraigned. The State would drop the other two charges. A plea for fifteen years would result in Mr. McSpadden being eligible for parole in approximately five years, or less.

The cases against Mr. McSpadden consisted of charges that during a period exceeding two years, he had repeatedly brutalized, raped and sodomized his minor stepdaughter. The child was approximately three years of age when the attacks commenced, and they continued until Mr. McSpadden's divorce approximately three years later. He was further charged with sexually molesting his teenage step daughter. Those charges alleged that he had told her to take off her blouse and he then grabbed her breasts, and that he exposed himself to her.

After my conference with Mr. Valle, I again met with Mr. McSpadden at the Cameron County jail. I advised Mr. McSpadden of the evidence and the witnesses against him. I further advised him of the State's plea bargain offer. Mr. McSpadden was advised that the State had a formidable case against him, and even in the event that all of the State's witnesses were found not to be creditable, the jury could convict him solely on the testimony of his victims. Again Mr. McSpadden began ranting that he was being "railroaded" and that no jury would believe the State's witnesses. He adamantly refused to discuss the State's plea bargain any further.

Mr. Gilbert R. Lazo
June 22, 1992
Page Three

On September 17, 1991 I began telephoning and interviewing the potential witnesses Mr. McSpadden had identified with the following results:

1.    The witness M.C. Newland, identified in Mr. McSpadden's statement of September 12, 1991 did not want to testify on behalf of Mr. McSpadden. She stated that she did not have any information that would assist Mr. McSpadden. She further stated that she knew Mr. McSpadden only through their brief association at Emergency Medical Services, that she was **not** a psychologist as Mr. McSpadden had represented to me, and that she had **not** discussed sexual abuse, or anything else, with Mr. McSpadden's ex-wife and stepchildren as he claimed in his statement of September 12, 1991.

2.    The witnesses, Bill Astin and Leonard Collier, refused to return my telephone calls. They referred the matter to Mr. Brendan Hall, Harlingen Emergency Medical Services' attorney. Mr. Hall telephoned me and explained that Messrs. Astin and Collier did not possess any information that would assist Mr. McSpadden. To the contrary, their testimony would only damage his case. Mr. Hall explained that Mr. McSpadden had been fired from Harlingen EMS' employ due to alcohol abuse and for Mr. McSpadden having attempted suicide. Mr. McSpadden was subsequently hospitalized in a Veterans Administration Hospital for treatment of his psychological and emotional problems.

3.    I was unable to locate the only other witness identified by Mr. McSpadden in his statement of September 12, 1991, Jay Garner. The only information Mr. McSpadden was able to supply me with was that Mr. Garner at one time had worked for the Public Health Service, Region 8. He would merely have been a character witness.

On September 17, 1991 I contacted Mr. Edward Pace who agreed to testify as a character witness on behalf of Mr. McSpadden. Mr. Pace did testify on behalf of Mr. McSpadden. He further testified that he was aware of Mr. McSpadden's suicidal tendencies. Mr. McSpadden did not furnish me with the name of this witness.

I also contacted Mrs. Jo Ellen Paschall, the Administratrix of University Preparatory School, on September 17, 1991. She agreed to testify as a fact/expert witness that it had been, her experience that some children alleged sexual molestation when they were seeking revenge against one parent or the other, and that children had admitted to her that they had done so. She further agreed to testify on the believability of such children and that it was not a rare occurrence when they recanted their allegations. Mrs. Paschall did testify to such on behalf of Mr. McSpadden. Mr. McSpadden did not furnish me with the name of this witness.

024

CMPDF - www.fenrir.com

Mr. Gilbert R. Lazo
June 22, 1992
Page Four

On September 18, 1991 I telephoned Mr. Travis Bodenhamer, one of the State's listed
witnesses. Mr. Bodenhamer was the teenage son of a client of mine. Further, he was one of
the only two State's witnesses whose testimony was unknown to me. Mr. Bodenhamer informed
me that he was present when Mr. McSpadden drove up in front of his ex-wife's residence, the
child victim saw Mr. McSpadden drive up, became hysterical and ran screaming to another
neighbor's residence, Mr. Max Vasquez, banging on the door and screaming and crying to be
let in. Mr. Vasquez was the other witness whose testimony was unknown to me until that time.
Mr. Bodenhamer and Mr. Vasquez testified that the child victim became hysterical at the sight
of Mr. McSpadden, that Mr. McSpadden had thrown some dishes out of his truck onto the street
(or sidewalk), smashing them, and that when they confronted him, he became abusive and drove
off at a high rate of speed. Mr. Bodenhamer did not come across well on the witness stand due
to his age, teenager, and his constant smiling as though he enjoyed testifying. Mr. Vasquez,
however, was an ex-law enforcement officer, college educated, and presented himself factually
and with sincerity. On cross-examination Mr. Vasquez admitted that he would not allow his
children to play unsupervised with the child victim due to having observed on one occasion their
playing a game having explicit sexual overtones (the child victim was demonstrating with dolls
how her father laid on top of her).

The Announcement hearing was held on October 11, 1991. After the hearing, I again
met with Mr. McSpadden at the Cameron County jail. During this conference I asked him
where his civilian clothes were, and I told him that I wanted him in a coat and tie at the trial.
He told me that he did not know where his clothes were, that Mr. Pace had told him that he had
been evicted from the house he was occupying and that the place was empty. Mr. McSpadden
requested that I go to the store and buy him a new suit, shoes, etc. and charge it to his account
with my office. I refused to do so inasmuch as Mr. McSpadden had not paid me any fee or
other money to that date. I arranged for a borrowed suit, shoes, etc. to be delivered to him on
October 13, 1991. See copy of letter attached hereto, marked Exhibit "F" and made a part
hereof. When the trial commenced on October 14, 1991 I asked Mr. McSpadden why he was
not dressed in the clothes that I had provided. He replied that they were too small, and that he
was able to get some clothes at the jail. The trousers were too long, but since he was sitting
behind the enclosed counsel table they could not be seen by the jury.

The trial commenced on October 14, 1991 with the selection of the jury before Judge
Darrell Hester. Judge Hester initially questioned the jury, then allowed each side approximately
twenty minutes for their *voir dire*. Inasmuch as the time allowed for *voir dire* is discretionary
with the judge, the attorneys do not have any control over that element of the trial. During the
*voir dire*, one of the jury panel questioned as to whether the child victim was hispanic. It was
explained that the child victim was hispanic, Mr. McSpadden being anglo. The judge struck the
proposed juror for cause. The remainder of the jury selection was uneventful.

625

Mr. Gilbert R. Lazo
June 22, 1992
Page Five

Judge Hester assigned the actual trial of the first case to Judge Everardo Garcia.

The State presented twelve witnesses. A synopsis of their testimony is as follows:

1.      Officer Tina Saldivar. Officer Saldivar was the initial investigating officer. She interviewed the child victims, witnesses, etc. Her testimony was merely foundational, leading up to probable cause for the arrest of Mr. McSpadden. I questioned her at length as to her experience in similar cases, her investigational techniques and her lack of investigation of the child victims and their mother, and why she focused immediately and exclusively on Mr. McSpadden. See copy of Investigator's Report attached hereto, marked Exhibit "G" and made a part hereof.

2.      Mrs. Nancy Ramee: Mrs. Ramee testified that she overheard Sherry (the youngest of the child victims) telling some of her playmates that "she had been raped". Upon questioning by Mrs. Ramee, Sherry accused Mr. McSpadden of having raped and sodomized her over a several year period. Mrs. Ramee thus constituted the "outcry witness" required under the law. She further testified that she told Sherry to go tell her mother about this. When several days had passed and Sherry had not done so, Mrs. Ramee went to Sherry's mother and related to her what she had been told by Sherry. She was cross-examined on the probability of Sherry's merely "telling tall tales" to her playmates, influenced by similar events on television. Further, the possibility of Mrs. Ramee having unintentionally "suggested" matters to the child victim during her questioning of her was explored and emphasized.

3.      Mrs. Juanita McSpadden: Mrs. Juanita McSpadden, the mother of Sherry, testified that she and Mr. McSpadden were recently divorced. She further testified that she had obtained an injunction against him being in the vicinity of herself, her children and their residence because of his violent behavior. She stated that upon being notified of Sherry's allegations against her ex-husband, she reported the matter to the police. She then took Sherry to a physician for an examination. Mrs. McSpadden is a nurse. On cross-examination, Mrs. McSpadden freely admitted that she hated Mr. McSpadden, was glad to be rid of him, and was not surprised at his present predicament. It was her opinion that Mr. McSpadden was psychotic. She further testified that Mr. McSpadden would go to the day-care center and the school where Sherry attended, pick Sherry up and take her home before anyone else in the family would arrive. Her bias and prejudice was established without difficulty.

4.      Dr. Stanley I. Fisch: Dr. Fisch is the pediatrician who examined Sherry at the request of Mrs. McSpadden. He testified that he found physical evidence of vaginal sexual contact. On cross-examination, Dr. Fisch admitted that if he had not been told that Sherry had

026

Mr. Gilbert R. Lazo
June 22, 1992
Page Six

been sexually molested, he would not have found such to be a differential diagnosis. Dr. Fisch's testimony was probably neutral and did, perhaps, do more to assist the defense than the State. See copy of Medical Report attached hereto, marked Exhibit "H" and made a part hereof.

*10*

5.    Mr. Gerry L. Amaya:   Mr. Amaya was employed by Tropical Texas in Harlingen. He was presented as a psychologist who had examined and treated Sherry. However, under cross-examination he admitted that he had taken over the case from another psychologist who was no longer with the Center, that the other psychologist had, in fact, been the interviewing and treating psychologist, that he had interviewed the child victim for approximately thirty minutes, that the interview had been in the office of the Assistant District Attorney with the Assistant District Attorney present, and that he had no personal knowledge of the specifics of the child's case.

Mr. Valle advised me upon the completion of the first trial that in the next trial he would present the actual psychologist who had examined and treated the child victim. That witness would testify as to the period of treatment the child underwent and as to her nightmares, etc. concerning the attacks.

6.    Mr. Travis Bodenhamer:   See above, at page four.

7.    Mr. Max Vasquez:   See above, at page four.

8.    Ms. Lisa Gonzales:   Ms. Gonzales was Sherry's teacher at the day-care center described above. She testified that Mr. McSpadden came to take Sherry home, Sherry came to her and said that she was "scared" to go with him and did not want to go. Inasmuch as Mrs. McSpadden had told her not to allow him to take the child, she therefore refused to allow him to do so. She further testified that upon her advising Mr. McSpadden of this, he requested to talk to Sherry, and she further refused to allow that. Upon cross-examination she admitted that it was not unusual for families undergoing marital crises to behave in this manner.

9.    Ms. Vicki Galbreath:   Ms. Galbreath testified that she was Sherry's first grade teacher at Treasure Hills Elementary in Harlingen, that Mr. McSpadden came to pick up Sherry, and that she would not allow him to leave with Sherry. She further testified that he requested to speak with Sherry and she allowed him to do so. She did not overhear the conversation, and Mr. McSpadden left. Inasmuch as the testimony was ineffective, she was merely cross-examined on whether their were any restrictions in Sherry's files as to who could visit her. Ms. Galbreath said there were none.

Mr. Gilbert R. Lazo
June 22, 1992
Page Seven

    10.   <u>Ms. Sherry Corkhill</u>: Sherry is the natural daughter of Mrs. Juanita McSpadden by a marriage previous to her marriage to Mr. McSpadden. Sherry was the youngest of the child victims in the offenses charged. She testified that Mr. McSpadden had frequently and continuously from approximately June 1988 through the end of October or the beginning of November 1990 had vaginal and anal intercourse with her. She testified as to where they were living at the time, to the times of day that it occurred, the rooms in the houses where the attacks occurred, the methods and places of penetrations, her pain and <u>of Mr. McSpadden's promises of gifts and of his threats.</u> She testified as to the "slimy and yucky stuff" that came out of her after Mr. McSpadden finished. Needless to say, her testimony was believable, and therefore, devastating to Mr. McSpadden's defense.

    A seven year old child cannot be cross-examined like an adult. It was clear at the conclusion of her testimony that the jury believed her. She was a precocious child, was attentive and aware and responded to questions on cross-examination with assurance and firmness. <u>She admitted that she had told her story quite a few times to quite a few people.</u> She was cross-examined as to her knowledge and belief of right and wrong, truth and lies. She admitted that she did not like Mr. McSpadden, and gave as reasons his attacks on her <u>and that she thought he was going to give her presents but he never did.</u>

    Sherry identified Mr. McSpadden at trial without <u>any hesitation or indication of fear.</u> When she was questioned about this on cross-examination she stated "that he is probably going to be put in jail, he can't do anything to me now.". She further responded that "she dreams that Bob (McSpadden) would be in jail for ever and ever.".

    After some period of cross-examination it became obvious that Sherry's story was firmly implanted in her mind and it was not going to change. Further, the impression that I was receiving from the jury was that they did not want me picking on this child any further, and to continue was simply implanting the little girl and her horror story more firmly in their minds.

    11.   <u>Ms. Carrie Carmona</u>: Carrie is the other child victim referred to in the Indictments. Carrie testified that <u>Mr. McSpadden would expose himself to her when they were home alone.</u> This happened frequently since <u>Mr. McSpadden was unemployed and was at home during the day when Mrs. McSpadden was at work.</u> She further testified that on one occasion he asked her to sit on his lap and remove her blouse so he could see her breasts, he wanted to see if they had grown. She stated that upon removing her blouse he said "God they are growing.", and grabbed her breasts. <u>She then slapped him and moved away.</u> Sherry testified that she was hiding from Mr. McSpadden at the time, he did not know she was there, and she

Mr. Gilbert R. Lazo
June 22, 1992
Page Eight

saw him grab Carrie's breast and heard the slap.  Upon cross-examination Carrie readily admitted a dislike for Mr. McSpadden, and further admitted that she had never liked him.  When asked why she did not tell her mother, she stated that she did not want to cause any more trouble than there already was between her mother and Mr. McSpadden.

The defense timely objected, prior to Carrie's testimony, to Carrie being permitted to testify in that her testimony concerning any alleged sexual contact with her step-father was inadmissible for any purpose.  Further objection was made that no foundation had been laid for the admission of that testimony.  The Court overruled the objection and permitted the witness to testify.  The objection was properly preserved for appeal.

12.  Ms. Melanie McSpadden:  With the exception of Sherry's testimony, the most damaging testimony came from Melanie McSpadden, a natural child of Mr. McSpadden's by a previous marriage.  The existence of this witness was known to the defense, however, because of her out-of-state residence, it was thought that the State was unaware of the witness, and even if they became aware of her, it would be difficult for them to produce her.  However, Mrs. Juanita McSpadden contacted her and she volunteered to come to Brownsville and testify against her father.

Melanie testified that her mother and father had divorced when she was quite young.  When she was seventeen she came to visit her father in the summer.  She further testified that during that visit, Mr. McSpadden tried to have sex with her, she resisted and he "hit her and threw her to the ground, took out his penis and penetrated her.".  She left and returned to her mother and never came to visit him again.

On cross-examination she stated that she had told her teacher what had happened and then her mother.  She admitted that she eventually recanted her statement and said that an uncle, who at the time of the recanting was deceased, had really been the one who had raped her.  She was quick to explain that her mother made her recant her story.  The witness was extremely hostile and made no effort to conceal the fact that she hated Mr. McSpadden, her father.  She stated clearly and unequivacably that she wished that Mr. McSpadden were dead.

Melanie may have been the "surprise" witness Mr. McSpadden refers to, but does not identify, in his grievance.  The only rebuttal witness to Melanie's testimony would have been her mother.  Her mother could have testified to Melanie's having recanted her accusations.  That testimony would have been merely cumulative inasmuch as Melanie admitted that she had done so.  If there were any additional rebuttal witnesses, Mr. McSpadden did not make their existence and identity known.

CutePDF - www.tesvia.com

Mr. Gilbert R. Lazo
June 22, 1992
Page Nine

       Melanie was called by the State as a rebuttal witness upon the completion of Mr. McSpadden's case in chief.  The defense timely objected, prior to Melanie's testimony, to Melanie being permitted to testify in that her testimony concerning any alleged sexual contact with her step-father was inadmissible for any purpose.  Further objection was made that no foundation had been laid for the admission of that testimony. The Court overruled the objection and permitted the witness to testify. The objection was properly preserved for appeal.

       Mr. McSpadden's grievance states that Melanie admitted she "lied" during her testimony.  If she did, she did not do so to me.  See my letter to Mr. McSpadden dated February 9, 1992 (Exhibit "P").  My only post-trial written communication to Mr. McSpadden concerning the investigation into Melanie's testimony is contained therein.

       At the conclusion of the State's case, the defense submitted Motions for Directed Verdict and for Mistrial, which were duly noted and overruled by the Court.

       The defense's case consisted of the testimony of Mr. McSpadden, Mr. Edward Pace and Mrs. Jo Ellen Paschall.  As so often happens in child sexual molestation cases, the defense is without any hard evidence, and the only plausible defense is nonaccessability to the complaining witness by the defendant, or outright unsubstantiated fabrication by the victim.  Since the child had been raped and sodomized over a period of several years, it was solely a matter of the credibility of the witnesses, and particularly of the victim and the assailant.  The fact that Mr. McSpadden's marriage to Sherry's mother had been his sixth failed marriage did not present a picture of a stable individual to the jury.

       During the presentation of Mr. McSpadden's case in chief, Mrs. McSpadden's previous husband, the natural father of Sherry, was noticed by me to be making frequent trips from the courtroom to the hallway.  I had invoked the "Rule on Witnesses" and there were no witnesses allowed in the courtroom.  During a brief recess in the trial, Mrs. Paschall advised me that Sherry's father was talking to Mrs. Juanita McSpadden and other witnesses in the hallway.  I informed the Court of this potential violation of the Court's Order and a brief hearing was held.  Sherry's father stated that he was merely passing the time of day with the witnesses and there was no testimony to contradict that.  I moved for a mistrial, which was duly noted and overruled by the Court.  However, upon my insistence, the Court ruled that none of the State's witnesses then remaining in the hallway were to be allowed to testify in rebuttal of the defense's case.  This effectively removed all of the State's rebuttal witnesses except Melanie McSpadden who had not arrived at the courthouse at that time.

030

Mr. Gilbert R. Lazo
June 22, 1992
Page Ten

Closing arguments were heard on October 17, 1992. During closing, the State made several inflammatory statements constituting prosecutorial misconduct, to which I duly objected. The Court overruled the objections, but they were properly preserved for appeal. The case went to the jury on October 17, 1991. The jury found Mr. McSpadden guilty of sexually assaulting his stepdaughter, Sherry. They subsequently sentenced Mr. McSpadden to life in prison. A sentence of life in prison carries a minimum sentence of fifteen years. Had I been a juror on that case, hearing the evidence that was presented, I would probably have found likewise.

On October 18, 1991 there was an Announcement hearing in Cause No. 91-CR-888-C which alleged additional instances of sexual assault on Sherry by Mr. McSpadden. I was advised by Mr. Valle, the prosecutor, that the State would present additional witnesses in order to shore up the weak points I had revealed in their previous case. Mr. McSpadden's potential exposure was to another life sentence. If the Court was to "stack" this sentence on top of the previous one, Mr. McSpadden would be required to serve a minimum of thirty years in prison before he would become eligible for parole. Mr. McSpadden would have been seventy-eight years old when he would become eligible for parole.

Additionally, there was still the allegations of Cause No. 91-CR-889, the sexual assault on Mr. McSpadden's stepdaughter, Carrie, to be concerned with. That Cause was set for trial on October 28, 1991. A conviction on this Indictment, and "stacking" of the sentence with the previous sentences, would ensure that Mr. McSpadden would never be released from prison.

On October 21, 1991, Mr. Valle approached me with a proposal that in trade for Mr. McSpadden's agreement not to appeal the verdict in the first trial, the State would dismiss the two remaining charges against him. I discussed the proposal with Mr. McSpadden. I explained to him that even if he were successful in his appeal, that would only mean a new trial, not an acquittal. He was further advised that unless the witnesses recanted their testimony, or he could produce some evidence that was not produced at the first trial, his chances of being acquitted on the retrial were slim. Further, the State had experienced one trial on this case, it was unlikely that they would repeat the same errors again.

Mr. McSpadden requested my advice on the agreement and I refused to comment as to whether he should or should not avail himself of it. I explained to him, as I do to other clients facing similar decisions, that "I am not the one who has to do the time, therefore I cannot make your decision for you or tell you what I would do if I were in your place". Mr. Valle then requested to speak with Mr. McSpadden. Mr. McSpadden agreed and the three of us met in one of the jury rooms. Mr. Valle explained the State's proposal, and the alternatives. I remained silent. Mr. McSpadden then requested to speak with me alone, and Mr. Valle left. Mr.

Mr. Gilbert R. Lazo
June 22, 1992
Page Eleven

McSpadden and I again discussed the State's proposal. I informed Mr. McSpadden again that if he waived his right to appeal the first case, the only way he could get another trial on that case would be to bring forth new evidence that was not available at the time of the first trial, or one of the State's principal witnesses would have to recant their testimony.

Mr. McSpadden then advised me that he would accept the State's proposal, and I notified Mr. Valle. Judge Hester directed that an Agreement Not To Appeal be drawn and executed so that there would be no misunderstanding as to its effect. The Agreement was drawn and executed. Additionally, Judge Hester brought Mr. McSpadden before the bench and questioned him as to his understanding of the consequences of the Agreement Not To Appeal and as to the voluntariness with which he executed it. Judge Hester, being satisfied that Mr. McSpadden understood the effect of the waiver that he signed and that he was signing it voluntarily, accepted same. The District Attorney then filed Dismissals on the remaining charges.See copies of Motions to Dismiss attached hereto, marked Exhibits "11" and "12" and made a part hereof.

On October 21, 1991 Mr. McSpadden complained to me that he was not receiving any mail. I told him that I would have a Change of Address form completed for his signature and he could have his mail forwarded to my office until his final assignment at the Texas Detention Center. The Change of Address forms were completed and filed and his mail was forwarded to my office and held there until I had Mr. McSpadden's final address. At that time, the mail being held at my office was forwarded to him. Additionally, at that time a new Change of Address form was filed in order that the mail would go directly to him. This service was provided merely an an accomodation to Mr. McSpadden and was not related to any legal representation of him.

On October 21, 1991 Mr. McSpadden requested that I contact Mr. Glen Barnard, his previous lawyer, and obtain his truck. I subsequently talked to Mr. Barnard who advised me that he had picked up Mr. McSpadden's truck at his request when Mr. McSpadden was arrested. He had parked it in his driveway at home as an accommodation to Mr. McSpadden. Mr. Barnard further stated that he would be glad to get it out of his way. Mr. Barnard gave me possession of Mr. McSpadden's truck, a 1983 GMC pickup in rather poor condition. The interior of the truck stank so bad that it was necessary to remove the contents and have the inside hosed out and washed. The rear bed of the truck was covered with a "camper top", and inside was a collection of dirty clothes, sheets, blankets and pillows. It was obvious that someone had been living in the back of the truck at one time. The contents of the truck were wet, badly mildewed and of no value. The contents were disposed of. Mr. McSpadden's allegation that the contents were worth $1,000 is patently untrue. This service was provided merely an an accomodation to Mr. McSpadden and was not related to any legal representation of him.

032

Mr. Gilbert R. Lazo
June 22, 1992
Page Twelve

On October 21, 1991 Mr. McSpadden requested that I contact Mr. Edward Pace who, again as an accommodation to Mr. McSpadden, was holding an automobile, a 1975 Bricklin. Mr. McSpadden represented that the automobile was of show quality and needed protection. Again his overactive imagination got in the way of the truth. The car is a piece of junk. It was necessary to retain the services of a tow truck to move the car from Mr. Pace's residence, where it had been parked in the driveway subject to the weather, to a place of storage. I had contacted Ferguson Motor Company and arranged for them to display the automobile on their showroom floor in order to provide a place of enclosed storage, at no cost to Mr. McSpadden. After seeing the condition of the automobile, that arrangement was not possible. The fiberglass body was cracking, the paint had totally deteriorated, wiring under the dash has been cut and removed, the airconditioning system is totally inoperable, the windows are inoperable, the pneumatic system that opens and closes the doors is totally inoperable (to enter and exit the car, the doors had to be forced up by hand and then propped up with broom handles), just to mention a few defects. In its present condition, I doubt that the automobile is worth $2,500. This service was provided merely an an accomodation to Mr. McSpadden and was not related to any legal representation of him.

Mr. McSpadden further requested that I investigate obtaining the return of property he alleged was in the possession of his last wife, Mrs. Juanita McSpadden. To that end a General Power of Attorney was drawn for his signature. See copy of General Power of Attorney attached hereto, marked Exhibit "K" and made a part hereof. Mr. McSpadden subsequently revoked his Power of Attorney on January 21, 1992. See copy of letter and Withdrawal of Power of Attorney attached hereto, marked Exhibits "N" and "O", respectively, and made a part hereof. Mr. McSpadden, in his letter of February 13, 1992, Exhibit "R", represented that he was going to provide me with a new Power of Attorney, which, of course, he never did. Therefore, I was without any authority to act on his behalf, had I agreed to do so, after January 1992. Again, this service was provided merely an an accomodation to Mr. McSpadden and was not related to any legal representation of him.

Mr. and Mrs. McSpadden had been living in a house on Rio Hondo Road, Harlingen, at the time of the dissolution of their marriage. Mrs. Juanita McSpadden, and her children, moved from that residence, leaving Mr. McSpadden in possession. Mr. McSpadden failed or refused to make the house payments, thereby resulting in the repossession of the property by the lender and the abandonment thereof by Mr. McSpadden. After Mr. McSpadden's trial, I visited that house. I found it unsecured and open. There was no furniture, appliances, dishes, bedding, etc. in the house. Various items of clothing, papers, Soldier of Fortune magazines, "girlie magazines", etc. were strewn about the floors. Additionally, the kitchen contained dozens of empty prescription bottles that had contained medicines usually prescribed for persons with

033

Mr. Gilbert R. Lazo
June 22, 1992
Page Thirteen

bipolar mood disorders, more commonly referred to as "manic-depressive". Again, this service was provided merely an an accomodation to Mr. McSpadden and was not related to any legal representation of him.

If Mr. McSpadden is a manic-depressive, that would explain his attempted suicide. Further, coupled with his possession of a penile prosthesis, it could explain his seeming psychosexual disorder. These were matters that I was not aware of until after the trial.

Mr. McSpadden informed me that he had asked Mr. Pace to secure the Rio Hondo property. I spoke with Mr. Pace who informed me that when he arrived at the property, he found it in the same condition that I later found it in. Also, since the property had been foreclosed upon, he found no need to secure the property.

Mr. Pace had further advised me that Mr. McSpadden had moved at some time to a house on Bass Boulevard. I visited that house. The premises were secured, however, by looking through the windows I could see that the house was empty of furniture, clothing, etc. I contacted the real estate broker whose sign was on the property and was informed that Mr. McSpadden had been a "squatter" on the property. Mr. McSpadden had told me that he had given "some guy" $100.00 cash to allow him to move in, no receipt. The out-of-town owner claimed to have no knowledge of Mr. McSpadden's occupancy of the house until Mr. McSpadden's arrest (one of the investigators for the District Attorney was a relative of the owner). The real estate salesman advised me that there had been some property put in the barn to the rear of the house. He further provided me with a key to the barn to inspect the property. Again, there were papers, clothing, etc. strewn about the concrete floor. They had obviously been there for months because they were wet, mildewed and stank. Inasmuch as I was there merely as an accommodation to Mr. McSpadden, I did not sort through the stinking mess. Again, this service was provided merely an an accomodation to Mr. McSpadden and was not related to any legal representation of him.

At some time after the conclusion of the trial, Mr. McSpadden's brother telephoned me to inquire as to Mr. McSpadden's status. During that conversation I asked his brother if he believed Mr. McSpadden to be capable of raping and sodomizing a child. He responded without any hesitation that in his opinion his brother was capable of such acts. He further advised me that his brother had been in trouble all of his life and was an embarrassment to the McSpadden family. Perhaps that explains why Mr. McSpadden retired from the U.S. Army with only the rank of Sergeant First Class.

\* REFER TO EXHIBIT "13" LINES 7 THRU 12 FOR REBUTTAL.

034

Mr. Gilbert R. Lazo
June 22, 1992
Page Fourteen

As to the remainder of Mr. McSpadden's allegations, I refer you to the following correspondence and the marked statements therein:

1.　Letter from Mr. McSpadden dated December 3, 1991, copy attached hereto marked Exhibit "L" and made a part hereof;

2.　Letter from Mr. McSpadden dated January 14, 1992, copy attached hereto marked Exhibit "M" and made a part hereof;

3.　Letter from Mr. McSpadden dated January 20, 1992, copy attached hereto marked Exhibit "N" and made a part hereof;

4.　Letter from Robert J. Banks dated February 9, 1992, copy attached hereto marked Exhibit "P" and made a part hereof;

5.　Invoice dated February 9, 1992, copy attached hereto, marked Exhibit "Q" and made a part hereof;

6.　Letter from Mr. McSpadden dated February 13, 1992, copy attached hereto marked Exhibit "R" and made a part hereof;

7.　Letter from Mr. McSpadden dated February 14, 1992, copy attached hereteo, marked Exhibit "S" and made a part hereof; and

8.　Letter from Mr. McSpadden dated February 17, 1992, copy attached hereto, marked Exhibit "T" and made a part hereof.

From the inception of Mr. McSpadden's cases, until the present, he has not paid any money for legal services. The truck and the car he tries to make so much of has a value, at the most, of approximately $4,000 to $4,500. That amount is less than one-half of his outstanding legal bill. I would be appreciative of any money which Mr. McSpadden may proffer in "partial payment" (as he alleges), of his outstanding bill. In Mr. McSpadden's letters of February 13, 1992 and February 17, 1992, Exhibits "R" and "T", respectively, he represents that he is going to commence paying on his account with my office, which, of course, he has never done.

In Mr. McSpadden's letter of May 30, 1992 to the Grievance Committee he states that he is "unable to hire an attorney to assistance (him) in this matter or (his) retrial paperwork.". I would only point out that at the time of his arrest, Mr. McSpadden was receiving at least

035

Mr. Gilbert R. Lazo
June 22, 1992
Page Fifteen

military retirement pay, and continues to do so even though he is being supported at State expense. He is by no means indigent. If Mr. McSpadden is unable to retain the services of any attorney, it is due to the lack of merit of his cause(s).

As a further indication of Mr. McSpadden's duplicity, I refer you to his letter to Mr. Barnard dated January 5, 1992, Exhibit "U". He represents to Mr. Barnard that he has requested me to pay Mr. McSpadden's outstanding bill with Mr. Barnard. However, the enclosed correspondence from Mr. McSpadden to me fails to support that statement, nor does he allege that he provided me with any money with which to pay Mr. Barnard.

My letter to Mr. McSpadden of February 9, 1992 unequivacably advises him that I no longer represented him. Subsequent to the expiration of his appeal period, I had neither a legal nor a moral obligation to pursue any matter on behalf of Mr. McSpadden. However, merely as an accommodation I attempted to assist him, even setting aside my personal feelings about a person who would commit the heinous crimes that he was convicted of.

Mr. McSpadden's grievance rambles on about "connections" between me, Judge Robert Garcia and the grandfather of one of his victim's; that me, Judge Robert Garcia (who was not the trial judge) and others were "linked", resulting in him being "railroaded"; and about "friends" of his who have contacted me. Mr. McSpadden has not provided any facts concerning the foregoing upon which I can formulate a response. If the Committee desires my response to Mr. McSpadden's comments, I will need the specifics of his allegations. Further, I imagine Judge Garcia would welcome the opportunity to respond to any allegations of wrongdoing on his part.

The bottom line to Mr. McSpadden's grievance is twofold. First, he is striving to abrogate any responsibility he has to pay his legal bill(s). Second, it is obvious that one of the jailhouse lawyers in prison with him has advised him that if he can sell "ineffective assistance of counsel" that could form the basis for a new trial. Mr. McSpadden is not uneducated in the use of the law since he claims that he has been a police officer and in law enforcement for many years.

If the Committee desires any additional information, please contact me.

Sincerely,

Robert J. Banks

Enclosures

c: Mr. Robert J. McSpadden

036

Invoice submitted to:

Mr. Robert J. McSpadden
TSC No. 600096
W.P. Clemens Unit
6901 N.E. 24th Avenue
Amarillo, Texas 79107

February 9, 1992
#151
In reference to: State vs. McSpadden, Cause No. 91-CR-887/888/889-C

|  | HOURS | AMOUNT |
|---|---|---|
| 09/06/91-Telecon Glen Barnard, discuss case | 0.50 | 60.00 |
| 09/09/91-Reviewed court files | 1.00 | 120.00 |
|     -Initial conference with client at Detention Center | 1.00 | 120.00 |
| 09/12/91-Court appearance - arraignment | 1.00 | 120.00 |
| 09/16/91-Conference with Assistant District Attorney, re: discovery | 1.50 | 180.00 |
|     -Obtain copy of divorce file (Case No. 90-11-7392-A) from Clerk's office | 1.00 | 120.00 |
|     -Conference with client at Detention Center | 1.00 | 120.00 |
| 09/17/91-Telecon M.C. Newland, re: witness | 1.00 | 120.00 |
|     -Telecon Brendan Hall (attorney for E.M.S.), re: witnesses | 0.50 | 60.00 |

037

EXHIBIT "2"

CMcPDF - www.fastio.com

Case 1:94-cv-00289   Document 26   Filed in TXSD on 07/10/1997   Page 28 of 55

| February 9, 1992 | HOURS | AMOUNT |
|---|---|---|
| 09/17/91-Telecon Ed Pace, re: witness | 0.50 | 60.00 |
| -Telecon Mrs. Paschall, re: witness | 0.50 | 60.00 |
| 09/18/91-Telecon Travis Bodenhamer, re: interview of state's witness | 0.50 | 60.00 |
| 09/20/91-Preparation of Jury Voir Dire and Opening Statement | 2.50 | 300.00 |
| 09/23/91-Legal research | 6.00 | 720.00 |
| 10/09/91-Preparation of Defendant's Motion For Production and Inspection of Evidence Which May Lead To Exculpatory Evidence | 1.00 | 120.00 |
| 10/11/91-Court appearance - announcement | 1.00 | 120.00 |
| -Conference with client at Detention Center | 1.00 | 120.00 |
| 10/12/91-Telecon Mrs. Paschall, re: providing clothes for trial, preparation of letter to Sheriff's Department | 0.30 | 36.00 |
| -Preparation for examination of witnesses, review file, etc. | 6.00 | 720.00 |
| 10/13/91-Legal research and preparation of Defendant's Trial Motion Number One | 2.00 | 240.00 |
| -Legal research and preparation of Defendant's Motion In Limine Number One | 2.00 | 240.00 |
| -Preparation of Defendant's Jury Election | 0.50 | 60.00 |
| -Preparation of Defendant's Application For Felony Probation From The Jury | 0.50 | 60.00 |
| 10/14/91-Court appearance - trial | 8.00 | 960.00 |

CMsPDF - www.texmo.com

Mr. Robert J. McSpadden                                    Page 3

|  | HOURS | AMOUNT |
|---|---|---|
| 10/15/91-Court appearance - trial | 8.00 | 960.00 |
| -Preparation of Defendant's Requested Charge Of The Court To Be Submitted To The Jury | 1.00 | 120.00 |
| -Preparation of Defendant's Motion for Instructed Verdict | 1.00 | 120.00 |
| 10/16/91-Court appearance - trial | 8.00 | 960.00 |
| 10/17/91-Court appearance - trial | 6.00 | 720.00 |
| 10/18/91-Court appearance - arraignment on Cause No. 91-CR-888-C, conference with Assistant District Attorney | 2.00 | 240.00 |
| 10/19/91-Legal research and preparation of Defendant's Plea of Former Conviction in Bar | 3.00 | 360.00 |
| 10/21/91-Court appearance - Cause No. 91-CR-888-C, confer w/A.D.A., judge and client, review Agreement Not To Appeal (Cause No. 91-CR-887-C) | 4.00 | 480.00 |
| 10/22/91-Preparation of Powers of Attorney and Change of Address | 1.00 | 120.00 |
| 10/23/91-Conference with client at Detention Center | 1.00 | 120.00 |
| 10/28/91-Telecon Glen Barnard, re: truck/property recovery | 0.30 | NO CHARGE |
| 11/01/91-Review of State's Motion to Dismiss (Causes No. 91-CR-888-C and 91-CR-889-C) | 0.30 | 36.00 |
| 11/04/91-Telecon Ferguson Motors, re: storage of automobile | 0.50 | NO CHARGE |
| 11/06/91-Inspection of house on Rio Hondo Drive | 1.50 | NO CHARGE |

639

CibPDF - www.fenrir.com

Mr. Robert J. McSpadden                                      Page 4

|  | HOURS | AMOUNT |
|---|---|---|
| 11/06/91-Conference with investigator (review of case) | 1.50 | 180.00 |
| 11/08/91-Telecon Ed Pace, re: automobile recovery | 0.30 | NO CHARGE |
| 11/12/91-Telecon Tommy Graham's, re: towing of automobile | 0.30 | NO CHARGE |
| 11/14/91-Recovery and storage of automobile | 1.00 | NO CHARGE |
| 11/22/91-Recovery, cleaning and storage of truck | 1.50 | NO CHARGE |
| 11/28/91-Inspection of house on Rio Hondo Road | 1.00 | NO CHARGE |
| 11/29/91-Conference with investigator (re: Melanie and Jane Wright) | 1.00 | 120.00 |
| 12/04/91-Inspection of house on Bass Boulevard | 1.00 | NO CHARGE |
| 12/06/91-Telecon Realtor, re: house on Bass Boulevard | 0.30 | NO CHARGE |
| 12/09/91-Pick up and return key, inspection of house and warehouse on Bass Boulevard | 1.50 | NO CHARGE |
| 12/10/91-Reviewed client's letter dated 12-3-91 | 0.30 | 36.00 |
| 01/14/92-Reviewed client's letter to Glen Barnard dated 1-5-92 | 0.30 | 36.00 |
| 01/21/92-Reviewed client's letter dated 1-14-92 | 0.30 | 36.00 |
| 01/27/92-Reviewed client's letter dated 1-20-92 | 0.30 | 36.00 |
| 01/31/92-Telecon Bill McSpadden, re: review of case | 0.70 | NO CHARGE |

040

CImPDF - www.fesite.com

Mr. Robert J. McSpadden                                    Page 5

|                                              | HOURS | AMOUNT |
|----------------------------------------------|-------|--------|
| 02/09/92-Wrote letter to client             | 1.00  | NO CHARGE |
| For Professional Services Rendered          | 90.70 | $9,576.00 |

Additional Charges:

| 11/16/91-Replacement of starter, etc. on automobile |  | 132.00 |
|-----------------------------------------------------|--|--------|
| 12/02/91-Towing fee paid to Tommy Graham's          |  | 60.00  |
| Total costs                                         |  | $192.00 |
| Total amount of this bill                           |  | $9,768.00 |
| Balance Due                                         |  | $9,768.00 |

Robert McSpadden's Statement
September 12, 1991
Cameron County Detention Center

We were separated twice 15 Feb 90 - 12 Jul 90 and permanently on 27 Oct 90. If either

girl had anything on me, they would have told their mother then.

My exwife was always bragging to everyone about her relationship with her daughters.

she always claimed they were more like sisters and were always having discussions of their

problems and goals. They were always private away from me, so they could talk freely. They

were always told to talk to her about any problems. And they would go to her, before they

would go to a stranger.

Carrie and I didn't get along very well. She was lazy and a compulsive liar. Her mother

let her get away with everything. If I was working in the yard and came in for a glass of tea

and sat down to rest, she would call her Mother at work and tell I was just setting around. If

I told her to do a household chore or that she couldn't go out, instead of waiting til her Mother

got home, she would call her at work. As trivial as this is, do you think she would hesitate if

I asked her to take her clothes off and touched her? Also she was trained by her Mother that

if I started an argument with her Mother, that she was to call the Police. Which she did on a

regular basis.

Sherry was very precocious and forward. She was caught at least twice, naked with the

boy and girl next door. Hawkins. They were experimenting sexually and twice Sherry made

sexual moves on me. Both times I reported this to my wife and she said she would talk her.

Janie let Sherry and the other two girls watch X-rated movies all the time. I told her it wasn't

042

EXHIBIT "3"

good for them. It was after the movies that Sherry would ask explicit questions or make statements. After watching Bettlejuice, she came to me, pulled on my shorts, grabbed my penis and said "Let me see how big you are". And after another X movie she pulled open her towel and said "theres more where that came from". I immediately told my wife and she said she would talk to her, and not to make too much of it.

Melanie is my real daughter, her Mother and I were divorced when she was 18 months old and she never spent time with me until she was 17. She made a statement in a class report, that I raped her. But under investigation it was a step-uncle. And Janie talked with my exwife and was told by her and my daughter, that I had never touched and she had lied.

Just a few weeks prior to our final separation Janie had a conference with her daughters and questioned them extensively about any sexual contact of any kind, with me. Even if I had made any sexual statements to them. They all swore that I hadn't done anything of a sexual nature with them. I wasn't present for any of this.

Character Witnesses

| | | |
|---|---|---|
| Bill Astin | HGN EMS | 428-3078 |
| Leonard Colier | "     " | |
| Jay Garner | PHS RGN 8 | |
| M C Newland | 428-8032 | |

M C Newland is a psychologist talked with Janie and the girls about 18 Dec 90 for 3 or 4 hours. And some of this was resolved (revealed?)

McSpadden Statement - September 12, 1991 - Page 2

043

FORM #15

# IN THE NAME AND BY THE AUTHORITY OF THE STATE OF TEXAS

THE GRAND JURORS, for the County of Cameron, State aforesaid, duly organized as such at the   JULY

Term, A. D. 19 91 , of the     197TH Judicial District Court                              in and for

said County, upon their oaths in said Court, present that   ROBERT MCSPADDEN


hereinafter called Defendant ,

on or about the      15TH           day of        JUNE                       A. D One Thousand Nine

Hundred and     EIGHTY-EIGHT           and anterior to the presentment of this indictment, in the County of

Cameron and State of Texas, did then and there unlawfully   intentionally and knowingly cause

Defendant's sexual organ to penetrate the female sexual organ of SHERRY CORKHILL, a

child then and there younger than fourteen years of age and not the spouse of the

Defendant,


against the peace and dignity of the State.

John D Quill

Foreman of the Grand Jury

91-CR-887 -C

044

EXHIBIT "4"

FORM #55

# IN THE NAME AND BY THE AUTHORITY OF THE STATE OF TEXAS

THE GRAND JURORS, for the County of Cameron, State aforesaid, duly organized as such at the JULY

Term, A. D. 19 91 , of the ___197TH___ Judicial District Court ___in and for___

said County, upon their oaths in said Court, present that   ROBERT MCSPADDEN

hereinafter called Defendant ,

on or about the   29TH   ___day of___   OCTOBER   A. D One Thousand Nine

Hundred and   NINETY   and anterior to the presentment of this indictment, in the County of

Cameron and State of Texas, did then and there unlawfully intentionally and knowingly cause

Defendant's sexual organ to penetrate the female sexual organ of SHERRY CORKHILL, a

child then and there younger than fourteen years of age and not the spouse of the

Defendant,

against the peace and dignity of the State.

_John DaSmith_
Foreman of the Grand Jury

91-CR-888-C

O45

Case 1:94-cv-00289   Document 26   Filed in TXSD on 07/10/1997   Page 36 of 55

# IN THE NAME AND BY THE AUTHORITY OF STATE OF TEXAS

THE GRAND JURORS, for the County of Cameron, State aforesaid, duly organized as such at the  JULY

Term, A. D. 19 91  , of the  197TH  Judicial District Court                                              in and for

said County, upon their oaths in said Court, present that  ROBERT MCSPADDEN


hereinafter called Defendant ,

on or about the  17TH  day of  FEBRUARY  A. D One Thousand Nine

Hundred and  NINETY  and, anterior to the presentment of this indictment, in the County of

Cameron and State of Texas, did then and there unlawfully  with the intent to arouse and gratify the

sexual desire of the Defendant, engage in sexual contact by touching with his hand

the breast of CARRIE CARMONA, a child younger than seventeen years of age and not the

spouse of the Defendant,


against the peace and dignity of the State.

_____John D. Quill_____
Foreman of the Grand Jury

91-CR-889 -C

044

EXHIBIT " 6 "

LAW OFFICES OF

# BRENDAN HALL

ATTORNEY AT LAW

BRENDAN HALL
BOARD CERTIFIED
CIVIL TRIAL LAW
TEXAS BOARD OF LEGAL SPECIALIZATION

1221 E. POLK
P. O. BOX 2725
HARLINGEN, TEXAS 78550

210/428-3986
FAX
210/425-3244

November 15, 1993

Mr. Robert McSpadden
600096
9601 N.E. 24th Avenue
Amarillo, Texas   79107

Re:  Your letter of November 6, 1993

Dear Mr. McSpadden:

I received your letter of November 6, 1993 regarding statements apparently attributed to me by your attorney, Robert Banks.  I did not tell Mr. Banks that Mr. Aston and Mr. Collier couldn't say anything good about you, nor did I tell him that you were "fired from EMS for alcohol abuse".  I have no knowledge of your habits regarding alcohol and certainly did not discuss that with Mr. Banks.  Since you were not fired by EMS for alcohol abuse, I would have no reason to say that.

I also spoke to Mr. Aston and Mr. Collier regarding Mr. Banks' apparent claims that they refused to testify because they "couldn't say anything good" about you.  Both of them deny having said that to Mr. Banks.

I am sorry to hear that you have been given incorrect information regarding these matters.  I can understand your desire to clear your name and wish you the best of luck in that regard.

Very Truly Your,

BRENDAN HALL

BH/eav

047

EXHIBIT "7"

Yo Bob:

I'm trying to find out what happened to the BLS check you returned to Chris Lawrence. I'm sorry about our failure to fill in the written amount, but I'm pretty sure the amount is correct.

BLS policy is to reimburse instructors for food, lodging and mileage — there is no honorarium or salary for instructors. As soon as I get in contact with Chris to track the check down, we will complete the original check or issue a new one and send it to your account.

I'm sorry this is taking so long, but Chris and I both travel a lot and stay pretty busy, and it's just hard to make connections. Take care.



**TEXAS DEPARTMENT OF HEALTH**
**PUBLIC HEALTH REGION 8**
**601. W. SESAME DRIVE**
**HARLINGEN, TEXAS 78550**

4UA-4

Robert

BOB MCSPADDEN
600096 CLEMENT
6901 N.E. 24 AVENUE
AMARILLO TEXAS 79107-9998

048

EXHIBIT "8"

February 9, 1992

Mr. Robert J. McSpadden - 600096
W.P. Clemens Unit
6901 N.E. 24th Avenue
Amarillo, Texas 79107

     Re:   *State vs. McSpadden*, Cause No. 91-CR-887-C, Cameron County, Texas

Dear Mr. McSpadden:

     I apologize for the delay in responding to your letters.  However, it has taken a considerable amount of time to investigate the matters you inquired about.

     The following is the status of your case and your property as best I can determine at this time.

     House - Rio Hondo Road:  The house on Rio Hondo Road has been foreclosed upon by the lender.  I inspected the premises twice.  The first time, the house was unsecured and the interior looked as though it had been trashed.  There were clothes, books, papers, etc. strewn everywhere.  I made no attempt to sort through the mess.  The second time I inspected the house, I found it clean and secured.  The lender was obviously preparing the property for sale.

     When the property has been sold, the lender will credit the proceeds of the sale against your mortage balance, increased by the foreclosure costs.  In the event the sale does not bring enough money to pay the foregoing sums, the lender can file suit against you and your ex-wife for the balance owed.

     House - Bass Boulevard:  The house on Bass Boulevard has been turned over to a Realtor for sale.  I inspected those premises twice.  The first time, the house was secured, clean and contained some pieces of furniture, i.e., couch, chair and several tables.  There was no personal property in the house.  The warehouse building to the rear of the house was secured and I could not gain entry.

049

Mr. Robert J. McSpadden
February 9, 1992
Page 2

I contacted the Realtor and inquired as to the dispostion of your property. I was informed that what property had been in the house was moved to the warehouse building to the rear of the house. The Realtor provided me with a key to that building, and I subsequently inspected the contents. At the time I inspected the second time, the building was unsecured. The building contained two large farm tractors, a junked automobile, a refridgerator, clothing and personal/financial records.

The tractors, obviously, were not your property. The junked automobile did not seem to have any value. The refridgerator contained moldy food and I do not know whether it operates or not.

The clothing and the personal/financial records seemed to be yours. They had been thrown on the concrete floor where they had become damp and started to mildew. The clothing consisted primarily of EMS uniforms with some sport shirts and slacks. The personal/financial records were such a mess that I did not go through them. I left all of the property where it was and notified the Realtor that the building was unsecured.

The Realtor maintains that you were a "squatter" on the property, and as such there is no duty owed to you to preserve or protect your property. The Realtor was aware of where you are before I spoke with him.

Truck: I recovered the truck from Glen Barnard. The interior of the truck smelled from all of the mildewed clothing, blankets, sheets, etc. I had the truck cleaned and the mess disposed of. The truck is presently in a storage area. However, the insurance on the truck has expired and the truck is presently uninsured. I will not, of course, be responsible for any loss of, or damage to, the vehicle.

During the clean-up of the truck, there were two American Express credit cards recovered. One is in the name of Nannette Gillit and the other is in the name of A.D. Clark. Please advise me as to the addresses of these people so that I can return their cards to them.

Automobile: I recovered the automobile from Ed Pace. Prior to my seeing the automobile, I had arranged with a local automobile dealer to place the automobile on his showroom floor as a means of protecting it. Inasmuch as the automobile was uninsured, and that there was something wrong with the engine in that it would not start, I arranged to have it towed to the dealer. Upon my inspection, it was obvious that the automobile could not be put

Mr. Robert J. McSpadden
February 9, 1992
Page 3

on display. In appearance, it was a disaster. The automobile would not start and it was necessary to replace the starter and some wiring before it could be moved again.

The automobile was moved to a storage area. I had a mechanic inspect the automobile and he advised me that the pneumatic system needed replacement, the bearing seals in the engine were leaking profusely, the electrical wiring was a nightmare, the fiberglass body was deteriorating, the interior was mildewing due to the rain leaking in through the window frames and there was a major electrical short in the wiring system that had destroyed the battery.

The automobile is presently uninsured and I will not, of course, be responsible for any loss or damage.

Camper: I have never seen the camper, however, I believe Ed Pace has been storing it.

Glen Barnard: Mr. Barnard sent me a copy of your letter to him dated January 5, 1992. I advised Mr. Barnard that you had not requested of me that I pay him the money you owe him. I further advised him that I was not in possession of any funds of yours with which to pay him. Neither Ed Pace nor anyone else has given me any money on your behalf.

Mr. Barnard gave me a ring of keys, a monthly calendar with telephone numbers in it and a bottle of pills. I have the keys and the calendar. I disposed of the medicine. Mr. Barnard has not given me any other property of yours.

Your letter to me of January 14, 1992 was the first time that you advised me that Glen Barnard, or the Sheriff, had your wallet, gun and money. However, pursuant to your letter of January 20, 1992, I have not involved myself in this matter.

Stolen Guns, etc.: The list of the guns, etc. you gave me as having been stolen was filed with the Harlingen Police Department. Without any evidence, they cannot seek a search warrant to search your ex-wife's residence. They can only wait until a check is made on one of the guns for some reason and it is found to be reported stolen. If you have any evidence that Sherry's mother, or anyone on her behalf, entered your property and removed your guns, etc., it should be forwarded to the Harlingen Police Department. However, pursuant to your letter of January 20, 1992, I will proceed no further with this matter.

051

Mr. Robert J. McSpadden
February 9, 1992
Page 4

Property awarded in divorce:  Mr. Barnard was your attorney of record in the divorce. It was my understanding from you, and from your letter of January 5, 1992 to Mr. Barnard, that he was representing you in the matter of obtaining the property from your ex-wife that was awarded to you in the divorce settlement.  I have no information on the status of that property.

Jane Wright:  I have had an investigator contact Mrs. Wright concerning Melanie and her testimony at your trial.  The investigator informs me that Mrs. Wright basically confirms what you told me regarding Melanie having recanted her previous testimony that you had raped her when she was a child.  Mrs. Wright further verified that on Melanie's visits with you, Melanie's brother, your son Robert, Jr., accompanied Melanie.  Mrs. Wright spoke with Robert, Jr., concerning Melanie's testimony and Robert, Jr. stated that he was not with Melanie all of the time during her visits with you, that there were periods when he was not in the house and that you and Melanie could have been alone.

We have asked Mrs. Wright to keep us informed as to Melanie's actions, and particularly her continued association with Sherry's mother.  Until such time as Melanie or Sherry either retract their testimony, or someone is found in whom Melanie, Sherry or Sherry's mother have confided that they lied, we can only search for witnesses and wait and watch.

I recently spoke with your brother, Bill.  He advised me that he and Robert, Jr. were going to arrange to visit you.  He also advised me that Melanie and Sherry's mother had visited a storeroom where you stored some items of personal property.  Sherry's mother gained entry via a key to the lock.  She and Melanie removed some of the items.  I was not aware that you had any property in storage.  If Bill's statement is accurate, you may wish to have someone file a theft report with the police.  A charge of theft against Melanie may improve her memory.

Your brother, Bill, also advised me that Robert, Jr. wanted to confront Sherry's mother and recover your guns, etc.  I strongly advise against that.  I have no doubt that Sherry's mother would immediately telephone the police and tell them that the son of the man who had raped her child was there threatening them.  I do not need to tell you what would happen in that event.

I assume from your letter of January 20, 1992 that you do not want me to represent you any further in this matter.  That is solely up to you.  I have notified the investigator to cease work on the case.  Inasmuch as you have withdrawn your power of attorney, I can no longer act in your behalf in the matter of the recovery of your property, etc.  I will advise the people with whom I am in contact in this matter that I no longer represent you.

Mr. Robert J. McSpadden
February 9, 1992
Page 5


I have enclosed herewith my final bill in this matter. As you are aware, I did not insist that you pay a retainer in advance nor have I been paid any money to date for legal services. The enclosed bill is due and payable upon receipt.

I wish you the best of luck on getting a new trial and on the subsequent retrial. These cases are extremely difficult in trial, and even more difficult to overturn.

With best regards, I remain,

Very truly yours,



Robert J. Banks

RJB:cdp

Enclosure

653



# HARLINGEN PEDIATRICS ASSOCIATES

### 2226 HAINE DRIVE
### HARLINGEN, TEXAS 78550
### (512) 425-8761

STANLEY I. FISCH, M.D.
ERNEST S. HOLMES, IV, M.D.
THOMAS S. SPURGAT, M.D.

HELEN HALL
R.N., M.S.N., C.F.N.P.
DAVID H. LESTER, M.S.W., C.S.W.
SANDRA B. TOVAR, R.N., P.N.P.

PROGRESS NOTE

NAME:  Sherry Corkill
HPA#:  1815-01
DATE:  4/16/91

HISTORY:  This 7 year old child was brought to the office by
her mother for an examination about possible sexual abuse.
Her mother, Janie McFadden, called me yesterday evening and
discussed her concerns with me by telephone.  This visit had
already been arranged but the mother wanted to have a chance
to talk to me before the visit in order to explain what she
was concerned about.

Mrs. McFadden and her three girls ages 7, 12, and 15 now
live apart from Mrs. McFadden's husband.  They left his home
at the end of October 1990.  Mother was not aware at that
time nor was she aware until very recently that there might
have been any sexual abuse.  Apparently the mother found out
about possible sexual abuse indirectly through a friend whom
her daughter had spoken to about being molested.

Sherry was at first somewhat reticent but was able slowly to
describe the events in question.  She relates that during
1990 on more than one occasion her stepfather, while at home
with her, and at times with other members of the family in
the household, forced her to undress and then undressed
himself.  He fondled her and had penile penetration of her
vagina and anus.  She related that afterwards she hurt and
was uncomfortable.  Her stepfather told her not to tell her
mother and vaguely threatened her if she did so.  Sherry
also stated that her 12 year sister was touched on the
breast by her stepfather but that she had slapped him and
walked away from him.  Sherry saw part of this from hiding
and heard the exchange of the slap.

EXAMINATION:  Patient was cooperative on the most part for
the examination.  She was very ticklelish and examination of
her abdomen and perineum was made difficult by her laughing.
She was able however finally to relax and permit inspection
of the perineum.  This revealed a somewhat normal appearing
vaginal introitus with an open hymenal ring.  No scars or
tears were observed, and there was no discharge or bleeding.
Overall the introital tissues appeared to be somewhat mature
for her age.

Inspection of the anus revealed no tears or scars and there
was no discharge or bleeding.

INFANT, CHILD AND ADOLESCENT CARE AND CONSULTATION

054

EXHIBIT "10"

Sherry Corkill
Progress Note
Page 2

IMPRESSION: Sexual Abuse by History and consistent with
findings on physical examination.

RECOMMENDATION: Mother was advised to continue the process
she has already begun of formal complaint to police and
Child Protective authorities.   In addition, I recommended
that she herself begin immediately to undergo some
psychological evaluation and counseling and that through her
she bring the girls into this process at the appropriate
time.  At the present time, her oldest daughter is extremely
angry at her for not protecting the children properly as she
sees it and the mother is feeling of course guilty about
this as well as many other aspects of this entire situation.
Outwardly, Sherry does not appear to be depressed nor overly
angry or hostile about what has happened to her, and she
continues to function well in school.

Stanley I. Fisch, M.D.

SIF: bg

055

Case 1:94-cv-00289   Document 26   Filed in TXSD on 07/10/1997   Page 46 of 55

| PATIENT NAME: Sherry Corkill | DOB: 7-14-83 | HPA #: 1815-1 |
|---|---|---|

DATE 4-16-91   WT. 75 1/2   HT. 50 1/4   FOC 74c.

TEMP:      PULSE:      BP: 93/48   RESP:

**REASON FOR VISIT:** Physical exam

| EXAMINATION | * | DESCRIPTION | * | [√ = Normal   x = Abnormal   0 = Not Examined] |
|---|---|---|---|---|
| Appearance | | | | |
| Head | | | | LAB: |
| Eyes | | | | |
| Ears | | | | |
| Nose | | | | |
| Mouth/throat | | See attached | | DX: Sexual abuse |
| Neck | | | | |
| Nodes | | Note | | |
| Chest/lungs | | | | |
| Heart | | | | |
| Abdomen | | | | RX: |
| GU | | | | |
| Extremities | | | | |
| Skin | | | | |
| Neuro/Dev | | | | FOLLOW-UP: |

**ADDITIONAL NOTES:**

By:   SF      ESH   HHH   ST

---

DATE      WT.      HT.      FOC

TEMP:      PULSE:      BP:      RESP:

**REASON FOR VISIT:**

| EXAMINATION | * | DESCRIPTION | * | [√ = Normal   x = Abnormal   0 = Not Examined] |
|---|---|---|---|---|
| Appearance | | | | |
| Head | | | | LAB: |
| Eyes | | | | |
| Ears | | | | |
| Nose | ! | | | |
| Mouth/throat | | | | DX: |
| Neck | | | | |
| Nodes | | | | |
| Chest/lungs | | | | |
| Heart | | | | |
| Abdomen | | | | RX: |
| GU | | | | |
| Extremities | | | | |
| Skin | | | | |
| Neuro/Dev | | | | FOLLOW-UP: |

**ADDITIONAL NOTES:**

By:   SF      ESH   HHH   ST

© 1990 Harlingen Pediatrics Associates, Inc.

056

# IN THE DISTRICT COURT OF CAMERON COUNTY, TEXAS

### _197th_ JUDICIAL DISTRICT

THE STATE OF TEXAS    )
          )
VS.         )   No. _91-CR-888-C_
_Robert Mc Spadden_  )
          )

## MOTION TO DISMISS

TO THE SAID HONORABLE COURT:

  Now comes the State of Texas by and through her Assistant District Attorney and moves the Court to dismiss the above entitled and numbered cause for the reason that:

  _____ 1. The evidence is insufficient
  __✓__ 2. The defendant was convicted in another cause _91-CR-887-C_
  _____ 3. The complaining witness has requested dismissal
  _____ 4. The cause has been re-indicted and refiled
  _____ 5. Case dismissed — operation of law (P.C. 12.45)
  _____ 6. Subsequent investigation shows defendant is a juvenile
  _____ 7. Indictment alleges alternative counts, defendant pleaded guilty to one count
  _____ 8. Multi-count indictment, defendant pleaded guilty to one or more counts
  _____ 9. Necessary witness(es) cannot be located
  ____10. Evidence suppressed or suppressible
  ____11. Other

and for cause would show the Court the following:

FILED _____ O'CLOCK ____ M
AURORA DE LA GARZA, DIST. CLERK
OCT 21 1991
DISTRICT COURT, CAMERON COUNTY, TEXAS
BY _____ DEPUTY

Respectfully submitted,

_____
Assistant District Attorney

## O R D E R

  The above entitled and numbered cause is hereby dismissed on the foregoing motion for the reasons herein above stated.

  ENTERED this the _21st_ day of _October_, 19 _91_.

_____
J U D G E

10/21/91 COPIES TO:
HON ROBERT BANKS
D.A.'s OFFICE
SHF.'s OFFICE

RECEIVED
NOV 01 1991

FILED _____ O'CLOCK ____ M
AURORA DE LA GARZA, DIST. CLERK
OCT 21 1991
DISTRICT COURT, CAMERON COUNTY, TEXAS
BY _____ DEPUTY

057

EXHIBIT " "
_11_

Case 1:94-cv-00289   Document 26   Filed in TXSD on 07/10/1997   Page 48 of 55

# IN THE DISTRICT COURT OF CAMERON COUNTY, TEXAS

## _____ 197th _____ JUDICIAL DISTRICT

THE STATE OF TEXAS          )
                            )
VS.                         )          No. 91-CR-889-c
                            )
Robert M. Spadlen           )

### MOTION TO DISMISS

TO THE SAID HONORABLE COURT:

Now comes the State of Texas by and through her Assistant District Attorney and moves the Court to dismiss the above entitled and numbered cause for the reason that:

_____ 1. The evidence is insufficient
___✓___ 2. The defendant was convicted in another cause   91-CR-889-c
_____ 3. The complaining witness has requested dismissal
_____ 4. The cause has been re-indicted and refiled
_____ 5. Case dismissed — operation of law (P.C. 12.45)
_____ 6. Subsequent investigation shows defendant is a juvenile
_____ 7. Indictment alleges alternative counts, defendant pleaded guilty to one count
_____ 8. Multi-count indictment, defendant pleaded guilty to one or more counts
_____ 9. Necessary witness(es) cannot be located
_____10. Evidence suppressed or suppressible
_____11. Other

and for cause would show the Court the following:

Respectfully submitted,

_____
Assistant District Attorney

### O R D E R

The above entitled and numbered cause is hereby dismissed on the foregoing motion for the reasons herein above stated.

ENTERED this the 21st day of _October_, 19 91

10/21/91 COPIES TO:
HON ROBERT BANKS
D.A.'s OFFICE
SIF.'s OFFICE

_____
JUDGE

EXHIBIT "."
12

058

Bob,

We haven't given up, but I have been working three jobs to make up for being out of work for a year.

I still need you to order the court records. They won't release them to us without your request.

I talked to Bill and he didn't say that it was your lawyer. Remember, this is the lawyer who took your truck and the Buick too. He is only concerned about his money, and how much he can get from you. Respect the records and we will see what we can do with them soon.

Meta

When the time
does come to celebrate,
and it will,
I'll be celebrating
right along with you.
Meanwhile, I hope you know
I'm here for you
and I always wish
good things for you.

Don, love and family.

EXHIBIT "13"

Name of ~~Complainant~~    Address    Phone No.

Ed Pace    1-512-943-4630

Offense

PO BOX 2~~n~~1,  S. Padre Is, Tx  78597

~~DETAILS OF OFFENSE, PROGRESS OF INVESTIGATION, ETC.:~~
~~(Investigating Officer must sign)~~

Page No. ①    Date 2-13-92
THURSDAY

DEAR BOB,

GOT YOUR MOST Recent Letter ON TUESDAY.
I GOT TWO PREVIOUS LETTERS FROM YOU AND ANSWERED
BOTH. I SENT $200°° TO YOUR COMMISSARY ACCOUNT
I THINK IT WAS EARLY JAN. I CALLED THEM AND THEY
SAID YOU GOT IT. I AM SENDING ANOTHER 200°° FRIDAY, 14 FEB
[ I GOT TO THE BASS BLVD HOUSE THE DAY AFTER I TALKED
TO YOU AND THE HOUSE WAS POSTED BY NO TRESPASSING SIGNS
AND DOORS WERE ALL SEALED. I WAS ABLE TO TELL ALL YOUR
STUFF WAS INSIDE - LAWN TRACTOR & TRAILER WERE NO WHERE
TO BE FOUND. YOUR TV'S WERE THERE AND A LOT OF
CLOTHING - PIANO - THINGS ON MANTLE. MICROWAVE ETC.
ALSO A LOT OF BOXES IN GARAGE. I GOT HOLD OF BANKS -
He went out and SAID THE PLACE WAS EMPTY, SO I SUPPOSE
THE LANDLORD CLEARED IT ALL OUT. I CHECKED W/ THE
NORTH AMERICAN STORAGE AND GAVE THEM YOUR ADDRESS
YOU OWE $3100.95 AS OF 20 JAN 92. YOU HAVE $10,000 LBS
OF STORAGE AND IT COST $250°°/MONTH TO STORE IT. THEY
WERE GOING TO NOTIFY YOU OF THE FACT THEY WERE GOING
TO AUCTION IT ALL OFF SOON.

060

EXHIBIT "14"

Page No. ②                    Date _____

BANKS HAS YOUR PICK-UP I DON'T KNOW WHERE?
I HAD YOUR CAR BUT BANKS HAD IT TOWED — SAID
HE WAS GOING TO HAVE Ferguson MOTORS CLEAN IT UP
AND DISPLAY IT IN THEIR SALES ROOM. THAT WAY IT
WOULD BE OUT OF WEATHER AND SAFER I STILL HAVE
YOUR CAMP TRAILER IF YOU WANT ME TO SELL IT AND
SEND YOU THE MONEY LET ME KNOW + GIVE ME
A PRICE. I'LL ALSO NEED SOME KIND OF PAPERS.
OTHERWISE I'LL JUST KEEP IT FOR YOU. 20. (I ASKED
BANKS HOW MUCH YOU OWED HIM AND COULD I GIVE
HIM A DOWN PAYMENT AND MONTHLY PAYMENTS AND
HE SAID NO. HE WOULD HANDLE THAT I THINK
HE WANTS TO BEAT YOU OUT OF YOUR CAR + TRUCK.
IF POSSIBLE GET IT CLEARED SO I CAN PICK THEM
BOTH UP.)

        Lucy AND I KNOW A GOOD LAWYER IN
HOUSTON A MR. PINK WHO SPECIALIZES IN
CRIMINAL DEFENSE. I AM GOING TO WRITE TO ~~first~~
HIM IN YOUR BEHALF. I WILL ALSO ON FRIDAY
CONTACT THE LAWYER YOU MENTIONED AND HAVE

Page No. (3)                                                    Date _____

her CONTACT You. I also tried to talk to you
on the phone - I got the WARDEN THEN a
BLock OFFiCER AND THEN a STONe WAll THEY
SAID no INComing CAlls AND onnY (1) out going
EACH 90 days. WHAT is the SITUATION FOR
IN PeRSoN VISITS. ITs A long shoT BUT
WE MAY Be ABle to get up THAT WAY. I AM
WORKing it 7:00 AM 5 NITES A week AND still
WORKing ABOUT 45-50 hOURS DURINg THe DAY.
As OF 22 FeB I STARt CodE enforcement DUTY
FoR spring BREAK 8/hes/DAY so I'll get
MORE Rest. There is a 50/50 chance I'll
Be Chief of Police iN LAgUNA VISTA ABOUt THE
MIDDle OF MARCH- JusT A chance— Billy is
Deputy Chief PARk RANger. Now. With A Big heAd.
    Will close for now – MY ADVISE ABOUT BANKS
is to DUMP Him As soon As POSSIBle.
    HANg ON AND HopE, BOB NO MATTER How
HARD IT IS, WE Believe iN You AND THiNk YOUR LUCK
is going to CHANge.      YOUR FRiend  EJ PAqUA

Mon
4/29/02

Dear Bob,

Got your letter. You had a appointment of 2004
I'm your local account. I

Today about storage. $150.
A call from north ... They
Here is the deal we struck. They
They wanted 1/2 of what only
is owed ($4200 owed as of now.)

Could only down $300 per day
would accept 300 per
till I get the $300 to them...
I delivered the first $300

Finally got an agreement
for $1500 down the $1500.00/month
Until they are paid up.
$250 of the 500 each month
would go to current storage
fees and $250 toward retiring
the fees owed at this time.

to pay 4/29/02 monthly
and got a receipt I will
Deal out $300 each day
on Tue-Wed-Thur-Fri
And drive to Harlingen each
afternoon to deliver. I hope
This meets with your

That is the only deal we
would take. So I went for
it.

approval. It's the only thing
They would buy. It's soon
as we can we need to get
the stuff out and into Harlingen

06-3

**III**

STORAGE UNIT somewhere at 80-100 per month. They Charged Your office 1500 for fixing And Changing them 250/month Since picking them out high. But the Buttons hurtful US over to Barrell. I will BE Talking to Banks tomorrow— on Supposedly he'll Be available then. I will try to get Back Your car and TRuck. I have an agent he will try to keep them. We could try to sell Your TRAiler to pay off the storage. Fee to get out from under that 250 a month. Give me some TRO Lights on this Avo it so

**IV**

An Asking and asking price. I went Back to the Jail This evening about Your Stuff there— I talked to them Last week, They said Your stuff was there. I didn't have Your keys when I when I went Back many Times couldn't find me stuff. I'm calling the Supervisor (my contact before to see if he has the stuff In A special place. Will let you know as soon as I know. Meanwhile I'll A/so let you know what I find out from Banks

Space will be next to
Steve but they are supposed
to tell me when I go over
w/ 300 Tomorrow.

P.S. long Lucy
To bring one else wait
to call me.

512-943-4530

More Soon

FILED
MAY 5 1994
U.S. DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS

065