52

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JAN 3 0 2001

Michael N. Milby
Clerk of Court

**ROBERT JOE MCSPADDEN**

**V.**                                          **CIVIL ACTION NO. B-94-289**

**GARY JOHNSON, DIRECTOR**

### Brief in Support of Writ of Habeas Corpus

TO THE HONORABLE JUDGE OF SAID COURT:

### Introduction and outline.

This court, by order of November 8, 2000 has requested specifics in support of the claim for relief based on trial errors. We will respond to this request with the convention of describing a series of fact and law specifics on each of the critical stages of the process, evaluating the effectiveness of counsel, that led to the judgment against Mr. McSpadden. However, before beginning this listing, we wish to describe in narrative form the cross examination of the defendant in this case. Overall, the failure of trial counsel to subject the case to a meaningful adversary testing process may constitute a denial of due process and establish a per se violation of defendant's right to effective assistance of counsel. United States v. Cronic, 466 U.S. 648 (1984). This court should consider not only individual errors, but also the cumulative effect in light of the totality of the circumstances that results from multiple acts and omissions. Strickland v. Washington, 466 U.S. 668 (1984); Crisp v. Duckworth, 743 F. 2d 580 (7th Cir. 1984); Nealy v. Cabana, 764 F. 2d 1173 (5th Cir. 1985); Hollines v. Estelle, 569 F. Supp. 146 (W.D. Tex. 1983). Finally, then, we will list facts and authorities based on traditional Strickland standards. We urge that a proper of reading of Strickland, is not merely to see whether trial counsel was ineffective, but to look at the issue behind this: whether the trial was unfair. An unqualified judge, a personally involved prosecutor, a loss of record by clerical staff, a biased juror or any number of other factors, beyond the control of trial counsel may cause an unfair trial.

Accordingly, the outline of this brief is as follows:

1. The unfair trial as demonstrated by an overview of the cross examination of Mr.McSpadden.
2. Legal authority demonstrating errors created by the cross examination of Mr. McSpadden.
3. Pretrial ineffectiveness.

4. Trial ineffectiveness.
    a. Voir dire related ineffectiveness.
    b. Opening statement ineffectiveness.
    c. Defense evidence ineffectiveness.
        i. Pediatric expert testimony.
        ii. Expert regarding suggestive influences on children's victim testimony.
        iii. Failure to advise on the hazards of the defendant testifying.
    d. Failure to move for a mistrial.
    e. Witness rule related ineffectiveness.
5. Sentencing ineffectiveness.
6. Appellate ineffectiveness.
7. An unfair trial constitutes "cause" for the purpose of addressing procedural bars to a writ.
    a. Conflict of interest.
    b. Fundamental miscarriage of justice.

## 1. The unfair trial as demonstrated by an overview of the cross examination of Mr. McSpadden.

Proffer: If Mr. McSpadden has an opportunity to testify, he will state that he was unable to gather the documentation which would have prevented his impeachment because of his incarceration and his attorney, Mr. Banks, as far as he knows made no effort to obtain them. Moreover, he will testify that Banks spent very little time with him in preparation for trial, about two hours, and gave no caution or legal counsel of the risks of testifying in this case.

The prosecutor had a personal stake in the outcome of the case because his own daughter was one of the outcry witnesses. This involvement prevented him from being able to approach the case with a detachment that would see that justice is done. The emotional and personal involvement of the prosecutor were manifested in a trial by personal characterization and name-calling, rather then a fair trial based in the evidence.

The first person Sheri Corkill said she told was the daughter of the prosecutor. On cross-examination Mr. Banks elicited:

8    Q    Okay. When did you tell anybody about that?

9    A    The first time was Alexis. She is my first person to ask the time I found out that Joe Valle was a lawyer, and I thought maybe he could help or something like that.... Vol II, p. 152

15    Q    (by Mr. Banks:) Okay. Now who was the first person you told?

17   A   Alexis Valle.

18   Q   And who was that?

19   A   That is Joe Valle's daughter. Vol II, p. 152.

Mr. Valle was a prosecutor in the case who presented state's witnesses and conducted the cross-examination of the defendant.

A hearing is necessary to determine the extent of Mr. Valle's personal involvement with the facts of the case. In particular, were he and the defendant neighbors? What did he learn or believe he learned from his daughter and other neighborhood talk? Was not he a likely fact witness in the case and would he have been privy, therefore, to potentially conflicting testimony available for cross-examination? Was he shielding his own daughter from testifying in the case? Why was witness Lynn Rayme represented to be (by the government for purposes of disclosure required under Texas Rule of Evidence 38.072 ) (Vol. II, pp. 104-107) the outcry witness, that is, the first person to whom the act was reported. Texas requires that a prosecutor not merely seek a conviction, but rather, see that justice is done. Was Mr. Valle in a position to do this?

Valle's anger is palpable, even from a reading of the cold record, and it results in a trial by insult and bigotry.

Valle makes an <u>ad hominem</u> attack early in his examination:

16   Q Well, you seem to be a Rambo type. You are a — what did you say? Vol. 3, p. 41.

Valle followed this characterization by a challenge that Mr. McSpadden had fabricated his military record:

21   Q (By Mr. Valle:) Aren't you? Tell me about your military accomplishments. What were you?

23   A Ranger, Special Forces.

24   Q Do you have any proof of that or are we just supposed to believe you? Did you bring with you a certificate of any kind? Vol. 3, pp 41-42.

The judge overrules the objection to this question without an inquiry as to whether Valle had a good faith belief Mr. McSpadden did not, in fact, have the military record he claimed. We urge the question, without a good faith belief that McSpadden was lying, was improper. A hearing is necessary to determine whether Valle had any good-faith basis for challenging the veracity of the military record. The judge should have required at least a representation from Valle that he had reason to doubt the record. Banks should have done an investigation to be able to support his incarcerated client on this issue.

3

Valle himself challenges Banks effectiveness in investigation of the case. Mr. McSpadden says, "I usually don't carry certificates around, plus I am in jail right now, sir."

Valle replies:

16   Q (By Mr. Valle:) Well, sir, you have an attorney here that can do the work for you, or are you lying to us, sir?  Vol.3, p. 42.

By this time, Banks gives up on objecting, probably judging correctly, the judge will lend no aid.

Valle then questions Mr. McSpadden about other offenses both indicted (Keri (Carrie) Vol.3, p. 43) and unindicted (Melanie Vol. 3, p. 45). This, without objection. And again later (Melanie on page 68), drawing an objection.

Valle makes himself a witness as to the color of Mr. McSpadden's pubic hair by his assertion, after Banks offers Valle an inspection:

17   MR. VALLE: No, he's got white hairs.

A hearing is necessary to determine whether, in fact, Mr. Valle had the personal knowledge to resolve this issue and whether the allegation is true. Mr. McSpadden urges that the representation was false at the time and remains false.

Valle makes a plea for racial prejudice. When Mr. McSpadden insists he wants a clean house, Valle pounces:

11   Q   Oh. Were you interested in having a Mexican maid to help you around the house or what?

No one had mentioned "Mexicans" before in trial. McSpadden's jury consisted of ten people with Hispanic names, Vol 5, pp 15-16, plus Hispanic a judge and prosecutors. Injection of race was particularly harmful, but not only did it not draw an objection, but Valle was allowed to underline the attack:

23   Q   No, sir. That is not what I asked you. You re telling this jury here, one Mexican woman with two Mexican daughters and one little one couldn't keep a home clean? Vol 3, p. 54
1    A   The whole thing is —
2    Q   No, sir. Yes or no, they couldn't keep the home clean for you, could they? Vol 3, p.55.

Still, no objection, so Valle becomes gratuitously insulting:

4

9       Well didn't you know how to do your own laundry when you were serving in the Special
        Services. Vol 3, p. 55.

This time Banks does object, but to no avail. The judge observes, "It is cross examination. The
objection is overruled. Go ahead." Vol. 3, p. 55, ll. 16-17.

        Valle then moves, with no showing of a basis in good faith, to ask the questions to challenge
whether Mr. McSpadden had actually attended seminars of the police academy as he claimed. Vol.
3, p. 56. Again, no objection, no protection from the judge requiring a showing of good-faith that
there was a basis to ask the question, and no investigation that would allow Banks to support his
incarcerated and beleaguered client.

        The cross examination is now wildly out of control. Valle begins questioning by veiled insult
and <u>double entendre</u> on the meaning of the word, "enjoy:"

10      Q       You enjoyed having Sheri in this area of the house, didn't you?

15      Q       ...Is that the only place you enjoy kids is inside the house or what?

18      Q       Where do you also enjoy kids?

20      Q       You particularly enjoyed Sheri inside this house, didn't you?

24      Q       So, you enjoy kids now inside and outside of the house?  Vol 3, p.65.

Finally, Banks objects that the question is ambiguous.  Vol 3, pp65-66.

Valle persists: "I want to find out where he enjoys kids, Judge, outside the house or inside the
house." Vol 3, p. 66, ll 2-3.  Banks now cross talks to Valle, the judge reprimands Banks, Banks
apologizes and McSpadden gets no relief.

Valle continues the game:

12      Q       (By Mr. Valle:) You enjoy kids inside the house.
5.      Q       You enjoy kids outside the house.  Vol. 3, p. 66.

Valle conducts  his entire cross examination with a character smears and name-calling:

McSpadden is "is a Mr. Rambo type."  (Vol. 3, p. 41).

McSpadden went to dirty movies in the army.  (Vol. 3, p. 44)

McSpadden was married six times.  (Vol. 3, p. 46)

5

McSpadden was in a psychiatric ward. (Vol. 3, p. 68)

McSpadden is not a Christian, does not go church and disliked his family being Catholic. (Vol 3, p.69)

McSpadden is "Mr. Strong Physical Person." (Vol. 3 p. 70 l. 18.).

McSpadden is "Mr. Macho Man." (Vol. 3. P. 70, l. 20).

It should be noted that the name-calling, though suited for cross examination was not limited to that stage of the trial. On final argument in sentencing, he calls McSpadden a "monster." Vol. 5, p. 13. Ll 4-5.

**2. Legal authority demonstrating errors created by the cross examination of Mr. McSpadden.**

    a. A prosecutor's misconduct in acting as both witness and prosecutor may be so egregious and prejudicial to a fair trial as to undermine confidence in its outcome and an evidentiary hearing will be required to determine whether the habeas corpus petition had cause for procedural default in failing to object at trial to the misconduct of the prosecutor in acting as both a witness and prosecutor. Walker v. Davis, 840 F. 2d 834 (11th Cir. 1988).

    b. Trial counsel's failure to object, exclude or limit cross examination testimony which improperly allows other offenses into the case amounts to ineffective assistance. Lyons v. McCotter, 770 F.2d 529 (5th Cir. 1985); United States v. Anderson, 933 F2d 1251 (5th Cir. 1991); United States v. Hitt. 981 F. 2d 422 (9th Cir. 1992).

    c. Trial counsel's failure to object to prejudicial testimony which was used to inflame minds of jury constitutes ineffective assistance. Vela v. Estelle, 708 F. 2d 954 (5th Cir. 1983).

    d. Failure of defense counsel to request mistrial, when the courts would have granted one for remarks by the prosecutor within the hearing of the jury concerning past inadmissible acts constitutes ineffective assistance. Nero v. Blackburn, 597 F. 2d 991 (5th Cir. 1979).

    e. Due process is denied when the court or government contribute to an unfair trial, for example, by allowing untrue testimony to be uncorrected. Faulder v. Johnson, 81 F3d515 (5th Cir. 1996); Goodwin v. Johnson, 132 F3d 162 (5th Cir. 1997); United States v. Deters, 143 F3d 577 (10th Cir. 1997).

**3. Pretrial ineffectiveness.**

Proffer: If allowed to testify Mr. McSpadden will state that Mr. Banks interviewed only one government witness before trial and that one by testimony. Moreover, he saw no evidence of pretrial investigation whatsoever and the time spent discussing the case with Banks was minimal. In particular, there was no investigation of potential conflicts from the prosecution arising from the fact that Mr. Valle's daughter was the true outcry witness. Because of inadequate investigation this fact was not learned until the time of testimony. Additionally, Banks failed to interview potentially

6

exculpatory witnesses before trial given to him by petitioner, in particular Ms. Jane Wright.

Petitioner urges a hearing is necessary to determine what, if any, pretrial investigation and research was conducted by Banks.

a. Trial counsel's failure to file any pretrial motions on defensive issues, failure to seek pretrial discovery, and failure to obtain a transcript of testimony before the grand jury warrant an evidentiary issue to resolve the ineffectiveness of counsel claim. Clark v. Blackburn, 619 F.2d 431 (5th Cir. 1980).

b. Trial counsel's failure to prepare for trial, conduct pretrial discovery, file pretrial motions and motion for a new trial compounded with other errors, may constitute ineffective assistance of counsel. Kemp v. Leggett, 635 F.2d 453 (5th Cir. 1981); Holiness v. Estelle, 569 F. Supp. 146 (W.D. Tex. 1983); Rummel v. Estelle, 498 F. Supp. 793 (W.D. Tex. 1980).

c. Trial counsel's failure to move the court for funds for independent expert witness constitutes ineffective assistance. Loyd v. Smith, 889 F. 2d 1416 (5th Cir. 1990); Loyd v. Whitley, 977 F.2d 149 (5th Cir. 1992).

d. Defense counsel must investigate and interview witnesses and be familiar with the laws and facts of the case in order to provide effective assistance. Bryant v. Scott, 28 F. 3d 1411 (5th Cir. 1994); United States v. Burton, 575 F. Supp. 1320 (E.D. Texas 1983); Ex Parte Gallegos, 511 SW2d 510 (Tex. Cr. App. 1974).

e. Trial counsel's failure to subpoena certain witnesses at the government's expense on behalf of his indigent client, required and evidentiary hearing to resolve the ineffectiveness of counsel claim. Friedman v. United States, 588 F. 2d 1010 (5th Cir. 1979).

**4. Trial ineffectiveness.**

**a. Voir dire related ineffectiveness.**

Proffer: If Mr. Banks were to testify, based on a previous written statement he has made regarding the facts of the case, he would state: "The trial commenced on October 14, 1991 with the selection of the jury before Judge Darrell Hester. Judge Hester        initially questioned the jury, then allowed each side approximately twenty minutes of their voir dire....During the voir dire, one of the jury panel questioned as to whether the child victim was Hispanic. It was explained that the child victim was Hispanic, Mr. Mc Spadden being anglo. The judge struck the proposed juror for cause." The written statement of Banks is attached as exhibit "A." The referenced portion is on page four.

We are unable to determine from the record whether no record was made of the voir dire or it has been lost. In either event, the petitioner was failed to be protected in his review of the case. This

issue may be resolved by a hearing.

A timely request creates a mandatory requirement for a record of all trial proceedings and failure to grant the request results in a reversal, even in the absence of a showing of harm. <u>Froyd v. State</u>, 628 S.W.2d 866 (Tex. App. – Corpus Christi, 1982).

Where through no fault of the appellant, significant parts of the trial transcript are unavailable, reversal is required, even without a showing of harm, because these are needed to show harm. <u>Pierre v. State</u>, 2 S.W.3d 439 (Tex. App. – Houston [1st Dist.] 1999, pet. ref'd).

The harm petitioner wishes to investigate includes whether racially discriminatory peremptory challenges were used by the prosecutor, <u>Power v. Ohio</u>, 499 U.S. 400 (1991), whether any juror was disqualified by law, <u>Franklin v. State</u>, 12 S.W. 473 (Tex. Crim. App. 2000), and whether prejudicial matters were injected during voir dire examination, Morrow v. State, 753 S.W.2d 372 (Tex. Crim. App. 1988). Any of these violations would require reversal.

Limitation of the voir dire to even as long as 45 minutes is reversible error if trial counsel has not wasted his allotted time and there are proper areas of inquiry that have not been explored. <u>Rios v. State</u>, 4 S.W.3d 400 (Tex. App.-- Houston [1st Dist.] 1999, pet. granted); <u>Tobar v. State</u>, 874 S.W.2d 87 (Tex. App. – Copus Christi 1994, pet. ref'd).

### b. Opening statement ineffectiveness.

Trial counsel failed to describe any of the facts of the case on opening statement, but only discussed legal theories. Trial counsel's failure to make opening arguments, compounded with other errors, may constitute ineffective assistance. United States v. Hammond, 425 F.2d 597 (D.C. Cir. 1990). The purpose of opening statements is to acquaint the jury with the facts they expect to prove. <u>United States v. Ramirez</u> , 367 F.2d 813 (7th Cir. App. 1966).

### c. Defense evidence ineffectiveness.

#### i. Pediatric expert testimony.

Dr. Stanley Fisch was the state's first witness. Vol 2, pp. 20-31. He rendered a series of opinions regarding the physical evidence. Because the complaining witness testified afterward, the defense was deprived of an opportunity to test discrepancies between the testimony of the complaining witness and the opinions of the pediatrician. The better practice would have been to produce an independent pediatric expert. Failing this, at least counsel should have recalled Dr. Fisch after the conclusion of the factual witnesses. Defense counsel failed to object to excusing the doctor as a witness. Failure to challenge this assertion was harmful in that Dr. Fisch found no scarring, "Looking at the vaginal opening and the tissues surrounding it, I found that the appearance looked

8

undisturbed. There were no signs of certainly recent injuries such as tears, scars, bruises, damage of that kind." (Vol 1, p.23  1.3-6). Also, the doctor testified that although there was a hymenal opening, the tissue surrounding it was present. (Vol 1, p. 23, l. 17-18). And that this type of opening "can be a normal anatomical situation. That can be just how a normal girl's hymen is built."(Vol. 1, p. 28, l. 18-19). Then afterward, the complaining victim repeatedly testified to facts that implied full-penetration of an adult penis on many occasions. Vol 2, p. 142 and 146). McSpadden was left without a reply that would test the discrepancy for lack of an available expert witness. Examples of learned treatises that both support the factual innocence argument of Mr. McSpadden and make reference to articles available to trial counsel at the time of trial are attached as exhibits "B," "C," "D," "E," and "F."

Trial counsel's failure to object to lack of corroborating evidence may constitute ineffective assistance. Summit v. Blackburn, 795 F. 2d 1237 (5th Cir. 1986).

Failure to develop facts that show the complaining witness in a rape case has given testimony contrary to the physical evidence is ineffective assistance of counsel requiring evidentiary hearing. Vick v. Lockhart, 952 F.2d 999 (8th Cir. 1991).

A charge involving indecency with a child must be corroborated to give sufficient evidence to sustain a conviction. Hernandez v. State, 750 S.W. 2d 902 (Tex. App. Corpus Christi 1988)

### ii. Expert regarding suggestive influences on children's victim testimony.

The government produced witness offering expert opinions, Jerry Amaya, psychologist working for Tropical Texas Mental Health and Mental Retardation. This witness gave characterizations of "regressed offenders" and "fixed offenders" and then extrapolated the petitioner, Mr. McSpadden, was within the category of "regressed offender." Defense counsel established that these opinions appeared to have no basis in scientific evidence that today would require a showing of testing a peer view, however no objection was made to the testimony. Vol 2, p. 96 ll 4-9. Defense counsel could not have been expected to foresee Daubert, but the reasoning in this case would at that time have provided a basis for cross examination and objection that was not made. Counsel offered neither reference to the literature for impeachment, nor another witness who would qualify as an expert in this murky area. The one witness he did call on the subject, Joellen Pascual, was not offered by the defense as a a qualified expert. Vol 2, p. 99, l. 17-19. When trial counsel attempted to elicit testimony by the witness as to her observations of the complaining witness in the hall, the judge threatened sanctions of contempt. Vol. 2 p. 101-102. Petitioner urges that a reading of the testimony of Amaya and Pascual show defense counsel lacked a rudimentary understanding of the subject matter that would permit an effective cross examination of Amaya and direct examination allowing either the qualification of Pascual as an expert or the selection of another expert.

9

Scientific opinions must be based on certain standards to guarantee reliability. <u>Daubert v. Merrell Dow Pharmaceuticals</u>, 113 S. Ct. 2786 (1993).

Trial counsel has a duty to familiarize himself with the specific scientific area in which an expert is needed may constitute ineffective assistance. <u>Stephens v. Kemp</u>, 846 F. 2d 642 (11th Cir. 1988).

Trial counsel's failure to retain an independent expert witness may constitute ineffective assistance. <u>Beasley v. United States</u>, 491 F. 2d 687 (6th Cir. 1974).

Failure to call an expert witness during trial may constitute ineffective assistance. <u>Anderson v. Butler,</u> 858 F.2d 16 (1st Cir. 1988).

If the trial court interferes with representation of the client by intimidation, the fairness of the trial is compromised and prejudiced is presumed without resort to the <u>Strickland</u> standard. <u>Wilson v. Mintzes,</u> 761 F 2d 275 (6th Cir. 1985); <u>Walberg v. Israel,</u> 766 F.2d 1071 (7th Cir. 1985); <u>United States v. Cross</u>, 977 F. 2d 732 (2nd Cir. 1992).

### iii. Failure to advise on the hazards of the defendant testifying.

McSpadden could only take the stand at great risk of impeachment in this case.

Defense counsel's failure to advise defendant of the serious ramifications of testifying may constitute ineffective assistance of counsel. <u>Pilchak v. Camper</u>, 741 F. Supp. 782 (W.D. Mo. 1990).

### d.  Failure to move for a mistrial.

The judge himself first appears to suggest a motion for mistrial. Vol 3, p. 102, l. 1. However, trial counsel fails to make the motion. Later, the judge asks point blank, "THE COURT: Okay. Do you want a declaration of a mistrial?" Vol. 3, p. 106, ll. 11-12. Inexplicably, considering the state of the trial, counsel replies, "No, your honor." Vol 3, p. 106. l. 13

Trial counsel's failure to move for a mistrial may constitute ineffective assistance. <u>Nero v. Blackburn</u>, 597 F.2d 991 (5th Cir. 1979).

### e.  Witness rule related ineffectiveness.

The trial court offered a mistrial because of witness violations of the Rule of Witnesses Tex. R. Crim. Evid. 613). The father of the complaining witness, Larry Corkill, had been in and out of the courtroom "more than five times yesterday and today" according to the judge and in

10

communication with other witnesses relating "what was occurring in the courtroom," according to trial counsel. Vol 3, p.106. The testimony of witnesses after the rule has been violated is error. <u>Webb v. State</u>, 684 S.W. 2d 802) (Tex. Crim. App. 1985).

### f. Final argument related ineffectiveness.

The prosecutor argued in final argument on sentencing, "I am asking you for the sentence of life in prison or ninety-nine years. Take your pick, because the way the Texas prison system is set out today, it is kind of ridiculous. You are in one door and out the next. It is a revolving door. These guys are going in and coming back out. It is terrible." Vol 5, p. 12, ll. 3-7. No objection. The prosecutor then explicitly invoked parole and told the jury, incorrectly when Mr. McSpadden would be released: "I will ask the minimum that you give this man if you don't want to give him ninety-nine years or life, sixty years. Sixty years is sixty years. By the time he is eligible for parole, at least it will guarantee Sheri Corkill that age. She will be just a little over an adult by then. At least by then, she will be an adult...." Vol 5, p. 12, ll. 19-24.

Trial counsel's failure to object to an argument by the prosecutor that invites the jurors to consider the possibility of parole constitutes ineffective assistance. <u>Valencia v. State</u>, 966 S.W.2d 188 (Tex. App. – Houston [1st Dist.] 1998); <u>Mendoza v. State</u> 840 S.W.3d 697 (Tex. App. – Corpus Christi 1992).

### 5. Sentencing ineffectiveness.

Proffer: Only one witness testified at sentencing, Mr. McSpadden. No witnesses were presented, involving petitioner's mental history or other mitigating evidence. Such witnesses were available.

Trial counsel's failure to present mitigating evidence of defendant's mental disease or defects, or of family members constitutes ineffective assistance of counsel and requires an evidentiary hearing. <u>Loyd v. Smith</u>, 889 F.2d 1416 (5th Cir.1990); <u>Loyd v. Whitley</u>, 977 F.2d 149 (5th Cir. 1992); <u>Martinez-Macias v. Collins</u>, 810 F. Supp. 782 (W.D. Tex. 1991).

### 6. Appellate ineffectiveness

Proffer: If Mr. McSpadden is allowed to testify, he will state that he was told by defense counsel that if he did not waive appeal the judge and prosecutor were threatening to try him on all of the extraneous offenses and stack the sentences, that is run them consecutively, to insure he would never get out of prison. McSpadden, despite errors in the trial, did not file a notice of appeal and waived his appeal because of this intimidation. If Banks is allowed to testify, he will describe the involvement of Valle and Judge Hester in the process as described in Exhibit "A" at pages 10 and 11: "On October 21, 1991, Mr. Valle approached me with a proposal that in trade for Mr.

11

McSpadden's agreement not to appeal the verdict in the first trial, the State would dismiss the two remaining charges against him.... Mr. McSpadden requested my advice on the agreement and I refused to comment as to whether he should or should not avail himself of it.... Mr. Valle then requested to speak with Mr. McSpadden. Mr. McSpadden agreed and the three of us met in one of the jury rooms. Mr. Valle explained the State's proposal, and the alternatives. I remained silent....Mr. McSpadden then advised me that he would accept the State's proposal, and I notified Mr. Valle."

The defense counsel is the best source for an unknowing defendant to learn his appellate rights and it is the duty of his lawyer to advise him of these rights. Government interference with these rights constitutes a *per se* violation of right to counsel. Shillinger v. Haworth, 70 F.3d 1132 (10th Cir. 1995); Harris v. Kuhlman, 601 F.Supp. 987 (E.D. New York 1985).

### 7. Ineffective assistance of counsel constitutes "cause" for procedural bar

#### a. Conflict of interest.

Proffer: If Mr. McSpadden is allowed to testify, he will state that his attorney Banks was involved financially with his ex-wife, Juanita Corkill, after McSpadden's conviction, in the sale of his truck and car and in assisting the renewal of military dependant status for his ex-wife after she had testified against him at trial.

Petitioner urges a hearing is necessary to determine whether Mr. Banks improperly represented Juanita Corkill after the conclusion of the trial of this case, and if so, if this was during a critical stage of the representation of Mr. McSpadden.

Trial counsel's conflict of interest may constitute cause for procedural default and demonstrate inability to act zealously in the defense of an accused. Jamison v. Lockhart, 975 F. 2d 1377 (8th Cir. 1992); Dawan v. Lockhart, 980 F.2d 470 (8th Cir. 1992); Bliss v. Lockhart, 891 f. 2d 1335 (8th Cir. 1989).

#### b. Fundamental miscarriage of justice.

Proffer: If Mr. McSpadden is allowed to testify, he will state that he was induced to waive his appeal by a representation to him by Mr. Banks, corroborated by a personal conversation with Mr. Valle, that the prosecutor and judge had agreed to try Mr. McSpadden repeatedly, stack the sentences and insure he would never be released from prison alive. The prosecutor, Mr. Valle, as described and Banks statement above, was allowed to speak directly to Mr. McSpadden and then Banks refused to advise him on the threat.

Proffer: The trial judge, Everardo Garcia, was not elected as a Texas state judge of general jurisdiction, that is, a District Judge. Rather, he was elected as a County Court of Law Judge with limited jurisdiction. Accordingly, he was not qualified by law to try Mr. McSpadden for a first

degree felony, nor did McSpadden consent to such a trial. If allowed a hearing, documentation of the constitutionally qualified courts may be presented to this court by public document and testimony.

Interference by the prosecutor with appellate rights may make compliance impractical and cause for procedural default. Murray v. Carrier, 477 U.S. 488 (1986). Government interference with these rights constitutes a *per se* violation of right to counsel. Shillinger v. Haworth, supra.; Harris v. Kuhlman, supra.

Trial by the wrong judge, that is the one without proper jurisdiction will void the judgment. Johnson v. State, 869 S.W.2d 347 (Tex. Crim. App. 1994); Saylors v. State, 836 S.W.2d 769 (Tex. App. – Waco 1992 pet. ref'd).

**Conclusion.**

Mr. McSpadden was tried by a County Court at Law Judge for a felony in which the outcry witness was the prosecutor's daughter, with an unprepared defense counsel in a case the entire record was not prepared. Despite receiving the maximum sentence from the jury, his case was not appealed because of threats personally delivered by the prosecutor with the alleged complicity of a judge who designed the terms of the waiver. An angry prosecutor ran over a weak defense lawyer who received no help from a constitutionally unqualified judge, after which clerical staff failed to prepare the record. The defense attorney was afterwards so concerned with disposing of McSpadden's property and the claims of his ex-wife that he may have become embroiled in a conflict. McSpadden was tried by racial and religious, and really, anti-military bias as a member of a racial minority in a courtroom and jury of the majority race. The heinous nature of the allegation drove the emotions of everyone involved, prosecutor, judge, defense counsel and jury to result in a judgment and sentence not corroborated by the physical evidence.

Petitioner urges a hearing and relief.

Respectfully submitted,
ROLAND E. DAHLIN II
Federal Public Defender
Southern District of Texas
Texas State Bar Number 05314000
Southern District of Texas No. 3198

By: _____

EDWARD A. STAPLETON III
Assistant Federal Public Defender
Attorney in Charge
Texas State Bar Number 19058400
Southern District of Texas No. 1501
600 E. Harrison Street, #102
Brownsville, Texas 78520
Telephone: (956) 548-2573
Fax: (956) 548-2674

## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of January, 2001, a copy of the Brief in Support of Writ

of Habeas Corpus of Petitioner Robert Joe McSpadden was mailed by U.S. mail to Caroline

Merchan, Assistant Attorney General, P.O. Box 12548, Austin, Texas 78711.

_____

EDWARD A. STAPLETON III
Assistant Federal Public Defender

14

June 22, 1992

Mr. Gilbert R. Lazo
Office of the General Counsel
State Bar of Texas
Suite 205
2302 South 77 Sunshine Strip
Harlingen, Texas 78550

      Re:   S2069200029  Robert Joe McSpadden - Robert J. Banks

Dear Mr. Lazo:

After having read Mr. McSpadden's grievance, I am of the opinion that it does not constitute a complaint recognizable by the Texas Disciplinary Rules of Professional Conduct. However, in order to lay this matter to rest, I am providing the following information.

On or about July 24, 1991 Mr. McSpadden was indicted in cases numbered 91-CR-887-C, 91-CR-888-C and 91-CR-889-C.  See copy of Indictments attached hereto, marked Exhibits "A", "B" and "C", and made a part hereof.  Arraignment on the Indictments was set for September 12, 1991.

Subsequent to September 2, 1991 I was contacted by Mr. Edward Pace who stated to me that Mr. McSpadden had requested that he contact me and request that I visit Mr. McSpadden at the Cameron County jail.  Mr. Pace further advised me that Mr. McSpadden had said that his present lawyer, Mr. Glen Barnard, was not diligently pursuing his case.

On or about September 6, 1991, I telephoned Mr. Barnard.  Upon speaking with Mr. Barnard, he advised me that he had not entered his appearance in the criminal cases and did not represent Mr. McSpadden, although he had visited Mr. McSpadden several times at the jail and had discussed representation.  He further advised me that he had previously represented Mr. McSpadden in recent divorce proceedings.  Inasmuch as he was having some difficulty in getting paid for his previous representation, he was not anxious to take on the expenses that the current representations would involve.

**EXHIBIT "A"**

Mr. Gilbert R. Lazo
June 22, 1992
Page Two

On or about September 9, 1991 I met with Mr. McSpadden at the Cameron County jail. Until that time, I had only a passing acquaintance with Mr. McSpadden. Mr. McSpadden assured me that the State did not have any evidence of criminal acts on his part. He claimed that the whole thing was a conspiracy between his ex-wife, her lawyer (Mr. Otis Klar) and Judge Euresti to "take him to the cleaners". I informed Mr. McSpadden that I would represent him at the Arraignment hearing scheduled for September 12, 1991. I further requested that he set down in writing his version of the incidents charged.

I appeared at the Arraignment hearing on behalf of Mr. McSpadden on September 12, 1991. After the hearing, I again met with Mr. McSpadden to review his version of the incidents charged. At that meeting, Mr. McSpadden gave me the written statement I had previously requested. See copies of Robert McSpadden Statement marked Exhibits "D" and "E" attached hereto, and made a part hereof.

On September 16, 1991 I conferred with Mr. Joe Valle, the Assistant District Attorney assigned to prosecute the charges against Mr. McSpadden. Mr. Valle permitted me open-file discovery. I reviewed the evidence, witness statements, etc. Mr. Valle intended to present to the juries. The State's case had been well prepared. As in most cases of this type, the credibility of the witnesses would be the deciding factor. At this time, Mr. Valle offered a plea bargain of fifteen years Texas Department of Corrections time in return for a guilty plea to one of the three charges on which Mr. McSpadden had been arraigned. The State would drop the other two charges. A plea for fifteen years would result in Mr. McSpadden being eligible for parole in approximately five years, or less.

The cases against Mr. McSpadden consisted of charges that during a period exceeding two years, he had repeatedly brutalized, raped and sodomized his minor stepdaughter. The child was approximately three years of age when the attacks commenced, and they continued until Mr. McSpadden's divorce approximately three years later. He was further charged with sexually molesting his teenage step daughter. Those charges alleged that he had told her to take off her blouse and he then grabbed her breasts, and that he exposed himself to her.

After my conference with Mr. Valle, I again met with Mr. McSpadden at the Cameron County jail. I advised Mr. McSpadden of the evidence and the witnesses against him. I further advised him of the State's plea bargain offer. Mr. McSpadden was advised that the State had a formidable case against him, and even in the event that all of the State's witnesses were found not to be creditable, the jury could convict him solely on the testimony of his victims. Again Mr. McSpadden began ranting that he was being "railroaded" and that no jury would believe the State's witnesses. He adamantly refused to discuss the State's plea bargain any further.

Mr. Gilbert R. Lazo
June 22, 1992
Page Three

On September 17, 1991 I began telephoning and interviewing the potential witnesses Mr. McSpadden had identified with the following results:

1.    The witness M.C. Newland, identified in Mr. McSpadden's statement of September 12, 1991 did not want to testify on behalf of Mr. McSpadden. She stated that she did not have any information that would assist Mr. McSpadden. She further stated that she knew Mr. McSpadden only through their brief association at Emergency Medical Services, that she was not a psychologist as Mr. McSpadden had represented to me, and that she had not discussed sexual abuse, or anything else, with Mr. McSpadden's ex-wife and stepchildren as he claimed in his statement of September 12, 1991.

2.    The witnesses, Bill Astin and Leonard Collier, refused to return my telephone calls. They referred the matter to Mr. Brendan Hall, Harlingen Emergency Medical Services' attorney. Mr. Hall telephoned me and explained that Messrs. Astin and Collier did not possess any information that would assist Mr. McSpadden. To the contrary, their testimony would only damage his case. Mr. Hall explained that Mr. McSpadden had been fired from Harlingen EMS' employ due to alcohol abuse and for Mr. McSpadden having attempted suicide. Mr. McSpadden was subsequently hospitalized in a Veterans Administration Hospital for treatment of his psychological and emotional problems.

3.    I was unable to locate the only other witness identified by Mr. McSpadden in his statement of September 12, 1991, Jay Garner. The only information Mr. McSpadden was able to supply me with was that Mr. Garner at one time had worked for the Public Health Service, Region 8. He would merely have been a character witness.

On September 17, 1991 I contacted Mr. Edward Pace who agreed to testify as a character witness on behalf of Mr. McSpadden. Mr. Pace did testify on behalf of Mr. McSpadden. He further testified that he was aware of Mr. McSpadden's suicidal tendencies. Mr. McSpadden did not furnish me with the name of this witness.

I also contacted Mrs. Jo Ellen Paschall, the Administratrix of University Preparatory School, on September 17, 1991. She agreed to testify as a fact/expert witness that it had been her experience that some children alleged sexual molestation when they were seeking revenge against one parent or the other, and that children had admitted to her that they had done so. She further agreed to testify on the believability of such children and that it was not a rare occurrence when they recanted their allegations. Mrs. Paschall did testify to such on behalf of Mr. McSpadden. Mr. McSpadden did not furnish me with the name of this witness.

Mr. Gilbert R. Lazo
June 22, 1992
Page Four

On September 18, 1991 I telephoned Mr. Travis Bodenhamer, one of the State's listed witnesses. Mr. Bodenhamer was the teenage son of a client of mine. Further, he was one of the only two State's witnesses whose testimony was unknown to me. Mr. Bodenhamer informed me that he was present when Mr. McSpadden drove up in front of his ex-wife's residence, the child victim saw Mr. McSpadden drive up, became hysterical and ran screaming to another neighbor's residence, Mr. Max Vasquez, banging on the door and screaming and crying to be let in. Mr. Vasquez was the other witness whose testimony was unknown to me until that time. Mr. Bodenhamer and Mr. Vasquez testified that the child victim became hysterical at the sight of Mr. McSpadden, that Mr. McSpadden had thrown some dishes out of his truck onto the street (or sidewalk), smashing them, and that when they confronted him, he became abusive and drove off at a high rate of speed. Mr. Bodenhamer did not come across well on the witness stand due to his age, teenager, and his constant smiling as though he enjoyed testifying. Mr. Vasquez, however, was an ex-law enforcement officer, college educated, and presented himself factually and with sincerity. On cross-examination Mr. Vasquez admitted that he would not allow his children to play unsupervised with the child victim due to having observed on one occasion their playing a game having explicit sexual overtones (the child victim was demonstrating with dolls how her father laid on top of her).

The Announcement hearing was held on October 11, 1991. After the hearing, I again met with Mr. McSpadden at the Cameron County jail. During this conference I asked him where his civilian clothes were, and I told him that I wanted him in a coat and tie at the trial. He told me that he did not know where his clothes were, that Mr. Pace had told him that he had been evicted from the house he was occupying and that the place was empty. Mr. McSpadden requested that I go to the store and buy him a new suit, shoes, etc. and charge it to his account with my office. I refused to do so inasmuch as Mr. McSpadden had not paid me any fee or other money to that date. I arranged for a borrowed suit, shoes, etc. to be delivered to him on October 13, 1991. See copy of letter attached hereto, marked Exhibit "F" and made a part hereof. When the trial commenced on October 14, 1991 I asked Mr. McSpadden why he was not dressed in the clothes that I had provided. He replied that they were too small, and that he was able to get some clothes at the jail. The trousers were too long, but since he was sitting behind the enclosed counsel table they could not be seen by the jury.

The trial commenced on October 14, 1991 with the selection of the jury before Judge Darrell Hester. Judge Hester initially questioned the jury, then allowed each side approximately twenty minutes for their *voir dire*. Inasmuch as the time allowed for *voir dire* is discretionary with the judge, the attorneys do not have any control over that element of the trial. During the *voir dire*, one of the jury panel questioned as to whether the child victim was hispanic. It was explained that the child victim was hispanic, Mr. McSpadden being anglo. The judge struck the proposed juror for cause. The remainder of the jury selection was uneventful.

Mr. Gilbert R. Lazo
June 22, 1992
Page Five

Judge Hester assigned the actual trial of the first case to Judge Everardo Garcia.

The State presented twelve witnesses. A synopsis of their testimony is as follows:

1.    <u>Officer Tina Saldivar</u>. Officer Saldivar was the initial investigating officer. She interviewed the child victims, witnesses, etc. Her testimony was merely foundational, leading up to probable cause for the arrest of Mr. McSpadden. I questioned her at length as to her experience in similar cases, her investigational techniques and her lack of investigation of the child victims and their mother, and why she focused immediately and exclusively on Mr. McSpadden. See copy of Investigator's Report attached hereto, marked Exhibit "G" and made a part hereof.

2.    <u>Mrs. Nancy Ramee</u>:  Mrs. Ramee testified that she overheard Sherry (the youngest of the child victims) telling some of her playmates that "she had been raped". Upon questioning by Mrs. Ramee, Sherry accused Mr. McSpadden of having raped and sodomized her over a several year period. Mrs. Ramee thus constituted the "outcry witness" required under the law. She further testified that she told Sherry to go tell her mother about this. When several days had passed and Sherry had not done so, Mrs. Ramee went to Sherry's mother and related to her what she had been told by Sherry. She was cross-examined on the probability of Sherry's merely "telling tall tales" to her playmates, influenced by similar events on television. Further, the possibility of Mrs. Ramee having unintentionally "suggested" matters to the child victim during her questioning of her was explored and emphasized.

3.    <u>Mrs. Juanita McSpadden</u>:  Mrs. Juanita McSpadden, the mother of Sherry, testified that she and Mr. McSpadden were recently divorced. She further testified that she had obtained an injunction against him being in the vicinity of herself, her children and their residence because of his violent behavior. She stated that upon being notified of Sherry's allegations against her ex-husband, she reported the matter to the police. She then took Sherry to a physician for an examination. Mrs. McSpadden is a nurse. On cross-examination, Mrs. McSpadden freely admitted that she hated Mr. McSpadden, was glad to be rid of him, and was not surprised at his present predicament. It was her opinion that Mr. McSpadden was psychotic. She further testified that Mr. McSpadden would go to the day-care center and the school where Sherry attended, pick Sherry up and take her home before anyone else in the family would arrive. Her bias and prejudice was established without difficulty.

4.    <u>Dr. Stanley I. Fisch</u>:  Dr. Fisch is the pediatrician who examined Sherry at the request of Mrs. McSpadden. He testified that he found physical evidence of vaginal sexual contact. On cross-examination, Dr. Fisch admitted that if he had not been told that Sherry had

Mr. Gilbert R. Lazo
June 22, 1992
Page Six

been sexually molested, he would not have found such to be a differential diagnosis. Dr. Fisch's testimony was probably neutral and did, perhaps, do more to assist the defense than the State. See copy of Medical Report attached hereto, marked Exhibit "X" and made a part hereof.

/0

5.  **Mr. Gerry L. Amaya:**  Mr. Amaya was employed by Tropical Texas in Harlingen.  He was presented as a psychologist who had examined and treated Sherry. However, under cross-examination he admitted that he had taken over the case from another psychologist who was no longer with the Center, that the other psychologist had, in fact, been the interviewing and treating psychologist, that he had interviewed the child victim for approximately thirty minutes, that the interview had been in the office of the Assistant District Attorney with the Assistant District Attorney present, and that he had no personal knowledge of the specifics of the child's case.

Mr. Valle advised me upon the completion of the first trial that in the next trial he would present the actual psychologist who had examined and treated the child victim.  That witness would testify as to the period of treatment the child underwent and as to her nightmares, etc. concerning the attacks.

6.  **Mr. Travis Bodenhamer:**  See above, at page four.

7.  **Mr. Max Vasquez:**  See above, at page four.

8.  **Ms. Lisa Gonzales:**  Ms. Gonzales was Sherry's teacher at the day-care center described above.  She testified that Mr. McSpadden came to take Sherry home, Sherry came to her and said that she was "scared" to go with him and did not want to go.  Inasmuch as Mrs. McSpadden had told her not to allow him to take the child, she therefore refused to allow him to do so.  She further testified that upon her advising Mr. McSpadden of this, he requested to talk to Sherry, and she further refused to allow that.  Upon cross-examination she admitted that it was not unusual for families undergoing marital crises to behave in this manner.

9.  **Ms. Vicki Galbreath:**  Ms. Galbreath testified that she was Sherry's first grade teacher at Treasure Hills Elementary in Harlingen, that Mr. McSpadden came to pick up Sherry, and that she would not allow him to leave with Sherry.  She further testified that he requested to speak with Sherry and she allowed him to do so.  She did not overhear the conversation, and Mr. McSpadden left.  Inasmuch as the testimony was ineffective, she was merely cross-examined on whether their were any restrictions in Sherry's files as to who could visit her.  Ms. Galbreath said there were none.

Mr. Gilbert R. Lazo
June 22, 1992
Page Seven

   10.   <u>Ms. Sherry Corkhill</u>:  Sherry is the natural daughter of Mrs. Juanita McSpadden by a marriage previous to her marriage to Mr. McSpadden.  Sherry was the youngest of the child victims in the offenses charged.  She testified that Mr. McSpadden had frequently and continuously from approximately June 1988 through the end of October or the beginning of November 1990 had vaginal and anal intercourse with her.  She testified as to where they were living at the time, to the times of day that it occurred, the rooms in the houses where the attacks occurred, the methods and places of penetrations, her pain and of Mr. McSpadden's promises of gifts and of his threats.  She testified as to the "slimy and yucky stuff" that came out of her after Mr. McSpadden finished.  Needless to say, her testimony was believable, and therefore, devastating to Mr. McSpadden's defense.

   A seven year old child cannot be cross-examined like an adult.  It was clear at the conclusion of her testimony that the jury believed her.  She was a precocious child, was attentive and aware and responded to questions on cross-examination with assurance and firmness.  She admitted that she had told her story quite a few times to quite a few people.  She was cross-examined as to her knowledge and belief of right and wrong, truth and lies.  She admitted that she did not like Mr. McSpadden, and gave as reasons his attacks on her and that she thought he was going to give her presents but he never did.

   Sherry identified Mr. McSpadden at trial without any hesitation or indication of fear.  When she was questioned about this on cross-examination she stated "that he is probably going to be put in jail, he can't do anything to me now.".  She further responded that "she dreams that Bob (McSpadden) would be in jail for ever and ever.".

   After some period of cross-examination it became obvious that Sherry's story was firmly implanted in her mind and it was not going to change.  Further, the impression that I was receiving from the jury was that they did not want me picking on this child any further, and to continue was simply implanting the little girl and her horror story more firmly in their minds.

   11.   <u>Ms. Carrie Carmona</u>:   Carrie is the other child victim referred to in the Indictments.  Carrie testified that Mr. McSpadden would expose himself to her when they were home alone.  This happened frequently since Mr. McSpadden was unemployed and was at home during the day when Mrs. McSpadden was at work.  She further testified that on one occasion he asked her to sit on his lap and remove her blouse so he could see her breasts, he wanted to see if they had grown.  She stated that upon removing her blouse he said "God they are growing.", and grabbed her breasts.  She then slapped him and moved away.  Sherry testified that she was hiding from Mr. McSpadden at the time, he did not know she was there, and she

Mr. Gilbert R. Lazo
June 22, 1992
Page Eight

saw him grab Carrie's breast and heard the slap. Upon cross-examination Carrie readily admitted a dislike for Mr. McSpadden, and further admitted that she had never liked him. When asked why she did not tell her mother, she stated that she did not want to cause any more trouble than there already was between her mother and Mr. McSpadden.

The defense timely objected, prior to Carrie's testimony, to Carrie being permitted to testify in that her testimony concerning any alleged sexual contact with her step-father was inadmissible for any purpose. Further objection was made that no foundation had been laid for the admission of that testimony. The Court overruled the objection and permitted the witness to testify. The objection was properly preserved for appeal.

12.   **Ms. Melanie McSpadden**: With the exception of Sherry's testimony, the most damaging testimony came from Melanie McSpadden, a natural child of Mr. McSpadden's by a previous marriage. The existence of this witness was known to the defense, however, because of her out-of-state residence, it was thought that the State was unaware of the witness, and even if they became aware of her, it would be difficult for them to produce her. However, Mrs. Juanita McSpadden contacted her and she volunteered to come to Brownsville and testify against her father.

Melanie testified that her mother and father had divorced when she was quite young. When she was seventeen she came to visit her father in the summer. She further testified that during that visit, Mr. McSpadden tried to have sex with her, she resisted and he "hit her and threw her to the ground, took out his penis and penetrated her.". She left and returned to her mother and never came to visit him again.

On cross-examination she stated that she had told her teacher what had happened and then her mother. She admitted that she eventually recanted her statement and said that an uncle, who at the time of the recanting was deceased, had really been the one who had raped her. She was quick to explain that her mother made her recant her story. The witness was extremely hostile and made no effort to conceal the fact that she hated Mr. McSpadden, her father. She stated clearly and unequivocably that she wished that Mr. McSpadden were dead.

Melanie may have been the "surprise" witness Mr. McSpadden refers to, but does not identify, in his grievance. The only rebuttal witness to Melanie's testimony would have been her mother. Her mother could have testified to Melanie's having recanted her accusations. That testimony would have been merely cumulative inasmuch as Melanie admitted that she had done so. If there were any additional rebuttal witnesses, Mr. McSpadden did not make their existence and identity known.

Mr. Gilbert R. Lazo
June 22, 1992
Page Nine

Melanie was called by the State as a rebuttal witness upon the completion of Mr. McSpadden's case in chief. The defense timely objected, prior to Melanie's testimony, to Melanie being permitted to testify in that her testimony concerning any alleged sexual contact with her step-father was inadmissible for any purpose. Further objection was made that no foundation had been laid for the admission of that testimony. The Court overruled the objection and permitted the witness to testify. The objection was properly preserved for appeal.

Mr. McSpadden's grievance states that Melanie admitted she "lied" during her testimony. If she did, she did not do so to me. See my letter to Mr. McSpadden dated February 9, 1992 (Exhibit "?"). My only post-trial written communication to Mr. McSpadden concerning the investigation into Melanie's testimony is contained therein.

At the conclusion of the State's case, the defense submitted Motions for Directed Verdict and for Mistrial, which were duly noted and overruled by the Court.

The defense's case consisted of the testimony of Mr. McSpadden, Mr. Edward Pace and Mrs. Jo Ellen Paschall. As so often happens in child sexual molestation cases, the defense is without any hard evidence, and the only plausible defense is nonaccessability to the complaining witness by the defendant, or outright unsubstantiated fabrication by the victim. Since the child had been raped and sodomized over a period of several years, it was solely a matter of the credibility of the witnesses, and particularly of the victim and the assailant. The fact that Mr. McSpadden's marriage to Sherry's mother had been his sixth failed marriage did not present a picture of a stable individual to the jury.

During the presentation of Mr. McSpadden's case in chief, Mrs. McSpadden's previous husband, the natural father of Sherry, was noticed by me to be making frequent trips from the courtroom to the hallway. I had invoked the "Rule on Witnesses" and there were no witnesses allowed in the courtroom. During a brief recess in the trial, Mrs. Paschall advised me that Sherry's father was talking to Mrs. Juanita McSpadden and other witnesses in the hallway. I informed the Court of this potential violation of the Court's Order and a brief hearing was held. Sherry's father stated that he was merely passing the time of day with the witnesses and there was no testimony to contradict that. I moved for a mistrial, which was duly noted and overruled by the Court. However, upon my insistence, the Court ruled that none of the State's witnesses then remaining in the hallway were to be allowed to testify in rebuttal of the defense's case. This effectively removed all of the State's rebuttal witnesses except Melanie McSpadden who had not arrived at the courthouse at that time.

Mr. Gilbert R. Lazo
June 22, 1992
Page Ten

Closing arguments were heard on October 17, 1992. During closing, the State made several inflammatory statements constituting prosecutorial misconduct, to which I duly objected. The Court overruled the objections, but they were properly preserved for appeal. The case went to the jury on October 17, 1991. The jury found Mr. McSpadden guilty of sexually assaulting his stepdaughter, Sherry. They subsequently sentenced Mr. McSpadden to life in prison. A sentence of life in prison carries a minimum sentence of fifteen years. Had I been a juror on that case, hearing the evidence that was presented, I would probably have found likewise.

On October 18, 1991 there was an Announcement hearing in Cause No. 91-CR-888-C which alleged additional instances of sexual assault on Sherry by Mr. McSpadden. I was advised by Mr. Valle, the prosecutor, that the State would present additional witnesses in order to shore up the weak points I had revealed in their previous case. Mr. McSpadden's potential exposure was to another life sentence. If the Court was to "stack" this sentence on top of the previous one, Mr. McSpadden would be required to serve a minimum of thirty years in prison before he would become eligible for parole. Mr. McSpadden would have been seventy-eight years old when he would become eligible for parole.

Additionally, there was still the allegations of Cause No. 91-CR-889, the sexual assault on Mr. McSpadden's stepdaughter, Carrie, to be concerned with. That Cause was set for trial on October 28, 1991. A conviction on this Indictment, and "stacking" of the sentence with the previous sentences, would ensure that Mr. McSpadden would never be released from prison.

On October 21, 1991, Mr. Valle approached me with a proposal that in trade for Mr. McSpadden's agreement not to appeal the verdict in the first trial, the State would dismiss the two remaining charges against him. I discussed the proposal with Mr. McSpadden. I explained to him that even if he were successful in his appeal, that would only mean a new trial, not an acquittal. He was further advised that unless the witnesses recanted their testimony, or he could produce some evidence that was not produced at the first trial, his chances of being acquitted on the retrial were slim. Further, the State had experienced one trial on this case, it was unlikely that they would repeat the same errors again.

Mr. McSpadden requested my advice on the agreement and I refused to comment as to whether he should or should not avail himself of it. I explained to him, as I do to other clients facing similar decisions, that "I am not the one who has to do the time, therefore I cannot make your decision for you or tell you what I would do if I were in your place.". Mr. Valle then requested to speak with Mr. McSpadden. Mr. McSpadden agreed and the three of us met in one of the jury rooms. Mr. Valle explained the State's proposal, and the alternatives. I remained silent. Mr. McSpadden then requested to speak with me alone, and Mr. Valle left. Mr.

Mr. Gilbert R. Lazo
June 22, 1992
Page Eleven

McSpadden and I again discussed the State's proposal.  I informed Mr. McSpadden again that if he waived his right to appeal the first case, the only way he could get another trial on that case would be to bring forth new evidence that was not available at the time of the first trial, or one of the State's principal witnesses would have to recant their testimony.

Mr. McSpadden then advised me that he would accept the State's proposal, and I notified Mr. Valle.  Judge Hester directed that an Agreement Not To Appeal be drawn and executed so that there would be no misunderstanding as to its effect.  The Agreement was drawn and executed.  Additionally, Judge Hester brought Mr. McSpadden before the bench and questioned him as to his understanding of the consequences of the Agreement Not To Appeal and as to the voluntariness with which he executed it.  Judge Hester, being satisfied that Mr. McSpadden understood the effect of the waiver that he signed and that he was signing it voluntarily, accepted same.  The District Attorney then filed Dismissals on the remaining charges. See copies of Motions to Dismiss attached hereto, marked Exhibits "I" and "J" and made a part hereof.
"11" "12"

On October 21, 1991 Mr. McSpadden complained to me that he was not receiving any mail.  I told him that I would have a Change of Address form completed for his signature and he could have his mail forwarded to my office until his final assignment at the Texas Detention Center.  The Change of Address forms were completed and filed and his mail was forwarded to my office and held there until I had Mr. McSpadden's final address.  At that time, the mail being held at my office was forwarded to him.  Additionally, at that time a new Change of Address form was filed in order that the mail would go directly to him.  This service was provided merely an an accomodation to Mr. McSpadden and was not related to any legal representation of him.

On October 21, 1991 Mr. McSpadden requested that I contact Mr. Glen Barnard, his previous lawyer, and obtain his truck.  I subsequently talked to Mr. Barnard who advised me that he had picked up Mr. McSpadden's truck at his request when Mr. McSpadden was arrested.  He had parked it in his driveway at home as an accommodation to Mr. McSpadden.  Mr. Barnard further stated that he would be glad to get it out of his way.  Mr. Barnard gave me possession of Mr. McSpadden's truck, a 1983 GMC pickup in rather poor condition.  The interior of the truck stank so bad that it was necessary to remove the contents and have the inside hosed out and washed.  The rear bed of the truck was covered with a "camper top", and inside was a collection of dirty clothes, sheets, blankets and pillows.  It was obvious that someone had been living in the back of the truck at one time.  The contents of the truck were wet, badly mildewed and of no value.  The contents were disposed of.  Mr. McSpadden's allegation that the contents were worth $1,000 is patently untrue.  This service was provided merely an an accomodation to Mr. McSpadden and was not related to any legal representation of him.

Case 1:94-cv-00289  Document 52  Filed in TXSD on 01/30/2001  Page 26 of 66

On October 21, 1991 Mr. McSpadden requested that I contact Mr. Edward Pace who, again as an accommodation to Mr. McSpadden, was holding an automobile, a 1975 Bricklin. Mr. McSpadden represented that the automobile was of show quality and needed protection. Again his overactive imagination got in the way of the truth. The car is a piece of junk. It was necessary to retain the services of a tow truck to move the car from Mr. Pace's residence, where it had been parked in the driveway subject to the weather, to a place of storage. I had contacted Ferguson Motor Company and arranged for them to display the automobile on their showroom floor in order to provide a place of enclosed storage, at no cost to Mr. McSpadden. After seeing the condition of the automobile, that arrangement was not possible. The fiberglass body was cracking, the paint had totally deteriorated, wiring under the dash has been cut and removed, the airconditioning system is totally inoperable, the windows are inoperable, the pneumatic system that opens and closes the doors is totally inoperable (to enter and exit the car, the doors had to be forced up by hand and then propped up with broom handles), just to mention a few defects. In its present condition, I doubt that the automobile is worth $2,500. This service was provided merely an an accomodation to Mr. McSpadden and was not related to any legal representation of him.

Mr. McSpadden further requested that I investigate obtaining the return of property he alleged was in the possession of his last wife, Mrs. Juanita McSpadden. To that end a General Power of Attorney was drawn for his signature. See copy of General Power of Attorney attached hereto, marked Exhibit "K" and made a part hereof. Mr. McSpadden subsequently revoked his Power of Attorney on January 21, 1992. See copy of letter and Withdrawal of Power of Attorney attached hereto, marked Exhibits "N" and "O", respectively, and made a part hereof. Mr. McSpadden, in his letter of February 13, 1992, Exhibit "R", represented that he was going to provide me with a new Power of Attorney, which, of course, he never did. Therefore, I was without any authority to act on his behalf, had I agreed to do so, after January 1992. Again, this service was provided merely an an accomodation to Mr. McSpadden and was not related to any legal representation of him.

Mr. and Mrs. McSpadden had been living in a house on Rio Hondo Road, Harlingen, at the time of the dissolution of their marriage. Mrs. Juanita McSpadden, and her children, moved from that residence, leaving Mr. McSpadden in possession. Mr. McSpadden failed or refused to make the house payments, thereby resulting in the repossession of the property by the lender and the abandonment thereof by Mr. McSpadden. After Mr. McSpadden's trial, I visited that house. I found it unsecured and open. There was no furniture, appliances, dishes, bedding, etc. in the house. Various items of clothing, papers, Soldier of Fortune magazines, "girlie magazines", etc. were strewn about the floors. Additionally, the kitchen contained dozens of empty prescription bottles that had contained medicines usually prescribed for persons with

CNMPDF - www.fenix.com

Mr. Gilbert R. Lazo
June 22, 1992
Page Thirteen

bipolar mood disorders, more commonly referred to as "manic-depressive". Again, this service was provided merely an an accomodation to Mr. McSpadden and was not related to any legal representation of him.

If Mr. McSpadden is a manic-depressive, that would explain his attempted suicide. Further, coupled with his possession of a penile prosthesis, it could explain his seeming psychosexual disorder. These were matters that I was not aware of until after the trial.

Mr. McSpadden informed me that he had asked Mr. Pace to secure the Rio Hondo property. I spoke with Mr. Pace who informed me that when he arrived at the property, he found it in the same condition that I later found it in. Also, since the property had been foreclosed upon, he found no need to secure the property.

Mr. Pace had further advised me that Mr. McSpadden had moved at some time to a house on Bass Boulevard. I visited that house. The premises were secured, however, by looking through the windows I could see that the house was empty of furniture, clothing, etc. I contacted the real estate broker whose sign was on the property and was informed that Mr. McSpadden had been a "squatter" on the property. Mr. McSpadden had told me that he had given "some guy" $100.00 cash to allow him to move in, no receipt. The out-of-town owner claimed to have no knowledge of Mr. McSpadden's occupancy of the house until Mr. McSpadden's arrest (one of the investigators for the District Attorney was a relative of the owner). The real estate salesman advised me that there had been some property put in the barn to the rear of the house. He further provided me with a key to the barn to inspect the property. Again, there were papers, clothing, etc. strewn about the concrete floor. They had obviously been there for months because they were wet, mildewed and stank. Inasmuch as I was there merely as an accommodation to Mr. McSpadden, I did not sort through the stinking mess. Again, this service was provided merely an an accomodation to Mr. McSpadden and was not related to any legal representation of him.

At some time after the conclusion of the trial, Mr. McSpadden's brother telephoned me to inquire as to Mr. McSpadden's status. During that conversation I asked his brother if he believed Mr. McSpadden to be capable of raping and sodomizing a child. He responded without any hesitation that in his opinion his brother was capable of such acts. He further advised me that his brother had been in trouble all of his life and was an embarrassment to the McSpadden family. Perhaps that explains why Mr. McSpadden retired from the U.S. Army with only the rank of Sergeant First Class.

Mr. Gilbert R. Lazo
June 22, 1992
Page Fourteen

As to the remainder of Mr. McSpadden's allegations, I refer you to the following correspondence and the marked statements therein:

1.  Letter from Mr. McSpadden dated December 3, 1991, copy attached hereto marked Exhibit "L" and made a part hereof;

2.  Letter from Mr. McSpadden dated January 14, 1992, copy attached hereto marked Exhibit "M" and made a part hereof;

3.  Letter from Mr. McSpadden dated January 20, 1992, copy attached hereto marked Exhibit "N" and made a part hereof;

4.  Letter from Robert J. Banks dated February 9, 1992, copy attached hereto marked Exhibit "P" and made a part hereof;

5.  Invoice dated February 9, 1992, copy attached hereto, marked Exhibit "Q" and made a part hereof;

6.  Letter from Mr. McSpadden dated February 13, 1992, copy attached hereto marked Exhibit "R" and made a part hereof;

7.  Letter from Mr. McSpadden dated February 14, 1992, copy attached hereteo, marked Exhibit "S" and made a part hereof; and

8.  Letter from Mr. McSpadden dated February 17, 1992, copy attached hereto, marked Exhibit "T" and made a part hereof.

From the inception of Mr. McSpadden's cases, until the present, he has not paid any money for legal services. The truck and the car he tries to make so much of has a value, at the most, of approximately $4,000 to $4,500. That amount is less than one-half of his outstanding legal bill. I would be appreciative of any money which Mr. McSpadden may proffer in "partial payment" (as he alleges), of his outstanding bill. In Mr. McSpadden's letters of February 13, 1992 and February 17, 1992, Exhibits "R" and "T", respectively, he represents that he is going to commence paying on his account with my office, which, of course, he has never done.

In Mr. McSpadden's letter of May 30, 1992 to the Grievance Committee he states that he is "unable to hire an attorney to assistance (him) in this matter or (his) retrial paperwork.". I would only point out that at the time of his arrest, Mr. McSpadden was receiving at least

military retirement pay, and continues to do so even though he is being supported at State expense. He is by no means indigent. If Mr. McSpadden is unable to retain the services of any attorney, it is due to the lack of merit of his cause(s).

As a further indication of Mr. McSpadden's duplicity, I refer you to his letter to Mr. Barnard dated January 5, 1992, Exhibit "U". He represents to Mr. Barnard that he has requested me to pay Mr. McSpadden's outstanding bill with Mr. Barnard. However, the enclosed correspondence from Mr. McSpadden to me fails to support that statement, nor does he allege that he provided me with any money with which to pay Mr. Barnard.

My letter to Mr. McSpadden of February 9, 1992 unequivocably advises him that I no longer represented him. Subsequent to the expiration of his appeal period, I had neither a legal nor a moral obligation to pursue any matter on behalf of Mr. McSpadden. However, merely as an accommodation I attempted to assist him, even setting aside my personal feelings about a person who would commit the heinous crimes that he was convicted of.

Mr. McSpadden's grievance rambles on about "connections" between me, Judge Robert Garcia and the grandfather of one of his victim's; that me, Judge Robert Garcia (who was not the trial judge) and others were "linked", resulting in him being "railroaded"; and about "friends" of his who have contacted me. Mr. McSpadden has not provided any facts concerning the foregoing upon which I can formulate a response. If the Committee desires my response to Mr. McSpadden's comments, I will need the specifics of his allegations. Further, I imagine Judge Garcia would welcome the opportunity to respond to any allegations of wrongdoing on his part.

The bottom line to Mr. McSpadden's grievance is twofold. First, he is striving to abrogate any responsibility he has to pay his legal bill(s). Second, it is obvious that one of the jailhouse lawyers in prison with him has advised him that if he can sell "ineffective assistance of counsel" that could form the basis for a new trial. Mr. McSpadden is not uneducated in the use of the law since he claims that he has been a police officer and in law enforcement for many years.

If the Committee desires any additional information, please contact me.

Sincerely,

Robert J. Banks

Enclosures

c: Mr. Robert J. McSpadden

Case 1:94-cv-00289   Document 52   Filed in TXSD on 01/30/2001   Page 30 of 66



# What is an 'Intact' Hymen? A critique of the literature

FELICITY A GOODYEAR-SMITH, MB ChB MGP MRNZCGP
*Honorary Research Fellow, Department of Psychiatry and Behavioural Science, Auckland Medical School, New Zealand*
TANNIS M LAIDLAW, PhD
*Research Fellow in Forensic Psychiatry, Auckland Regional Forensic Services and the Department of Psychiatry and Behavioural Science, Auckland Medical School, New Zealand*

## ABSTRACT
The purpose of this study was to establish medico-legal guidelines based upon medical findings which support or refute allegations of sexual penetration, taking into account non-sexual explanations for positive physical findings. A review of the literature was undertaken to examine what has been determined about the range of usual findings which can be expected if the hymen has been penetrated. While a large body of literature is available on the topic, some findings are ambiguous, and further research is required to advance and clarify our knowledge base in these areas.

In only a minority of non-acute cases can definitive statements be made as to whether an alleged molestation has occurred. A non-scarred hymen that will not admit a finger is 'intact'; a hymenal opening accommodating two fingers or a vaginal speculum, with evidence of a deficit or scarring at the lower pole, indicates past sexual or, possibly, non-sexual penetration. Other findings are not definitive and, at best, can estimate only relative probability of occurrence of penetration. Findings within the normal range should be presented as 'neither confirm nor deny abuse', not 'consistent with abuse'. Often, it is impossible to establish whether a hymen is 'intact' in regard to past sexual intercourse.

## INTRODUCTION
A doctor examining an allegedly sexually abused child or adolescent long after the alleged incident is said to have taken place, is looking for answers to the questions:

1. Are there any physical signs present that are capable of corroborating the allegations?
2. Are there any reasonable alternative explanations for any physical signs that are present, other than sexual abuse (Paul, 1986; Lawton et al., 1987)?

Clearly, when there is an allegation of vaginal penetration, the appearance of the hymen, including its diameter and the presence or absence of deficits in its circumference, may be of prime significance. We have conducted a review of the literature to examine what has been determined about the range of normal and the possible findings which can be expected if the hymen has been penetrated. The factors we have assessed are the size of the hymenal opening and the nature and position of any deficits in its circumference.

## DIAMETER OF THE HYMENAL ORIFICE
In 1983 it was reported that a hymenal horizontal opening greater than 4 mm in girls under the age of 13 years was considered to be an indicator of sexual abuse (Cantwell, 1983). Other studies initially confirmed that finding (Cantwell, 1987; White and Ingram, 1989; Goff et al., 1989). Subsequent research has demonstrated that this finding was seriously flawed and the 'greater than 4 mm diameter' is no longer cited in court as evidence of sexual abuse.

A 1988 study of hymenal diameter of 116 girls referred for sexual abuse examination found that in those where there had been fondling only (no digital or penile penetration) the hymen diameter increased in size according to the girls' ages. There was a considerable range but the mean for 1 to 5 years was 5.4 mm; for 6 to 9 years it was 9.7 mm and aged 10 to 12, it was 11.7 mm (Adams et al., 1988). Another study of 110 prepubertal girls who

had not been sexually abused found a wide range of hymenal orifice size (0 – 8 mm), which varied with both the age of the child and the technique used to do the examination (McCann et al., 1990). Further research of 22 three-year-olds similarly found that the horizontal diameter of their hymens ranged between 2 mm and 8 mm, and a longitudinal study of hymen morphology in the first three years of life similarly demonstrated that hymenal diameter increases with age and may be as large as 8 mm by three years (Berenson, 1995). Another series of 172 examinations of girls obtained significantly larger hymenal opening measurements when the examinations used the supine traction technique or the knee-chest position rather than the supine separation technique (McCann et al., 1990).

One study of hymenal diameter in children evaluated for sexual abuse found that in 174 girls with no signs of injury, the hymenal opening diameter varied directly with age, increasing about 1 mm with every year (hence the average diameter is about 12 mm at 12 years old) (Claytor et al., 1989). However, with 334 girls where there was some evidence of injury, the hymenal opening diameter did not vary as predictably with age, hypothesized as due both to enlargement of the hymen from tearing, and to subsequent scarring resulting in the loss of hymenal resilience.

The hymen may be thick or thin; elastic or non-elastic. Clearly, an elastic hymen is more likely to stretch than tear, and digital penetration, tampon insertion and masturbation may lead to an enlarged hymenal opening without tearing. A study which compared the hymenal openings of 200 never-sexually active girls, half of whom had used tampons and half of whom had only ever used menstrual pads, found that while the range was wide and overlapping, the median hymenal diameter of the girls who had used menstrual pads was smaller (hymenal diameters of 12 mm) than those who used tampons (15 mm) (Emans et al., 1994).

The diameter of an average index or middle finger is about 15 mm to 20 mm. An erect penis is 25 mm to 40 mm in diameter. While insertion of a finger may occur without tearing of the hymen in an adolescent girl, it is unlikely that a normal-looking hymen of less than 10 mm diameter, even in the case of an elastic hymen, has previously accommodated full penetration of an adult finger, let alone a penis (Kean, 1987; Goodyear-Smith, 1989).

Dr David Paul, Her Majesty's Coroner of the City of London, wrote in a comprehensive 1986 paper regarding the investigation of alleged sexual abuse of children (Paul, 1986) that with respect to alleged digital penetration: 'What can be safely stated is that the hymenal orifice that will not admit even the very tip of the examining doctor's finger could not have been penetrated by anything that size or larger in the past'. Regarding alleged penile penetration he said:

> The invariable finding must be a hymenal opening and hymenal ring that is large enough to allow the passage of an erect adult penis, dildo or vibrator through it. If the hymenal opening or ring is of such a size that no such object could have penetrated through it, then vaginal penile or pseudo-penile penetration could not have taken place.'

He stated that while tears to the hymen heal, the hymen never returns to its 'pre-penetration' formation: healed tears will always remain visible as deficits in the hymenal rim, and the opening will not reduce to its pre-penetration diameter.

Some more recent commentators have suggested that it may be possible for hymenal tears to heal without trace (Adams et al., 1994), but we could find no longitudinal studies which confirm this speculation to date. One longitudinal study of three children who had suffered posterior tears to their hymens as a result of sexual assault showed that a narrow hymenal rim at the point of injury and irregular hymenal edges remained, although the jagged edges smoothed off over time (McCann and Voris, 1993). One case is reported where the vaginal aperture became closed (an 'acquired' imperforate hymen) following the healing of extensive lacerations to the posterior hymen and perineum from penile penetration of a five year old. In this case a thick opaque scar was apparent, occluding the

Case 1:94-cv-00289   Document 52   Filed in TXSD on 01/30/2001   Page 32 of 66

vaginal opening (Berkowitz et al., 1987). Narrowing of the opening of the hymen occasionally has been reported following chronic vulvovaginal infection (Rock and Azziz, 1987).

As well as the size of the hymenal opening, it is important to note the presence or absence of any deficits in its circumference, and their significance with respect to any alleged sexual activity. The two main issues here relate to the position and the nature of any observed deficits. We therefore examined the literature to ascertain what is known to be normal or abnormal with respect to hymenal deficits.

## NATURE OF A HYMENAL DEFICIT

Part of this discussion depends on whether a deficit is considered to be a 'transection' or a 'cleft'. There is inconsistency in the use of these words in the medical literature. Some studies do not specify whether the deficits they refer to extend fully to the vaginal wall or not. More recent publications generally define a cleft or notch as 'an indentation in the rim of the hymen' and a transection or complete cleft as 'a V-shaped notch in the hymen that went from the edge of the hymen to the base (junction of the hymen and vestibule)' although there are a number of exceptions to this. These definitions will be referred to as the standard definitions in this paper, unless otherwise specified.

Clefts and notches in the hymen occur naturally at the sides (3 and 9 o'clock positions) although generally not in the lower area (between 4 o'clock and 8 o'clock) (Levitt, 1993). Recent studies have suggested that partial deficits of the hymen in the upper position (8 to 4 o'clock) may commonly occur congenitally. However, if this deficit extends down to the vaginal wall, it is more likely to be acquired (the result of tearing) rather than be naturally occurring. It is therefore important to examine studies of hymens in girls with regard to the extent of the described deficits.

### Hymenal deficits in neonates

It appears that all girls are born with hymens. Examination of 1,131 consecutive new-born girls revealed that 100% had hymens present (Jenny et al., 1987). Neonate hymens tend to

be either annular (circumferential) or fimbriated (folded). An annular hymen has a smooth edge surrounding the vaginal opening. A fimbriated hymen has been described as a 'congenital frilly-type where there are deep "indentations" producing an irregular... hymen which is impossible to differentiate from an annular hymen that has been ruptured' (Paul, 1986). Other variations include a septated hymen (two hymenal openings with a band of tissue between) and cribiform (where there are multiple hymenal openings). Imperforate hymens (no opening) have also occasionally been reported. The crescentic-shaped hymen (a posterior rim of hymen with attachments at the 1 and 11 o'clock positions) does not appear to be present at birth although it is a relatively common finding by one year of age (Berenson, 1993).

A study of the hymens of 468 new-born girls found that 'clefts [of the hymen] were a frequent anatomical variation easily visualized in the neonate' (Berenson et al., 1991). These clefts ranged from 0.5 mm to 3 mm in depth, and were found in 35% of the neonates with annular hymens, with a quarter of these in the lateral (3 or 9 o'clock) position. The authors defined a cleft as 'division or split of the rim'. It was not specified if this division extended down to the vaginal wall or not. We could find no studies which give the normal range of the introitus of a neonate. While the hymenal tissue at this age is certainly abundant due to maternal oestrogen, these are still very small structures and 3 mm is a significantly large deficit in a child of this age, and may well extend down to the wall. The authors conclude that 'lateral and ventral clefts... are normal anatomical variations in the new-born'.

Most of the hymens examined (73%) were annular, but 17% were 'fimbriated (folded), which had three or more clefts in the rim resulting in a fringed or ruffled edge'. If this figure is added to those with an annular hymen who had clefts, it is found that at least 52% of all neonates had a cleft or clefts in their hymen.

P. 2

Case 1:94-cv-00289   Document 52   Filed in TXSD on 01/30/2001   Page 33 of 66

## Hymenal deficits in prepubertal girls

A longitudinal study was conducted on 57 of the baby girls who had had their hymens photographed in the above study at birth (Berenson et al., 1991), had no history of sexual abuse and were re-examined at age one (Berenson, 1993). In this study a notch was defined as 'a division or split in the rim' (the extent of the deficit was not specified). Notches were found in 38% of the annular hymens of newborns and 29% of one year olds; 25% of the girls had a notch present at birth which was not seen at one year; 14.5% had a notch in their hymens at one year which had not been reported at birth. In other words, some notches disappeared, some remained the same and some appeared where there had previously been none. The author excluded those hymens that she found were fimbriated, described in her earlier study as '(folded)', which had three or more clefts in the rim resulting in a fringed or ruffled edge'. Twenty-one per cent of the newborns and 7% of the one year olds had fimbriated hymens. This means that, in this study, at least 59% of the neonates and 36% of the one year olds had notches in their hymens.

In another study, the hymens of 79 non-abused girls aged between three months and 11 years 7 months were examined for a variety of characteristics (Gardner, 1992). Two girls in this study were found to have notches in their hymens, where notches were defined as 'perpendicular disruptions of the hymenal skirt of tissue, usually but not always down to the vaginal mucosa'. This paper concludes with the following warning:

> This study demonstrates the range of genital variation in a population of symptom-free girls not believed to have been sexually abused... Physicians should not be persuaded to over-interpret physical findings for sociolegal purposes nor to make a diagnosis of sexual abuse on the basis of physical examination alone.'

In a further study of 211 girls aged between one month and seven years, 8% had notches in their hymens, and one girl had a transection (Berenson et al., 1992). The authors clearly believe that transections are the result of sexual trauma, since they hypothesized that 'The subject was probably a victim of prior abuse despite a negative history'. There was no evidence to support this assumption.

A study of 100 non-abused prepubertal girls (aged 10 months to 10 years) found up to 6.6% had hymenal clefts, using the standard definition (McCann et al., 1990). It should be noted that in this study, whether a cleft was found or not varied considerably with the method used to examine the girl. More clefts were found when a traction method was used (6.6%) than when the separation (4.1%) or knee-chest methods (2.2%) were used. Other investigators have found that a hymen can appear normal when a child is examined in one position but abnormal in another, and they warn that if an examination casts doubt on the integrity of the hymen in one position, to re-examine in another 'because of the serious consequences that may ensue if hymenal anatomy is pronounced abnormal' (Bays et al., 1990).

## Hymenal deficits in post-pubertal girls

In a study of 200 sexually inactive and 100 sexually active adolescent girls (Emans et al., 1994) 10% (20) of the girls who claimed to have never had sexual intercourse had complete clefts in their hymens, over one-third of these being at the lateral position. Eighty-four per cent of the sexually active girls had complete clefts, and some of these had more than one cleft (average of two, with a range 0 – 4). The authors hypothesized that the 10% of sexually inactive girls with complete clefts were all actually victims of undisclosed sexual abuse or had been involved in unreported sexual relationships, but they admitted they had no data to support this speculation. No explanation was proffered for the 16% of sexually active girls without complete clefts.

In another study of 204 girls (mean age 13) alleging sexual abuse involving penile penetration, only 8% were found to have full transections, although another 37% had notches or narrowing of the hymen (Adams and Knudson, 1996). This study relied on a retrospective examination of case notes and colposcopic photographs. No details were given regarding the hymenal opening size in this study, nor what percentage had hymens that would not admit the passage of the examiner's



ar, although it was noted that 'not all ents were able to tolerate a digital examtion or probing with a moistened swab'. ther limitation of this study, which the hors acknowledged, was that some transecus might have been missed because it was possible to determine from the photograph ether or not a split went to the vaginal wall. e researchers suggested that these findings dicated that most of their adolescent subjects d elastic and/or redundant hymens which commodated a penis without tearing. We uld add the possibility that in fact some may ver have experienced penile-vaginal peneation.

## OSITION OF A HYMENAL DEFICIT

number of studies have found that deficits in he hymen thought to be naturally occurring or congenital (not acquired through force) are ound in the upper position (between 8 to 4 o'clock), but not in the lower region of the hymen (between 4 to 8 o'clock). Deficits in the lower hymen are believed to be the result of trauma. This research is still in its early stages, but a summary of the available studies follows.

### Findings in non-abused children

In the study of new-born girls reported above (Berensen et al., 1991) it was reported that 'clefts [of the hymen] were a frequent anatomical variation easily visualized in the neonate. These clefts predominantly occurred at the 12 o'clock position, but they were also noted laterally at the 3 and 9 o'clock positions'. The authors defined a cleft as 'division or split of the rim'.

In the study of 211 girls aged between one month and seven years, 5% were found to have notches in their hymens, and one girl had a transection. The authors concluded that 'notches... on the hymen between 9 and 3 o'clock positions... were all noted frequently enough... to be considered normal' (Berensen et al., 1992).

A study comparing sexually abused and non-abused girls reported that it is normal to find complete clefts in non-abused prepubertal girls between the 11 and 1 o'clock positions

(Emans et al., 1987). There is some doubt and confusion in the literature as to whether complete clefts can occur at other positions in the hymen prior to the onset of sexual intercourse.

One study of non-sexually active adolescent girls found that 10% had complete clefts in their hymens, over one-third of these being at the sides, 23% at the lower position and the remainder in the upper position (from 10 to 2 o'clock) (Emans et al., 1994).

In summary, deficits of the hymen in the upper position, especially midline (12 o'clock), may well be a variation of normal. Deficits which do not extend to the hymenal base occur commonly in the lateral positions in girls with no history of sexual activity. Deficits which extend to the hymenal base have been found to occur much more rarely in this population. Deficits at the lower position, especially 6 o'clock, both partial and full, do not appear to be naturally occurring, but may be acquired through either sexual or non-sexual means (Berensen, 1994).

### Findings with sexual intercourse and other sexual activities

A number of commentators have observed that the initial rupture of the hymen from penile penetration is likely to occur in the posterior, or lower, midline position, whereas tearing of the hymen from digital penetration is more likely to causes splits in the hymen laterally (especially at 3 or 9 o'clock). This can be explained by the mechanics of penile penetration and the anatomy of the genital region. The symphasis pubis prevents any anterior movement and forces the penis posteriorly, causing trauma at the midline position to the posterior fourchette, whereas in digital penetration, the force is more likely to be directed to one side rather than the midline. Heger (1985) explains this thus:

> 'When the penis attempts intromission into the vaginal introitus, it is forced posteriorly traumatizing the posterior fourchette and causing scarring at that focus and the hymen between 3 and 9 o'clock. Most commonly the scarring occurs between 5 and 7 o'clock'.

A manual for doctors performing forensic

sexual abuse examinations emphasizes that digital and object penetration tears of the hymen are more likely to occur 'lateral and ventral', that is at the sides and top, whereas penile penetration causes damage in the 'opposite 180° to digital penetration' (Fancourt et al., 1991).

The report of the Royal College of Physicians (1991) says that transections of the hymen 'are commonly at 5-7 o'clock and often involve the posterior fourchette. They are associated with penile penetration', whereas 'digital penetration of the hymen is more likely to cause abrasions or tears between 9 and 3 o'clock anteriorly'. A number of other researchers and commentators also report that damage to the hymen from attempted or actual penile penetration of the vagina is likely to be at the lower (6 o'clock) position (Woodling and Heger, 1986; Tipton, 1989; McCann, 1990; Kerns et al., 1992). Colposcopic examinations of 500 actual or supposed victims of sexual offences found that the majority of hymenal ruptures from intercourse occurred in the posterior region of the hymen (between 5 and 7 o'clock) (Teixeira, 1981).

From the clinical experience of Goodyear-Smith, many young women have been examined who claim to have had only one or two episodes of sexual intercourse. On observation, they are most likely to have a tear in the hymen close to the 6 o'clock position. Furthermore, young women examined by Goodyear-Smith who give a history of four or more instances of sexual intercourse often have very little hymenal tissue to see, and are likely to have multiple tears with only remnants of hymenal tissue at various positions of the introitus. Very frequent penetration disrupts the hymen completely, with or without visible hymenal remnants (Fancourt et al., 1991).

Once a woman has given birth to children, there is seldom much hymenal tissue to be seen. The distension of the introitus by an infant's head results in only myrtiform caruncles (residual tags of hymenal tissue) remaining (Pokorny, 1987). Even in young women who have been sexually active only for a relatively short period of time, and who have never had children, very little hymen

might remain. In a study of 100 sexually active adolescent girls, 21% were found to have myrtiform caruncles (defined as rounded bumps of hymen separated on both sides by a complete cleft) (Emans et al., 1994).

Studies using staining of the vaginal mucosa and/or colposcopy to demonstrate signs of microtrauma have found these both in women having consensual intercourse and women who complained of rape, although genital injury was more prevalent in the latter group (Norvell et al., 1984; Slaughter et al., 1997).

Findings with penile penetration of children
In a study of genital injuries resulting from sexual intercourse with children, the children 'all had midline posterior tears to their hymens (i.e. at the 6 o'clock position) and the authors noted that 'injuries on the posterior rim of the hymen were consistent with penile penetration and were not inevitably the same changes which might result from fondling or other forms of sexual molestation' (McCann et al., 1990).

Other confirming research of sexually abused girls also indicated that penile penetration in girls and young adolescents is much more likely to cause hymenal tears in the lower 4 to 6 o'clock (and especially the 5 to 7 o'clock) position rather than asymmetrically at the sides (Emans et al., 1987; Pokorny et al., 1992).

Concomitant tissue findings
Examination of prepubertal girls who have suffered hymenal transections from penile penetration indicate that, in such circumstances, the injuries rarely involve the hymen alone (Enos et al., 1986; Muram, 1989). Typically, there is a posterior laceration of the hymen which also involves tearing of the posterior vaginal wall, and occasionally (especially in a young child) tearing that extends into the rectum. Where there has been penetrative intercourse with prepubertal girls, a large number of case reports indicate that not only the hymen is torn at the position of the posterior fourchette but that lacerations also usually extend through the vaginal mucosa, possibly involving the ano-rectal canal or the



AFR 28 00 12:09PM FME    Case 1:94-cv-00289   Document 52   Filed in TXSD on 01/30/2001   Page 36 of 66    P.6

...dder (Berkowitz et al., 1987; Herman-Giddens and Frothingham, 1987). These lesions leave scars on healing. Paul (1977) found that penile penetration always causes tears to the vaginal mucosa as well as to the hymen in girls up to the age of about six years and that mucosal tears are common findings above this age.

A longitudinal study of three girls who incurred genital injuries from sexual trauma found that, over time, the jagged appearance of the hymenal tear became smoother and injury to the posterior fourchette healed, leaving only faint scars (McCann et al., 1992). Care must therefore be taken by the physician to examine the region thoroughly, preferably under magnification using a colposcope, recording findings using diagrams and, ideally, photographs.

Furthermore, it is important to differentiate scars from normal anatomic variants. In some girls there is either a thin white line (linea vestibularis) or a white spot (partial linea vestibularis) found in the midline of the posterior fourchette, presumed to result from developmental fusion of the tissues (Kellogg and Parra, 1993). This can be mistaken for scar tissue at times. Posterior fourchette findings that are slightly asymmetrical (not in the midline) or have surrounding neovascularization (evidence of new blood vessel development in response to trauma) can be assumed to be traumatically acquired.

## POSSIBLE NON-SEXUAL CAUSES OF HYMENAL DISRUPTION

### Accidental injuries

The possibility of non-intentional injury should be considered. This may be in the form of straddle injury: a fall onto a smooth, horizontal elongated narrow object such as a bicycle crossbar, playground equipment, a bed or a fence. Asymmetric (e.g. at 3 or 9 o'clock positions) and/or anterior (12 o'clock) lesions of the hymen are much more likely to be the result of straddle injuries, whereas sexual abuse is much more likely to produce symmetrical lesions in the posterior position (i.e. at 6 o'clock) (Bays and Jenny, 1990; Pokorny et al., 1992). In general, injury is to the external genitalia and the hymen is not damaged

during straddle injuries, although this does happen on occasion, especially if there has been damage to the vagina. One commentator writes about vaginal injuries:

'Almost invariably the hymen is lacerated when there is a vaginal injury. Most vaginal wounds one of us (JWH) has seen have been of the lateral walls. Generally there will be relatively little blood loss and the child will not have much pain if the damage is confined to a ripping of the mucosa from the underlying musculofascial tissues. Usually the hymenal tear does not bleed to any extent. The mother brings the child because she knows about the accident and because there is some bleeding exuding from the introitus.' (Huffman, 1974)

In one study, three out of six premenarchal girls with a history of straddle injury at least one year prior to the examination had a ragged (notched or keyhole) posterior fourchette (Gardner, 1992). This is a finding sometimes attributed by other writers to sexual abuse. In another case series study, three out of 11 girls suffering straddle injuries had signs of tearing to the hymen (all at the 6 or 7 o'clock position) (Pokorny and Kozinetz, 1988).

One study of perineal wounds suffered by young girls documented 101 'fall astride' injuries and 31 accidental impalements (Jones and Bass, 1991). The latter are more likely to cause tears in the hymen and posterior fourchette, whereas the blunt trauma from 'astride' injuries is more likely to produce bruising and damage to the surrounding soft tissues. Another study documented four cases of penetrative injury to the hymen, all of which caused symmetrical tears (a fall or jump onto a tree-stump, a toy and a metal rod; and the accidental insertion of a finger by an examining doctor) (Pokorny et al., 1992).

Tears to the hymen and surrounding tissues can be caused by stretching injuries. These can result from violent 'splits' when the thighs are suddenly, forcefully abducted. Documented examples of such an injury include a young child doing the 'splits' when her feet slipped apart during dancing (Frith, 1970) and a two-year-old girl who fell at a park (Randall et al., 1995). Such an injury can cause tears to the skin, hymen and posterior vaginal wall.

Case 1:94-cv-00289  Document 52  Filed in TXSD on 01/30/2001  Page 37 of 66

It could be hypothesised that if a child sustained such an injury in the pre-school years, she would be unlikely to recall it unless she had been subsequently told about it at a later age.

### Self-inflicted transections of the hymen

There is very little in the literature about this occurrence. Inevitably, most patients who come to medical attention are those who engage in serious trauma to the genitalia using sharp objects. It could be hypothesised that someone engaged in self-destructive or self-mutilating behaviours might be more likely than normal to cause tears to her own hymen.

Young children do at times insert objects into their vaginas which have to be removed, although these will not necessarily tear the hymen. Many kinds of objects, ranging from rolled-up paper or cloth, to crayons, toys, pins and coins, have been removed from young girls' vaginas (Huffman, 1974) and it could be hypothesised that the insertion and/or removal of these objects could cause a tear to the hymenal edge on occasion. Vaginal foreign bodies are one of the most likely causes of vaginal bleeding in young girls other than sexual abuse (Paradise, 1990). In one case study, the prevalence of vaginal foreign bodies in outpatient girls under 13 years of age with gynaecological disorders was 4% (Paradise and Willis, 1985). Very young children may place objects in bodily orifices in the context of self-exploration; when this happens in older children there may be an element of psychopathology and self-injury (Putnam and Stein, 1985).

It is also likely that sexually mature adolescents do at times insert objects into the vagina in the act of masturbating. These may range from vibrators to bluntly rounded objects such as carrots. It may be possible that some girls tear their own hymens through digital penetration. All these methods would be more likely to result in lateral hymenal tears than posterior ones.

### Tampon use

It has been considered that tampon insertion might cause splits in the hymen, although some authors argue against this possibility. In a review article about the medical diagnosis of sexual abuse, Bays and Chadwick (1993) claim that there is no evidence that tampon use causes any trauma to the hymen. Examination of their references, however, reveals a daisy-chain of misinformation with evidence that is not based on any research data. They refer to an article by Woodling and Kossoris (1981) who, in the course of a long discussion paper about sexual abuse issues, mention 'the repeated use of vaginal tampons... [does] not disrupt hymenal integrity'. This is a reference to Underhill and Dewhurst (1978). When this paper is examined, in fact, it makes claims to the contrary. The data are from a study of 28 girls who claimed to be virgins, done with the purpose of establishing whether or not their hymens appeared 'intact'. Virginity was confirmed in only 60% of the girls and the authors hypothesize that one of the causes of a distensible or incomplete hymenal ring might be that 'the repeated use of vaginal tampons may cause recurrent minor trauma, sufficient to stretch the introitus'. They conclude that when a woman or girl alleges sexual assault and an incomplete hymenal ring is found, this does not confirm that her hymen was damaged from sexual intercourse, as this might have happened from other means, including tampon use.

Bays and Chadwick also quote Cowell (1981) that tampons do not 'alter hymenal integrity' although 'distensibility is increased due to slight stretching'. Cowell makes this statement in a discussion about performing an initial vaginal examination in an adolescent, which she suggests will be easier to conduct if the girl has started using tampons. She gives no references for the basis of her claim that tampons do not disrupt the hymen.

The final paper on which Bays and Chadwick base their assumption (that tampons do not damage hymens) is a 1945 review article by Dickinson. Dickinson reports that the median diameter of the hymenal opening of a virginal woman is 25 mm, whereas the diameter of a tampon is 17 mm or less. He therefore concludes that 'the tampon has a calibre that does not impair standard anatomical virgi-



y'. However, Dickinson has not examined the hymens of women who use tampons. He does not address the issue that while the median hymenal size is larger than a tampon diameter, no range is given, and there may be some girls whose hymenal diameter is less than that of a tampon. Clinical information indicates that a number of girls are unsuccessful in their attempts to insert tampons until after they have become sexually active. Furthermore, even if a tampon diameter is less than the hymenal opening, it is likely that initial attempts at insertion may push the tampon obliquely rather than exactly midline, which could impinge on the hymenal ring at the 3 or 9 o'clock position, possibly disrupting its edge. Certainly, some girls report initial attempts at tampon insertion to be painful.

In summary, although Bays and Chadwick's 1993 review paper claims that tampons cannot damage the hymen, there appears to be no research data to support that claim. The only data appear to be from a study conducted by Emans and her colleagues the following year (Emans et al., 1994). In this research, 200 post-menarchal girls who denied ever having had sexual intercourse were examined. One hundred girls who had never used tampons were compared with 100 who were tampon users. The median hymenal diameter was found to be slightly bigger in those who used tampons (15 mm) compared with those who used menstrual pads (12 mm). Performing a gynaecological examination was 7.4 times more likely to be easy in girls who used tampons compared to those who used pads.

Fourteen of the tampon users were found to have complete clefts in their hymens, compared to six of the non-tampon users. The authors claim that there was no significant difference statistically in these two groups and conclude that tampon use does not cause clefts in the hymen.

We reanalysed their data to assess whether there is a statistical difference between the 14% of the tampon users found to have complete clefts compared to the 6% of the pad users. The $\chi^2$ test gave a marginally significant result ($\chi^2$, 3.55; p = 0.06). While not quite reaching the required 95% level, these data

certainly do not prove that there is no association, and indeed suggest that it is likely that tampon use is associated with more hymenal clefts. We have written up our analysis in depth elsewhere (Goodyear-Smith and Laidlaw, in press).

In conclusion, despite reports in the literature to the contrary, the limited research findings to hand indicate that it is possible that tampon use can disrupt the hymen in virginal girls on occasion.

### The possible effects of sporting activities on the hymen

Although it has been suggested sometimes that certain sporting activities, particularly horse-riding and gymnastics, can cause hymenal changes in virginal girls, there is very little research data available on the topic. The only paper we could find that addressed this issue was that of Emans et al. (1994) discussed earlier. Of the 200 non-sexually active adolescents studied, 74% (147) had participated in sports. These included 'swimming (45%), biking (34%), gymnastics (21%), aerobics (20%), horse-riding (3%), and other (20%).' The researchers report 'there was no increase in complete clefts in girls who participated in sports or specifically in gymnastics' but no actual data were presented so we were unable to analyse this conclusion further. It should be noted that with a total of 20 non-sexually active girls with complete clefts, the numbers in these sub-categories would have been too small to demonstrate whether some sports can occasionally cause hymenal deficits. This is particularly relevant in considering whether frequent horse-riding could lead to some hymenal disruption on occasion, since only 3% of the study subjects had ever engaged in this activity. As this is the only study to date, it must be stated that this issue has not yet been adequately addressed.

### The effects of a vaginal examination on the hymen of a non-sexually active girl

It could also be asked whether the hymen of a girl who had never had intercourse could be disrupted by undergoing a pelvic examination, either a 'bimanual' (when two of the examining

296   Med. Sci. Law (1998) Vol. 38, No. 4

doctor's fingers are inserted into the vagina), or insertion of a vaginal speculum. In general in New Zealand, vaginal examinations are not routinely performed prior to the onset of sexual intercourse, and in the clinical experience of Goodyear-Smith, such examinations, when required, can be difficult to perform and cause discomfort to the patient, particularly if she has never been a tampon user.

In the Emans (1994) study referred to previously, the researchers tried to assess whether a gynaecological examination could cause disruption to the hymen in a non-sexually active girl. Among the 200 non-sexually active girls in their sample, 6% (12) had previously used a vaginal pessary or cream; 17% (34) had had a prior speculum examination; and 23% (46) had had a previous bimanual examination. Clefts were found in 7% (3 out of 46) of girls who had had prior examinations and in 11% (17 out of 154) of girls who had not had prior examinations. The numbers of clefts for girls using vaginal creams were not reported. While the authors conclude that 'complete clefts... cannot be attributed to prior gynaecological examinations', we believe that this conclusion is not valid, given the tiny number of cases involved and the fact that variables such as prior tampon use were not adjusted for.

One case has been reported of an acute tear to the hymen at the 7 o'clock position of a five-year-old girl caused by the examining doctor's finger accidentally penetrating the hymen (Pokorny and Kozinetz, 1988).

### Possible effects of skin disorders on the hymen and surrounding tissues

A number of conditions can cause redness, swelling, abrasions and occasionally bleeding of the tissues surrounding the hymen. These include thrush and other infections; pin worms; nappy rash; poor hygiene; and irritants such as bubble bath (Paul, 1977; Bays and Jenny, 1990; Pierce and Hart, 1992; O'Brien, 1995). These have all at times been mistaken for signs of sexual abuse. Often the signs will be exacerbated by repeated scratching of the tissues by a child trying to relieve the irritation.

Other skin disorders which can cause skin changes, splits in the skin and bleeding include forms of dermatitis; psoriasis; and lichen sclerosus. The latter condition can result in alarming blisters and bleeding under the skin after minor trauma such as wiping with toilet paper, giving the mistaken impression that the child has been subjected to significant genital trauma. Case studies suggest that the hymen is not affected by this condition (Young et al., 1993).

### CONCLUSIONS

When presented with an allegation of sexual molestation of a child or adolescent in the non-acute situation, there will be only a minority of cases where the examining doctor can make a definitive statement as to whether or not the alleged event has occurred. If the alleged event does not involve penetration beyond the hymen, then findings are likely to be normal and will neither confirm nor refute the allegation. It should be noted that in some countries, including New Zealand, legal penetration requires only that a penis has entered the labia not necessarily the vagina, hence the nature of the alleged penetration should be clarified.

If the hymen appears normal (no evidence of scarring) and will not admit the examining doctor's finger, then it can be safely stated that penile penetration of the vagina beyond the hymen has not occurred (this is definitely an 'intact' hymen). A hymenal opening easily accommodating two fingers or a vaginal speculum, with evidence of a hymenal deficit or scarring at the lower pole (6 o'clock position), indicates past penetration, either from sexual activity or non-sexual trauma.

The vast majority of other findings will not be definitive with respect to determination of penetration, and at best an estimate of relative probability may be offered, taking into account the nature of the allegation and current knowledge on what is likely to be a variation on normal or acquired through trauma.

Forensic examiners need to be objective in their interpretation of both positive and negative findings. Normal findings in a case where an absence of physical signs might be expected,

...ould be presented as 'neither confirm nor
...ny abuse', not 'consistent with abuse'. Where
...ere are physical findings, both possible
...xual causes and any reasonable alternative
...planations for their presence should be
...dvanced. Contrary to lay opinion, in many
...nstances it is impossible to establish whether
...r not a hymen is 'intact' with respect to past
...exual intercourse.

## REFERENCES

Adams J., Ahmad M. and Phillips P. (1988) Anogenital findings and hymenal diameter in children referred for sexual abuse examination. *Adolescent Pediat. Gynecol.* 1, 123–7.

Adams J., Harper K., Knudson S. and Revilla J. (1994) Examination findings in legally confirmed child sexual abuse: it's normal to be normal. *Pediatrics* 94, 310–17.

Adams J. and Knudson S. (1996) Genital findings in adolescent girls referred for suspected sexual abuse. *Arch. Pediat. Adolescent Med.* 150, 850–7.

Bays J. and Chadwick D. (1993) Medical diagnosis of the sexually abused child. *Child Abuse & Neglect* 17, 91–110.

Bays Jan and Jenny Carole (1990) Genital and anal conditions confused with child sexual trauma. *Am. J. Dis. Child.* 144, 1319–22.

Bays J., Chewning M., Keltner L., Sewell R., Steinberg M. and Thomas P. (1990) Changes in hymenal anatomy during examination of prepubertal girls for possible sexual abuse. *Adolescent Pediat. Gynecol.* 3, 41–6.

Berenson A. (1993) Appearance of the hymen at birth and one year of age: a longitudinal study. *Pediatrics* 91, 820–4.

Berenson A. (1994) The prepubertal genital examination: what is normal and abnormal. *Current Opinion in Obstet. & Gynecol.* 6, 526–30.

Berenson A. (1995) A longitudinal study of hymenal morphology in the first three years of life. *Pediatrics* 95, 490–6.

Berenson A., Heger A. and Andrews S. (1991) Appearance of the hymen in newborns. *Pediatrics* 87, 458–65.

Berenson A., Heger A., Hayes J., Bailey R. and Emans S. (1992) Appearance of the hymen in prepubertal girls. *Pediatrics* 89, 387–95.

Berkowitz C., Evik S. and Logan M. (1987) A simulated 'acquired' imperforate hymen following the genital trauma of sexual abuse. *Clin. Pediat.* 26, 307–9.

Cantwell H. (1983) Vaginal inspection as related to child sexual abuse in girls under thirteen. *Child Abuse & Neglect* 7, 171–6.

Cantwell H. (1987) Update on vaginal inspection as it relates to child sexual abuse in girls under thirteen. *Child Abuse & Neglect* 11, 545–6.

Claytor R., Barth K. and Shubin C. (1989) Evaluating sexual abuse: observations regarding anogenital injury. *Clin. Pediat.* 9, 419–22.

Cowell C. (1981) The gynecologic examination of infants, children, and young adults. *Pediat. Clinics of North America* 28, 247–66.

Dickinson R. (1945) Tampons as menstrual guards. *J. Am. Med. Assoc.* 128, 490–4.

Emans J., Woods E., Flagg N. and Freeman A. (1987) Genital findings in sexually abused, symptomatic and asymptomatic, girls. *Pediatrics* 79, 778–85.

Emans S., Woods E., Allred R. and Grace E. (1994) Hymenal findings in adolescent women: impact of tampon use and consensual sexual activity. *J. Pediat.* 125, 153–60.

Enos W., Conrath T. and Byer J. (1986) Forensic evaluation of the sexually abused child. *Pediatrics* 78, 385–98.

Faucourt R., Shand C., Broadmore J. and Milford R. (eds) (1991) *The Medical Management of Sexual Abuse* (4th edn) New Zealand, DSAC.

Frith K. (1970) Rape, divorce and nullity. *Br. J. Hosp. Med.* Dec. 762–7.

Gardner J. (1992) Descriptive study of genital variation in healthy, nonabused premenarchal girls. *J. Pediat.* 120, 351–7.

Goff C., Burke K., Rickenback C. and Buzhendorf D. (1989) Vaginal opening measurement in prepubertal girls. *Am. J. Dis. Child.* 143, 1366–8.

Goodyear-Smith Felicity (1989) Medical evaluation of sexual assault findings in the Auckland region. *NZ Med. J.* 102, 493–5.

Goodyear-Smith F. and Laidlaw T. Can tampon use cause hymenal changes in girls who have not had sexual intercourse? A review of the literature. *Forensic Science International* (in press).

Heger A. (1985) *Child Sexual Abuse: A Medical View.* Los Angeles, United Way Inc.

Herman-Giddens M. and Frothingham T. (1987) Prepubertal female genitalia: examination for evidence of sexual abuse. *Pediatrics* 80, 203–8.

Huffman J. (1974) Gynecologic examination of the premenarchal girl. *Pediatric Annuals* 6–18.

Jenny Carole, Kuhns Mary and Arawaka Fukiko (1987) Presence of hymens in newborn female infants. *Pediatrics* 80, 399–400.

Jones L. and Bass D. (1991) Perineal injuries in children *Br. J. Surg.* 78, 1105–7.

Kean H. (1987) Child sexual abuse. Letter to the Editor. *Lancet* 31 Oct., 1018.

Kellogg N. and Parra J. (1993) Linea vestibularis: follow-up of a normal genital structure. *Pediatrics* 3, 453–6.

Kerns D., Ritter M. and Thomas R. (1992) Concave hymenal variations in suspected sexual abuse victims. *Pediatrics* 90, 263–73.

Lawton Margaret, Goodyear Felicity and Stringer Peta (1990) *Sexual Assault Examinations – A Guide for Medical Practitioners* (2nd edn). Wellington, DSIR.

Levitt Carolyn (1993) Medical evaluation of the sexually abused child. *Primary Care* 20, 343–54.

Case 1:94-cv-00289   Document 52   Filed in TXSD on 01/30/2001   Page 41 of 66

McCann J. (1990) Use of the colposcope in childhood sexual abuse examinations. *Pediat. Clinics of North America* 37, 863–80.

McCann J. and Voris J. (1993) Perianal injuries resulting from sexual abuse: a longitudinal study. *Pediatrics* 91, 390–7.

McCann J., Voris J. and Simon M. (1992) Genital injuries resulting from sexual abuse: a longitudinal study. *Pediatrics* 89, 307–17.

McCann J., Voris J., Simon M. and Wells R. (1990) Comparison of genital examination techniques in prepubertal girls. *Pediatrics* 85, 182–6.

McCann J., Wells R., Simon M. and Voris J. (1990) Genital findings in prepubertal children selected for nonabuse: a descriptive study. *Pediatrics* 86, 428–39.

Muram D. (1989) Child sexual abuse – genital tract findings in prepubertal girls. *Am. J. Obstet. & Gynecol.* 160, 328–35.

Norvell M., Benrubi G. and Thompson R. (1984) Investigation of microtrauma after sexual intercourse. *J. Reproductive Med.* 29, 269–71.

O'Brien T. (1995) Paediatric vulvovaginitis. *Aust. J. Dermatol.* 36, 216–18.

Paradise J. (1990) The medical evaluation of the sexually abused child. *Pediat. Clinics of North America* 37, 839–62.

Paradise J. and Willis E. (1985) Probability of vaginal foreign body in girls with genital complaints. *Am. J. Dis. Child.* 139, 472–9.

Paul D. (1977) The medical examination in sexual offences against children. *Med. Sci. Law* 17, 251–8.

Paul D. (1986) What really did happen to Baby Jane? – the medical aspects of the investigation of alleged sexual abuse of children. *Med. Sci. Law* 26, 85–102.

Pierce A. and Hart C. (1992) Vulvovaginitis: causes and management. *Arch. Dis. in Childhood* 67, 509–12.

Pokorny S. (1987) Configuration of the prepubertal hymen. *Am. J. Obstet. & Gynecol.* 157, 950–6.

Pokorny S. and Kosinetz C. (1988) Configuration and other anatomical details of the prepubertal hymen. *Adolescent Pediat. Gynecol.* 1, 97–103.

Pokorny S., Pokorny W. and Kramer W. (1992) Acute genital injury in the prepubetal girl. *Am. J. Obstet. & Gynecol.* 166, 1461–6.

Putnam N. and Stein M. (1985) Self-inflicted injuries in childhood. *Clin. Pediat.* 24, 514–18.

Randall Bond G., Dowd D., Landsman I. and Rimsza M. (1995) Unintentional injury in prepubescent girls: a multicenter, prospective report of 56 girls. *Pediatrics* 95, 628–31.

Rock J. and Azzis R. (1987) Genital anomalies in childhood. *Clin. Obstet. & Gynecol.* 30, 682–96.

Royal College of Physicians of London (1991) *Physical Signs of Sexual Abuse in Children.* Salisbury, Wilts., Cathedral Press Ltd.

Slaughter L., Brown C., Crowley S. and Peck R. (1997) Patterns of genital injury in female sexual assault victims. *Am. J. Obstet. & Gynecol.* 176, 609–16.

Teixeira W. (1981) Hymenal colposcopic examination in sexual offenses. *Am. J. Forens. Med. & Pathol.* 2, 209–14.

Tipton A. (1989) Child sexual abuse: physical examination techniques and interpretation of findings. *Adolescent Pediat. Gynecol.* 2, 10–25.

Underhill R. and Dewhurst J. (1978) The doctor cannot always tell: medical examination of the 'intact' hymen. *Lancet* i, 375–6.

White S. and Ingram C.D. (1989) Vaginal introital diameter in the evaluation of sexual abuse. *Child Abuse & Neglect* 13, 217–24.

Woodling B. and Heger A. (1986) The use of the colposcope in the diagnosis of sexual abuse in the pediatric age group. *Child Abuse & Neglect* 10, 111–14.

Woodling B. and Kossoris P. (1981) Sexual misuse: rape, molestation and incest. *Pediat. Clinics of North America* 28, 481–99.

Young S., Wells D. and Ogden E. (1993) Lichen sclerosus, genital trauma and child sexual abuse. *Aust. Family Physician* 22, 729–33.

Case 1:94-cv-00289    Document 52    Filed in TXSD on 01/30/2001    Page 42 of 66



## pediatric annals

# Examination for Sexual Abuse in Prepubertal Children: An Update

ANN S. BOTASH, MD

Medical practitioners have an important and significant role in the evaluation of children suspected of being sexually abused. This role—to protect, diagnose, treat, and reassure the sexually abused child[1]—requires time, patience, compassion, objectivity,[2] and a working knowledge of normal genital anatomy. Medical examiners must be alert to the symptoms, signs, and physical findings indicative of possible genital trauma. Children may have masked presentations, such as behavioral problems, medical symptoms, or other physical illness,[3] which, although not diagnostic for abuse, may be the result of sexual abuse. By including sexual abuse screening questions in the review of systems and by performing a careful genital examination at every general pediatric visit, medical examiners will enhance their opportunity for primary identification of child abuse[4] and improve their own knowledge and experience.

### EDUCATIONAL OBJECTIVES

1. Review proper techniques for genital examinations in prepubertal children.
2. Discuss normal prepubertal gynecologic anatomy.
3. Develop knowledge of abnormal prepubertal gynecologic anatomy.

Many medical practitioners approach the suspected victim of child sexual abuse with trepidation. Until recently, medical knowledge and training in this area was limited, and practitioners did not regularly include the genital examination in their performance of complete pediatric examinations.[5] This article reviews physical examination methods for prepubertal genital examinations. Normal and abnormal genital findings are described. With regular examinations of children's genitalia, practitioners will gain experience in recognizing variants of normal genital anatomy and better appreciate abnormal findings.

Dr Botash is from the Department of Pediatrics, SUNY Health Science Center at Syracuse, Syracuse, New York Address reprint requests to Ann S Botash MD, 750 East Adams St, Syracuse, NY 13210

EXHIBIT "C"

Case 1:94-cv-00289   Document 52   Filed in TXSD on 01/30/2001   Page 43 of 66



**Figure 1.** Forced oral penetration resulting in a bruised palate with palatal petechiae on a 4-year-old girl. (Reprinted with permission from Medical Economics Publishers.)

By including sexual abuse screening questions in the review of systems and by performing a careful genital examination at every general pediatric visit, medical examiners will enhance their opportunity for primary identification of child abuse and improve their own knowledge and experience.

## WHO NEEDS A GENITAL EXAMINATION?

Every child should have an external genital examination at every routine pediatric visit. Children who present within 72 hours of possible sexual assault or molestation need a complete physical examination, including a forensic examination to look for and collect evidence of sexual abuse. Other indications for emergent evaluations include acute vaginal or rectal bleeding or severe emotional distress. Indications for urgent (within a few days) genital examinations include vaginal discharge and possible sexually transmitted disease (STD) or the possibility of pregnancy in the pubertal child. All other children, such as those with only suspicious behavioral changes or delayed disclosure of abuse occurring more than 72 hours prior to presentation for the examination, may be examined at a scheduled office visit or referred to a child sexual abuse medical center.

Allegations of sexual abuse that arise in the course of a custody dispute are often very challenging. Whether or not these allegations are false, the child is being victimized and should be examined.

## PHYSICAL EXAMINATION TECHNIQUES

### Preparation

When performed properly, the medical examination for suspected sexual abuse should not be a traumatic event. However, close inspection of body areas that may have been sites of abuse may trigger memories of abuse and therefore be stressful for a child. Protocols for preparing suspected sexually abused children for an examination should include techniques that empower the child. For example, the child could be provided choices about who is allowed in the examination room, he or she should be educated about positions used during the examination, and he or she should be allowed to handle culture swabs or view objects through a colposcope or otoscope. These steps

may reduce fear and improve comfort.[6] Children may have been forced to pose for pornography as part of their abuse incident and care should be taken to explain and advise children and parents of the possible need for medical photographs. Children should never be forced to undergo an examination. Sedation may be necessary for those who require an emergent or urgent examination and are unable to cooperate.

Addressing parental anxiety is also an important aspect of preparation. Reassurance that the examination of the prepubertal child does not involve the use of a speculum or a bimanual examination can greatly alleviate concerns. Anticipatory guidance should emphasize the likely possibility of a normal examination. It is important to explain before the examination that normal findings do not rule out the possibility of abuse, and this may prepare the parents for the later frustration of having "no physical evidence."

### Method of Examination

The external examination of genitalia should occur as part of the natural progression of a comprehensive physical examination of every child at every visit. Abused children may have signs of abuse on the genitalia or other body sites or neglected medical needs. Wrists and ankles should be examined for signs of tethering. Bruises from grasp or pinch marks or from suction may be located on nongenital sites. Attention should be given to the oral cavity, where forced oral-genital contact could result in palatal petechiae (Figure 1) or torn frenula.

To view the genitalia, use of proper techniques enable visualization of subtleties of normal and abnormal genital anatomy and of the dynamic changes of genital findings. These techniques include proper positioning of the child and of the examiner's gloved hands.

Male genitalia can be examined with the child supine or standing. The glans should be examined and, if possible, foreskin retracted to view the base of



**Figure 2.** The supine frog-leg position is most frequently used and comfortable for the child. (Reprinted with permission from Kit Hefner, SUNY Health Science Center Office of Educational Communications.)



**Figure 3.** The examiner's thumb and forefinger grasp the labia majora and apply traction in the downward (arrows) direction and outward (toward the examiner). (Reprinted with permission from Kit Hefner, SUNY Health Science Center Office of Educational Communications.)

the glans. The scrotum should be examined and testicles palpated.

For prepubertal girls, the supine frog-leg position (Figure 2) is often the most comfortable.[7-10] In younger children, there may be more cooperation by seating the child in the mother's lap, leaning against the mother with the knees held and legs separated by the mother.

Traction is applied by placing the thumb and forefinger on the labia majora then pulling laterally and downward (Figure 3).[5] In this position, the child lies with legs in full abduction "like a butterfly or frog" and feet in apposition. This method is often successful in opening the vaginal canal without causing additional trauma to the tissues.[5] In contrast, direct lateral labial separation may be painful and may cause tears of the posterior fourchette. Some examiners have used gentle drops of warm bacteriostatic water through a catheter to "float" the hymenal edges for better visualization.[5] Others moisten swabs and trace the outline of the introitus.[2,10] Because the hymenal edge is sensitive, all efforts to visualize the genitalia should be made before using a swab.

Examination findings change depending on position, relaxation, traction, and possibly other factors.[2,12] In general, the more relaxed the child, the more visible the hymenal edges and the more dilated the introital diameter.[2,8,11-13] Therefore, it is important to view findings using varying traction and positions.

The anus can be examined in the lateral recum-

bent position or knee–chest position (Figure 4).[7-9] The knee-chest position may be considered awkward and embarrassing for the child and may have been the position in which the child was victimized. Gluteal folds can be gently separated to look for external signs of trauma. Increased traction will assist with observation of the anal sphincter tone, fissures, or internal scars. If there is rectal bleeding, an endoscopic examination should be arranged. A rectal examination, with insertion of a gloved finger, is usually not indicated.

Use of the knee-chest position for all children is controversial and, if used, should be limited to a very short duration. The advantages of this position in the prepubertal girl are that the change in position may allow previously adhered, possibly redundant hymenal tissue to drop downward and assist with clarification of questionable examination findings.[7,8,11] In cases where there is bleeding or suspicion of a vaginal foreign body, this position can provide visualization to the cervix.[7,8,11]

Note that these positions and examination techniques are simply performed in the office setting, add little time to the general examination, offer adequate visualization of the genitalia without expensive or highly technical equipment, and do not require the use of special examination tools such as the nasal, vaginal, or pediatric specula.

## Colposcopy

The use of magnification and photographic documentation of physical findings in suspected sexual abuse has become routine practice for sexual abuse examinations.[12-17] However, the colposcope is not a common piece of equipment in most pediatric offices. The colposcope is used to illuminate and magnify the external genitalia and rectal area in female and male patients and allow the examiner to more easily dis-

Case 1:94-cv-00289  Document 52  Filed in TXSD on 01/30/2001  Page 45 of 66



**Figure 4.** The knee–chest position, with the buttocks raised and back in a relaxed lordotic position, provides an alternative method for visualization of the hymen. (Reprinted with permission from Kit Hefner, SUNY Health Science Center Office of Educational Communications.)

> **Children who present within 72 hours of possible sexual assault or molestation need a complete physical examination, including a forensic examination to look for and collect evidence of sexual abuse.**

cern abnormalities. If a colposcope is not available, the naked eye with ample lighting is adequate, or an otoscope can be used to provide illumination and magnification.[16]

There are many commercially manufactured colposcopes equipped with cameras or video attachments for child sexual abuse examinations and documentation of findings. Photodocumentation can also be achieved with a 35-mm camera equipped with a macrofocusing lens and ring flash.[17] Note that Polaroid photographs are often inadequate for magnification, resolution, and depth of field. It is preferable to have no photograph than to have a poor or false representation of the findings. With or without a camera, all physical findings should be clearly documented as drawings in the child's medical record.

## PHYSICAL EXAMINATION FINDINGS

Abnormal physical findings for sexual abuse in prepubertal children are infrequent.[1,2,4,10,12,14,18,19] The reasons for this include possible delay in seeking medical care, rapid and often complete healing of genital tissues, sexual molestation involving fondling without tissue damage, hymen elasticity, and others.[14] When subtle or distinct genital findings suggestive of previous abuse are present, knowledge of normal prepubertal genital anatomy will assist with proper identification.

### Examination of Boys

Studies reporting medical findings of sexual abuse in boys have been limited.[14,20] Sexual abuse in boys appears to be greatly underreported.[7,14,20] As in girls, physical abuse caused by sexual abuse in boys are unusual.[14,20] Injuries to the glans, shaft of the penis, or scrotum may include tears, bruising, petechiae, bite marks, or healed scars.

### Anal Findings

Anal injuries are often difficult to discern. Acute anal injuries may result in abrasions, bruises, edema, and lacerations. Healed injuries resulting from chronic or past abuse include skin tags, distorted or irregular folds, funneling (anus appears deeply placed), dilation or gaping of the anal sphincter, reflex anal dilation, loss of sphincter tone, shortening and eversion of the anal canal, external venous congestion, flattening of the anal folds, and reddening and thickening of perianal tissues.[2,7,14,21-24]

Some findings, such as fissures and skin tags, may be found in nonabused children. Constipated children may develop superficial fissures.[25] Other causes of decreased anal tone and dilation of the anal sphincter include stool in the rectal vault during the examination, general anesthesia, and neurogenic patulous anus,[23] as is found in spina bifida. It is generally accepted that anal dilation is significant if, lacking neurologic abnormalities or stool in the vault, it is greater than 1.5 cm.[8,11,12,14,21] Significant dilation may persist in various examination positions or on repeat examinations.

In adults, anal tone has been measured as a marker for sexual abuse. Some suggest that anismus may be a marker for abuse and normal anorectal reflexes may be changed as a result of traumatic insults.[26] Case-controlled studies in children documenting changes in rectal tone as the result of sexual abuse have not been reported.

Some reports indicate that rectal findings subsequent to penetration are unusual.[21,23,24] However, Muram[22] observed anal and perianal abnormalities in as many as 84% of those children who gave a clear history of anal assault. Others have reported fatal anorectal injuries.[27] Normal dilation of the anal sphincter for routine stool passage may be greater than that required for penetration of a penis and, therefore, victims may remain free of medical findings resulting from penetration.

Midline folds, avascular areas, or wide smooth areas (diastasis ani) are often seen in normal nonabused children.[21] Midline lacerations caused by sexual abuse may resolve leaving midline avascular areas, which are not easily differentiated from normal findings. The task of deciding if abnormal rectal findings are consistent with a history of sexual abuse is made

CM/PDF – www.fasoo.com

Case 1:94-cv-00289   Document 52   Filed in TXSD on 01/30/2001   Page 46 of 66



**Figure 5.** Normal anatomy of the prepubertal girl. The crescent hymen depicted here is the most common prepubertal type. (Reprinted with permission from Medical Economics Publishers.)



**Figure 6A.** A normal fimbriated hymen.



**Figure 6B.** A normal prepubertal crescent hymen.

easier if there have been previously documented normal examinations for comparison.

## Normal Prepubertal Female Anatomy

Anatomic features of the genital area in prepubertal girls are depicted in Figure 5. In documenting the physical findings, practitioners should describe the hymen morphologic type or variant type. It is important to document the position of the child during the examination and the exact location of any findings. The use of the clockface assists with documentation. Descriptive terminology has been previously summarized by the American Professional Society on the Abuse of Children.[28]

The hymen is a small amount of mucosal tissue that surrounds the opening to the vaginal introitus and is made of elastic and collagenous connective tissue.[29] There are a range of anatomical variants of normal prepubertal hymens. Many factors may influence the hymenal morphology, including congenital differences, race, hormonal influences, and healing from trauma or infections.[29] Estrogen causes thickening of the hymenal tissue and paleness of the mucosa.[30,31] The normal newborn hymen is generally thickened with redundant tissue and may be described as fimbriated (see Adams[31]; Figure 6A).[30,32] By 3 years of age, the majority of prepubertal girls have developed a thin crescentic-shaped hymen (Figure 6B).[31,32] Some have an annular hymen (Figure 7). The annular hymen is thicker than the crescent hymen, with tissue circumferentially around the introitus. The crescent hymen is missing tissue in the superior portion and is thin. As children approach puberty and estrogen is again more abundant, the hymen becomes thickened and fimbriated again.

Other hymen configurations that have been described include sleeve-like (Figure 8), septated (Figure 9), and microperforate. The sleeve-like

hymen is similar to the annular hymen but opens anteriorly. The septate hymen should be differentiated from a bifid or duplicate vagina and is recognized by a thin band of tissue connecting superior and inferior sections of the hymen. The tissue of all of these types of hymen is extremely elastic.

The microperforate hymen and imperforate hymen (Figure 10) require surgical repair before puberty and are the only anatomic variants that leave little or no opening. An acquired imperforate hymen has also been described following sexual abuse.[14] Professionals must be cautioned not to misidentify a normal, closed hymen with these abnormal anatomic variants.

Not only do many myths and cultural beliefs surround the patient's and family's perception of the hymen, but many professionals have developed misconceptions about this tissue. The significance of the introital diameter, notches and bumps in the hymenal membrane, midline avascular areas, and tissue bands are points of concern. The introital diameter varies with positioning and relaxation, and a normal hymen can appear to have a large opening. Other variations in normal findings include hymenal tags (or septal



**Figure 7.** A normal annular hymen. (Reprinted with permission from Lori Frasier, MD, Children's Hospital, Columbia, Mo.)



**Figure 8.** This variant of the annular hymen has a more anteriorly placed opening and a "sleeve-like" appearance.



**Figure 9.** A band of tissue connects superior and inferior portions of the septate hymen. This photo was obtained utilizing the colposcope green filter.

remnants), superior and lateral notches, external ridges, longitudinal intravaginal ridges and bumps, and perihymenal and periurethral bands.[10-12,14,18,30,31]

Midline avascular areas of the posterior fourchette have been observed in up to one quarter of nonabused prepubertal populations.[11] Although sexually molested girls may have increased friability of the posterior fourchette, increased erythema, and vascularity,[18] these findings have also been frequently observed in nonabused girls.[11] Emans et al found that bumps in the lower half of the hymenal ring were more common in sexually molested children than in control children.[18] However, later research by Berenson et al[30] documents longitudinal intravaginal ridges extending to the hymenal rim occurring normally in newborns between the 5 and 7 o'clock positions. In her longitudinal study, these bumps and ridges became more apparent as the child developed a crescentic hymen.[32] Bumps unrelated to ridges may also be seen normally.[31,32] Normal hymenal tags, or septal remnants, occur most commonly in superior and inferior portions of the hymen (not usually laterally) and may be the result of cleavage of a hymenal septum. Figures 11 and 12 are two perspectives of a

normal crescent hymen with a normal bump (Figure 11) and the corresponding intravaginal ridge at the 5 o'clock position (Figure 12).

Although there may be an evolution of changes associated with growth and hormone effects to the hymen, good documentation of findings at birth and throughout childhood clearly assist in providing a basis for comparison. With clear records documenting normal anatomy, a newly observed finding raises the suspicion of trauma and warrants further investigation.

**Nonspecific Findings**

Many genital findings may be the result of trauma, poor hygiene, or other medical causes. These findings are described in detail in the article by Drs Siegfried and Frasier[33] in this issue of *Pediatric Annals*.

**Suspicious Genital Findings**

There are a few findings that can be identified as clear evidence of penetrating trauma.[12] The article by Adams[33] in this issue provides an updated classification system of anogenital findings in children. Fresh lacerations and newly healing scars, observed with a good history for sexual abuse, can provide clear evidence of abuse. Children with acute bleeding may need immediate referral to a pediatric gynecologist or surgeon. A prospective study of unintentional injuries to the perineal area concluded that hymenal injuries are rarely the result of unintentional injury.[16] More commonly, delays in seeking medical care result in the presentation to the practitioner of well-healed findings.

Absence of hymenal tissue in the area below the horizontal 3 to 9 o'clock line, confirmed in various positions with variations in traction, can be considered clear evidence of trauma. Healed transections in this area, most commonly at the 6 o'clock position (Figure 13), can also be considered clear evidence of penetration.[12,14,18] In general, notches or clefts in the hymenal tissue may normally develop in the superior

Case 1:94-cv-00289   Document 52   Filed in TXSD on 01/30/2001   Page 48 of 66



**Figure 10.** The tiny dark dimple in the mid-right side of the patient's hymen is a microperforation in this functionally imperforate hymen.



**Figure 11.** A bump is apparent on this crescent hymen at the 5 o'clock position.



**Figure 12.** A more posteriorly directed view reveals the normal intravaginal ridge associated with this normal hymenal bump

portion of the introitus as the hymen evolves during infancy from the fimbriated or annular configuration to the crescentic form.

Studies of nonabused children have indicated that no children have been born with an absent hymen.[5,17,18] No children had a congenital transection or attenuated hymen, and no children developed this finding as a result of normal evolution of hymenal configuration.[5] Therefore, if no hymen is observed in a child, the practitioner must suspect sexual abuse.

Because the introital diameter changes with traction, patient position, and relaxation, the size of hymenal diameter is rarely useful as a sign of abuse. Attempts to develop guidelines for normal hymenal size have been fraught with research design problems, such as lacking information concerning the positioning, relaxation, or amount of traction applied to the labia. When the medical practitioner notes a subjectively large hymenal diameter, the examiner should observe the hymenal rim for signs of narrowing and attenuation or absence of tissue. The rim size is of more critical concern than the

actual diameter of the introitus.[11,12] Both McCann and Berenson reported normal children having a posterior hymenal rim size, measured at the most inferior (6 o'clock location) to be at least 2 mm or greater.[11,12] Conservative advice is that any inferior rim less than 1 mm should be considered suspicious for trauma due to sexual abuse.[12]

## LABORATORY TESTING

Most children suspected of being sexually abused present to the medical practitioner long after physical findings have healed and forensic evidence has been washed away. The forensic examination, necessary within 72 hours after assault or molestation, includes collection of clothes, hair, saliva, blood, and smears of areas of possible semen.[19] The collected material is usually maintained through a "chain of evidence" using prepared rape kits specific to each state's crime laboratories. These kits are not commonly stocked at private offices and practitioners should familiarize themselves with local resources such as local emergency departments for the forensic examination and/or rape kit materials.

Recommendations for sexually transmitted disease (STD) testing in the prepubertal girl are dependent on the STD prevalence within a community, whether or not the child is symptomatic, and whether the alleged perpetrator is at high risk for an STD. In general, prevalence rates for STDs in prepubertal children tend to be below 4%, and most asymptomatic prepubertal children, presenting nonacutely, do not need screening for STDs. For a more in-depth review, refer to the July 1994 issue of *Pediatric Annals* on Sexually Transmitted Disease.[2]

The medical practitioner should be aware of proper methods to obtain vaginal swabs, smears, and cultures in prepubertal children. Only culture methods should be used for testing. Direct fluorescent antibody or enzyme immunoassay should not be used. Sensitivity to the child and use of techniques to reduce

Case 1:94-cv-00289 Document 52 Filed in TXSD on 01/30/2001 Page 49 of 66



**Figure 13.** A healed "V"-shaped transection through the hymen and fossa in a prepubertal girl.

Although the diagnosis of sexual abuse can never rely solely on physical findings, abnormal findings suspicious for sexual abuse are significantly more useful if there have been prior documented normal examinations.

trauma are necessary. In boys, small-tipped dacron or cotton swabs moistened with bacteriostatic water can be gently rubbed on the edge of the urethral mucosa. Deep insertion of this swab is not indicated. For vaginal cultures, one examiner should perform the labial traction technique and, as the hymen relaxes, a second examiner can insert the tip without touching the hymenal ring to swab the vaginal wall. This avoids the sensitive hymen and improves tolerance and cooperation for the examination.

## SUMMARY

The complete physical examination of prepubertal children should always include a genital examination. Most children, even those who have been sexually abused, will have a normal genital examination. A child's acceptance and tolerance to this aspect of the examination will be enhanced by use of the techniques described. Sexually abused children may be identified through routine review of systems and history, including behavioral and psychosocial, and open-ended questions regarding sexual abuse. Regular genital examinations will also help to identify sexually abused children. Although the diagnosis of sexual abuse can never rely solely on physical findings, abnormal findings suspicious for sexual abuse are significantly more useful if there have been prior documented normal examinations.

When sexually abused children initially present to their medical practitioner, the practitioner should obtain a complete medical and psychosocial history and perform a thorough examination. The practitioner need not be an expert in the interpretation of the possible legal significance of specific genital findings but should recognize normal, abnormal, and suspicious findings. Reassurance from a trusted practitioner relating to a normal body can be the most valuable treatment for a child's emotional healing. Practitioners need to be aware of the resources in their community for medical evaluations for sexual abuse, legal investi-

gations, and mental health referrals. If there is a local center for child abuse evaluations, such as a Child Advocacy Center or Center of Excellence for child protection, practitioners should consider referrals to and consultations with these resources.

## REFERENCES

[references illegible]

1995;42:1411-1416.

27. Orr CJ, Clark MA, Hawley DA, Pless JE, Tate LR, Fardal PM. Fatal anorectal injuries: a series of four cases. J Forensic Sci 1995;40:219-221.

28. Terminology subcommittee of the APSAC Task Force on Medical Evaluation of Suspected Child Abuse. Practice guidelines: Descriptive Terminology in Child Sexual Abuse Medical Evaluations. APSAC 1995:1-8.

29. Pokorny SF. Configuration of the prepubertal hymen. Am J Obstet Gynecol 1987;157:950-956.

30. Berenson AB, Heger A, Andrews S. Appearance of the hymen in newborns. Pediatrics 1991;87:458-465.

31. Berenson AB, Heger AH, Hayes JM, Bailey RK, Emans SJ. Appearance of the hymen in prepubertal girls. Pediatrics 1992;89:387-394.

32. Berenson AB. A longitudinal study of hymenal morphology in the first 3 years of life. Pediatrics 1995;95:490-496.

33. Adams JA. Sexual abuse and adolescents. Pediatr Ann 1997;26:299-304.

34. Berkowitz CD, Elvik SL, Logan M. A simulated acquired imperforate hymen following the genital trauma of sexual abuse. Clin Pediatr (Phila) 1987;26:307-309.

35. Siegfried EC, Frieden LD. Anogenital diseases of childhood. Pediatr Ann 1993;22:321-331.

36. Bond GR, Dowd MD, Landsman I, Rimsza M. Unintentional perineal injury in prepubescent girls: a multicenter prospective report of 56 girls. Pediatrics 1995;95:628-631.

37. Mor N, Merlob P, Reisner SH. Types of hymen in the newborn infant. Eur J Obstet Gynecol Reprod Biol 1986;22:225-228.

38. Jenny C, Kuhn MLD, Arakawa F. Hymens in newborn female infants. Pediatrics 1987;80:399-400.

39. Enos WF, Conrath TB, Byer JC. Forensic evaluation of the sexually abused child. Pediatrics 1986;78:385-398.

40. Sirotnak AP. Testing sexually abused children for sexually transmitted diseases: who to test, when to test, and why. Pediatr Ann 1994;23:370-374.

Case 1:94-cv-00289   Document 52   Filed in TXSD on 01/30/2001   Page 51 of 66

ORIGINAL CONTRIBUTION

# Genital Findings in Prepubertal Girls Evaluated for Sexual Abuse

## *A Different Perspective on Hymenal Measurements*

*Perry A. Pugno, MD, MPH*

**Objective:** To evaluate the usefulness of the horizontal transhymenal diameter as a screening parameter to differentiate between prepubertal girls with and without other definitive signs of sexual abuse.

**Design:** Case comparison study using transhymenal measurements as a diagnostic screening test referenced against prior publications of criterion standards.

**Setting:** A primary care (family practice) clinic in association with an academic program in northern California.

**Patients:** A consecutive, referred sample of 1058 prepubertal girls aged 6 months to 10 years who were examined as allegedly having been sexually molested between 1987 and 1994.

**Results:** Girls with no definitive signs of genital trauma exhibited a mean transhymenal diameter of 2.3 mm and in general showed an increase of approximately 1 mm per year of age. Girls with definitive signs of genital trauma exhibited a mean transhymenal diameter of 9.0 mm and no significant variance with age. Correcting for age differences, the transhymenal diameter was highly significant as a differentiating factor ($F = 1079$, $P<.001$). When compared against the criterion standard, the transhymenal measurement is 99% specific and 79% sensitive as a screening tool.

**Conclusion:** Although not independently diagnostic of sexual molestation, the transhymenal diameter, when compared against the criterion standard for age, is a useful screening parameter for primary care physicians evaluating children of potential sexual abuse.

*Arch Fam Med. 1999;8:403–406*

D URING the past 2 decades, the number of children suspected to have been sexually abused has increased dramatically.[1] The attention given to this societal problem is measured by the rising number of media reports focused on it. Despite increased attention and its obvious importance, however, the diagnosis of sexual abuse remains difficult to establish in most cases. This state of affairs poses a challenge to the medical profession to support the needs of the judicial system and child protective agencies to make a determination as to the presence or absence of physical signs of sexual molestation. Although this has also prompted the medical profession to determine with some sense of assurance the "normal" developmental anatomy of children's genitalia, multiple investigators[2-5] have reported on the occurrence and perceived significance of physical signs correlated with localized trauma to the genitalia. Some studies[6-8] have even attempted to identify the parameters of "normalcy" through detailed screening of pediatric patients, but results vary widely. The most difficult variable to control for the abused child is the variable of unreported sexual abuse.[9]

One physical parameter that received substantial attention in recent years is the horizontal transhymenal diameter measured in prepubertal girls. Previous studies[8,10,11] have documented the high degree of correlation between examiners recording such quantitative measurements. For this parameter, multiple authors have suggested a benchmark threshold of "normal" for prepubertal girls of 4 to 10 mm,[12-16] some noting enlargement with age[11,17] and others not.[5,18]

There is also good consensus among physicians who perform evidentiary examinations on a regular basis that no single parameter should be used as a criterion for the establishment of the diagnosis of sexual abuse.[4] Still, it remains important to clarify whether the parameter of transhymenal measurement has a role in lending further credence to other physical findings currently associated with sexual abuse. To do so, however, demands the identification of a reliable "control" population with which these findings can be compared.

*From the M.H.S. Family Practice Residency Program, Methodist Hospital of Sacramento, Mercy Healthcare, and Department of Family and Community Medicine, University of California at Davis Medical Center, Sacramento.*

EXHIBIT "D"

## SUBJECTS AND METHODS

### SUBJECTS

From calendar years 1987 through 1994, a total of 1839 children were referred to the Mercy Family Health Center, Redding, Calif, for evidentiary examinations as potential victims of sexual abuse. They included 403 boys and 1436 girls. The children were referred by either social service or law enforcement agencies from a total of 14 northern California counties. For the purposes of this study, 1058 prepubertal girls (maturational level, Tanner I) were identified within an age range of 6 months to 10 years 9 months.

### DATA ANALYSIS

All children referred for evidentiary examinations were evaluated in accordance with the California Medical Protocol for the Examination of Sexual Assault and Child Sexual Abuse Victims,[19] and physical findings were documented on the mandated California Child Sexual Abuse Reporting Form (OCJP 925). Historical information was obtained from all available sources, including family members, social workers, and law enforcement personnel. As part of the evaluation process, each child underwent a complete general physical examination. These examinations were conducted at a leisurely pace to ensure the child's cooperation and maximum state of relaxation. Any child refusing or resisting the examination was eliminated from the study (n = 5). In all cases, genital examinations were conducted by myself with the child in the supine "frog leg" position, and used the labial separation technique. Briefly, this technique involves gentle separation of the labia just sufficient to permit visualization of the introitus.[11] The horizontal transhymenal diameter was measured with no traction, since traction obviously enlarges the orifice and would be impossible to quantify accurately (force, vector, etc). The measurements were made repeatedly when the child being examined was "relaxed and cooperative"; this was believed to be a reproducible end point, identifiable to any health professional who frequently examines children.

The horizontal transhymenal diameter was defined as the width of the orifice in the hymenal membrane between the 3- and 9-o'clock positions as viewed in the coronal plane. Transhymenal diameters were directly measured macroscopically using both a precision millimeter scale and a comparison of the opening with precision illustrations of circular and elliptical figures. In addition, genitalia were reexamined using the labial traction technique[11] with the child in either the knee-chest or lateral recumbent position to ensure as comprehensive an examination as possible and to identify the presence or absence of other physical signs. In each case, visualization of the genital tissues was augmented by the use of a lighted, handheld magnifier, a colposcope, or both. Data tabulation was abstracted directly from the reporting form, and an audit of tabulation precision was conducted to ensure an error rate of less than 0.004%.

For 149 cases (14.1%) the examiner was able to compare his measurements of individual children with those reported by other physicians who examined those same individuals. As previously noted, the documented measurements between examiners were virtually identical and in no case varied by more than 1 mm. This provided assurance of the children's cooperativeness with the examinations and the reliability of the measurements' accuracy.

Criteria for the examiner to determine that an individual examination exhibited evidence consistent with the genital trauma of sexual assault were identified by a review of recent literature and the selection of those criteria generally accepted among the relevant medical community to be reliable indicators.[3,4,20] These criteria included abrasions, lacerations, contusions, hymenal transections, obvious scarring, and marked narrowing of the hymen itself. For the purposes of this study, minor irregularities of the hymenal ring, septal remnants, bumps, notches, or variations in the vascular pattern were considered sufficiently "nonspecific" to preclude their use in this study as definitive indicators of genital trauma. In addition, since it would be a basis for circular reasoning, the measurement of the hymenal opening itself was eliminated as an indicator of genital trauma.

Statistical analysis was performed using the publicly available software package Epi Info produced by the National Institutes of Health.[21] The analysis of variance and $\chi^2$ tests for statistical significance were calculated using the method of Yates correction.

The purpose of this project was to evaluate the transhymenal diameter measurement from a somewhat different perspective, specifically from within a population of children referred for examinations for suspected sexual molestation. The main question, therefore, became, "Is the horizontal transhymenal diameter of prepubertal girls, with definitive evidence of penetration trauma to the genitalia, significantly different from that of alleged victims who show no definitive physical signs of acute or chronic penetration trauma to genital tissues?"

### RESULTS

### POPULATION CHARACTERISTICS

The age distribution for the study population is represented in **Figure 1**. Although many of these children were examined with little or no history available regarding the specifics of the allegations (n = 331), a history from the child of genital penetration was noted to be predictive of definitive physical signs of genital trauma (n = 299, relative risk = 1.84).

### TRANSHYMENAL MEASUREMENT

The **Table** summarizes the results of horizontal transhymenal measurements using the supine labial separation technique among prepubertal girls selected by the presence or absence of definitive physical signs of genital trauma. Girls with no definitive signs of trauma (negative examinations) demonstrated a mean transhymenal diameter of 7.3 mm (average age, 5.0 years). Prepubertal girls whose examinations revealed the presence of definitive physical signs of genital trauma (positive exami-

CutePDF · www.cutepdf.com

Case 1:94-cv-00289 Document 52 Filed in TXSD on 01/30/2001 Page 53 of 66



Figure 1. Age distribution of the study population (N = 1058).

| Transhymenal Diameters by Age and Examination Findings | | |
|---|---|---|
| | Diameter, Mean ± SD, mm | |
| Age, y | Negative Examination | Positive Examination |
| <1 | 0.7 ± 1.1 (n = 16) | 9.5 ± 2.5 (n = 2) |
| 1 | 1.0 ± 1.6 (n = ...) | 6.5 ± 3.3 (n = ...) |
| 2 | 1.0 ± 1.3 (n = 101) | 6.5 ± 4.1 (n = ...) |
| 3 | 1.9 ± 1.5 (n = 120) | 7.2 ± 3.9 (n = ...) |
| 4 | 1.9 ± 1.9 (n = ...) | 7.8 ± 3.9 (n = ...) |
| 5 | 3.3 ± 2.0 (n = ...) | 7.6 ± 3.9 (n = ...) |
| 6 | 3.2 ± 2.1 (n = ...) | 9.9 ± 4.9 (n = ...) |
| 7 | 4.1 ± 2.6 (n = ...) | 10.9 ± 4.9 (n = ...) |
| 8 | 3.8 ± 2.9 (n = ...) | 11.1 ± 5.4 (n = ...) |
| 9 | 3.8 ± 3.2 (n = ...) | 12.9 ± 5.9 (n = ...) |
| 10 | 5.3 ± 3.5 (n = ...) | 13.5 ± 5.9 (n = ...) |
| Total | 3.3 ± 2.4 (n = 685) | 9.0 ± 5.2 (n = 373) |



Figure 2. Horizontal transhymenal diameter findings in prepubertal girls (n = 685) with physical examinations negative for definitive signs of genital trauma, plotted against a reference guideline for maximal "normal" hymenal measurements.



Figure 3. Horizontal transhymenal diameter findings in prepubertal girls (n = 373) with physical examinations positive for definitive signs of genital trauma, plotted against a reference guideline for maximal "normal" hymenal measurements.

nations) exhibited a mean horizontal transhymenal measurement of 9.0 mm (average age, 6.2 years). Despite correcting for the difference in average age of the 2 populations, the difference in mean transhymenal diameter was highly significant (F = 1079, P<.001).

The study population with negative examinations was further subdivided into the 3 groups of early childhood (ages 2-5 years), midchildhood (ages 5-8 years), and preadolescence (ages 8-10 years). When compared with the results of other investigators' transhymenal measurements for prepubertal girls selected for nonabuse, the girls with negative examinations in this study exhibited similar values.[9] For example, in the age group of 5 to 8 years, this study population of girls with negative examinations exhibited a mean transhymenal diameter of 3.3 mm compared with the mean of 4.2 mm of the study population of McCann et al.[9] This supports the perspective that the population with negative examinations is a valid and reliable representation of "normal" genital anatomy.

To further assist in the evaluation of these data from a normative viewpoint, scatter diagrams of individual measurements were plotted against a reference guideline for maximal normal transhymenal diameter by the age of the child. **Figure 2** and **Figure 3** demonstrate the relationship of individual measurements with a reference guideline for the upper limit of "normal" transhymenal diameters as included in the *Informational Guide to the California Medical Protocol for the Examination of Sexual Assault and Child Sexual Molestation Victims*.[22] The guide-

line is based on an expected increase in transhymenal diameter of approximately 1 mm per year of age during the prepubertal period (after 5 years of age, the maximum diameter equals 1 mm per year of age).

| Age | Maximum Diameter, mm |
|---|---|
| Infancy to 2 y | 4 |
| 2-5 y | 5 |
| 6-9 y | 9 |
| 10 y to puberty | 15 |

This guideline is consistent with the findings of other investigators.[17,23] When compared with the reference guideline, the results of this study demonstrate a very low incidence of false-positive findings (specificity, 99%) and a reasonably low incidence of false-negative findings (sensitivity, 79%). In other words, this study shows that the horizontal transhymenal diameter measurement, when compared with a commonly used reference guideline, is a potentially useful parameter for the screening of children suspected to have been molested.

Case 1:94-cv-00289   Document 52   Filed in TXSD on 01/30/2001   Page 54 of 66

# Children With Anogenital Symptoms and Signs Referred for Sexual Abuse Evaluations

*Nancy D. Kellogg, MD; Juan M. Parra, MD, MPH; Shirley Menard, RN, PhD, CPNP*

**Objective:** To determine whether children referred to a sexual abuse clinic because of anogenital symptoms or signs have examination findings that are suggestive of or probable or definitive for sexual abuse.

**Design:** Case series of 157 patients.

**Setting:** Child and adolescent ambulatory care sexual abuse clinic.

**Results:** A medical records review of 3660 cases was done; 157 cases were identified for study. Most (75%) referrals were from medical clinics. Of 184 complaints, the most common presenting symptom or sign was anogenital bleeding or bruising (29.3%), followed by irritation or redness (21.7%), abnormal anogenital anatomy (20.7%), vaginal discharge (18.4%), lesions (6.5%), and "other" symptoms or signs (3.3%). We used a standardized classification system and determined that 25 patients (15%) had examination findings in the sexual abuse clinic that were suggestive of or probable or definitive

for sexual abuse. Although 85 patients had examination findings that corroborated the presenting symptom(s), 70 had nonspecific examination findings or a diagnosis other than sexual abuse. Seventy-two patients had normal examination findings. Only patients with the presenting symptom of lesions had an increased likelihood of a sexual abuse diagnosis. Common examination findings included anogenital erythema, enhanced vascularity of the hymen or vestibule in prepubertal girls, labial adhesions, and culture-negative vaginitis.

**Conclusions:** Few children are referred for sexual abuse evaluations based on physical signs or symptoms alone. Children with anogenital symptoms but without a disclosure or suspicion of sexual abuse are unlikely to have examination findings suggestive of abuse. The evaluation of children with anogenital symptoms and signs should include a consideration of alternative conditions and causes not directly related to sexual abuse.

*Arch Pediatr Adolesc Med. 1998;153:634-641*

---

**Editor's Note:** One of the most physically and emotionally difficult diagnoses to make is that of sexual abuse in a child. Just imagine what it must be like for the child.

*Catherine D. DeAngelis, MD*

CHILD SEXUAL abuse is a common pediatric problem affecting approximately 12% of girls younger than 14 years.[1] Medical evaluations are commonly requested in children who are suspected victims of sexual abuse. Detecting sexual abuse is challenging because many children do not disclose their abuse,[2] and physical findings tend to be absent or nonspecific.[3,4] The accurate detection of findings associated with sexual abuse also depends on a familiarity with variations in anogenital anatomy that have been described in children who have not been abused.[5-7]

Sexual abuse of children is sometimes detected in clinical settings. The children may present with anogenital symptoms or signs, including bleeding, pain, inflammation, and vaginal discharge.[7] Al-

ternatively, they may be asymptomatic, and a clinician may uncover suspicious findings during the anogenital examination. Clinicians are challenged to differentiate symptoms or findings attributable to sexual abuse from physiologic, skin, or other conditions. This determination is critical in addressing the safety needs of a child and providing appropriate treatment. Although the detection of sexual abuse is of unquestionable importance, a mistaken diagnosis can be traumatizing to the child, family, and persons who are suspected of abuse.

The purpose of this study is to determine whether children who have not disclosed abuse but who are referred for sexual abuse evaluations because of anogenital symptoms or signs have examination findings that are suggestive of or probable or definitive for sexual abuse. The probability of sexual abuse was assessed using a standardized classification system.[9]

From the Division of General Pediatrics, Department of Pediatrics (Drs Kellogg and Parra), and the Department of Family Nursing Care (Dr Menard), University of Texas Health Science Center, San Antonio.

## RESULTS

A total of 3660 medical records were reviewed: 157 patients met the criteria for in-

## PATIENTS AND METHODS

A medical records review was performed of cases evaluated in an ambulatory care sexual abuse clinic from February 3, 1989, through May 20, 1996. The criteria for inclusion in the study included: (1) children and adolescents aged from birth to 17 years who are referred because of a concern about sexual abuse based on physical symptoms or signs; (2) there is no disclosure of sexual abuse at, or before, the time of referral; and (3) there is no report of behavioral changes suggestive of or indicating sexual abuse. Examples of such behaviors were nightmares, masturbation, and sexualized behavior with other children, adults, or toys. Children who presented with condylomata acuminata were also excluded because of difficulties in determining the sexual transmission of this disease, especially in young children.

The following information was assessed: patient's sex, age at the time of the evaluation, referral source, time from referral to evaluation, primary symptom(s) that led to the referral, examination results, colposcopic photographs, culture results, and year the evaluation was done.

Medical records and colposcopic photographs of each study patient were reviewed by the authors. Each author reviewed the photographs independently and reached the same conclusions regarding each case. Examination findings were then classified according to the system devised by Adams et al.[a] Four classes of findings were used: no evidence of abuse (class 1), possible sexual abuse (class 2), probable sexual abuse (class 3), and definitive evidence of sexual abuse (class 4). Although this classification system is based on numerous research articles, it has not been extensively tested or universally accepted. Examination findings in the sexual abuse clinic were compared with the presenting symptom for consistency and possibility of resolution during the referral-to-examination interval. When findings were consistent with the presenting symptom, examination results were suggestive of abuse, nonspecific for abuse, or consistent with a diagnosis other than sexual abuse. When examination findings did not reflect the presenting symptom or sign, we assessed the likelihood of whether the presenting symptom or sign could have resolved during the interval between the presenting symptom and examination at the sexual abuse clinic. Symptoms or signs of irritation, redness, bleeding, bruising, vaginal discharge, and lesions were deemed more likely to resolve than those of "abnormal examination findings," which included scarring and "enlarged opening."

Statistical methods included 1-way analysis of variance, $\chi^2$ analysis, and odds ratio using the Fisher exact test. $P$ values of less than .05 were considered significant.

faculty member. Child Protective Services provided 15% of the referrals, day care providers referred 1% of the patients, and other sources (attorneys, self, law-enforcement agencies) constituted the remaining referrals. This referral pattern differed from the overall referral pattern to this clinic: medical clinics, 27%; Child Protective Services, 42%; and other, 32%. In addition, the study group was younger and more likely to be female than other children referred to the sexual abuse clinic. In this study, Child Protective Services referrals were based on reports of symptoms from other sources, some of which were likely to be medical professionals.

Ninety-nine patients (63.1%) were reported as possible victims of child abuse to Child Protective Services, law enforcement, or both, before being examined in the sexual abuse clinic. For 12 patients (7.6%), reports were not made before they were evaluated in the sexual abuse clinic. For the remaining 46 patients (29.3%), it could not be determined by medical records review whether the referral source had reported suspected abuse to the authorities. Of the 25 patients with findings of sexual abuse on examination, 17 were reported as possible victims of abuse before the examination, 1 was not reported before the examination, and for 7 patients it was undetermined whether a report was made previously. Examiners at the sexual abuse clinic reported these last-described 8 cases to Child Protective Services.

The time from referral to examination was recorded for 69 patients. Although the average interval from referral to examination was 9.7 days, more than half were seen within 3 days (range, 1-70 days). Patients with symptoms of bleeding were generally seen within 1 day. All children who were verbal and able to respond appropriately were questioned by examiners in the sexual abuse clinic about the possibility of sexual abuse. The 157 cases in this study were evenly dispersed among the 7 years of medical records review, ranging from 19 cases in 1990 and 1993 to 26 cases in 1994.

There were 6 categories of presenting symptoms or signs that led to a concern of sexual abuse and resulted in referral to our sexual abuse clinic: anogenital bleeding or bruising, anogenital irritation or redness, abnormal anatomical findings, vaginal discharge, anogenital lesions, and other. There were 184 presenting symptoms or signs in 157 patients. The frequencies of these presenting symptoms or signs are as follows: bleeding or bruising, 54 complaints (29.3%); irritation or redness, 40 complaints (21.7%); abnormal examination findings, 38 complaints (20.7%); vaginal discharge, 34 complaints (18.4%); lesions, 12 complaints (6.5%); and other, 6 complaints (3.3%). The "abnormal examination findings" category included presenting symptoms or signs of enlarged vaginal (or hymenal) opening, scarring, and anal dilatation. Those presenting with lesions had discrete blisters, growths, bumps, ulcers, or other similarly described anogenital lesions. The "other" category included 3 patients with urinary tract infections, 1 with recurrent urinary tract infections, and 2 with recurrent dysuria.

From the classification system developed by Adams et al,[a] 132 (84%) examinations had no findings suggestive, probable, or indicative of sexual abuse. In the remaining patients, 19 (12%) had findings consistent with

clusion in the study. Of these, 151 (96.2%) were girls and 6 (3.8%) were boys. The average age was 4.6 years (range, 2 months to 16.8 years). Referrals were predominantly (118 [75%]) from medical clinics, of which 30 were from pediatric resident physicians and their supervising pediatric

Case 1:94-cv-00289   Document 52   Filed in TXSD on 01/30/2001   Page 56 of 66

**Table 1. Seventy Examination Findings That Correlate With Presenting Symptom or Sign but Are Nonspecific for Abuse or Consistent With a Separate Diagnosis**

| Examination Findings | Patients, No. (%)* |
|---|---|
| Vulvovaginitis or proctitis, culture negative | 15 (21) |
| Mild erythema or friable tissue, not cultured | 13 (19) |
| Vulvovaginitis or proctitis, culture positive | 10 (14) |
| Labial agglutination | 7 (10) |
| Accidental (witnessed) injury to vulvovaginal area | 4 (6) |
| Anal skin tag | 3 (4) |
| Anatomical variations (perihymenal bands, septate hymen) | 3 (4) |
| Failure of midline fusion of perineal raphe | 3 (4) |
| Lichen sclerosus | 3 (4) |
| Anal dilatation associated with encopresis or neurologic deficit | 2 (3) |
| Urethral prolapse | 2 (3) |
| Urinary tract infection | 2 (3) |
| Other (varicosities, molluscum contagiosum, ingrown hair) | 3 (4) |

*Percentages add up to less than 100% due to rounding.*

**Table 2. Twenty-one Examination Findings That Correlate With Presenting Symptom and Sign and Are Suspicious for Abuse**

| Examination Findings | Patients, No. (%)* |
|---|---|
| Hymenal notch or area of hymen attenuated to ≤1 mm | 13 (62) |
| Genital type 1 herpes simplex virus and hymenal notch or attenuation to ≤1 mm | 3 (14) |
| Genital type 2 herpes simplex virus and hymenal notch or attenuation to ≤1 mm | 2 (10) |
| Focal hymenal hemorrhages | 2 (10) |
| Vaginal gonorrhea and hymenal notch or attenuation to ≤1 mm | 1 (5) |

*Percentages add up to more than 100% due to rounding.*



Figure 1. *This girl, aged 2 years 2 months, was referred by a day care provider because of vaginal bleeding. Erythematous patches on the vulva were consistent with candidiasis. A small superficial laceration extends anteriorly from the anterior junction of the labia majora. The remainder of the examination findings were normal. This case was reported to authorities for investigation.*

"probable" abuse. 4 (3%) had findings "definitive" for abuse, and 2 (1%) had findings consistent with "possible" abuse. The mean age of patients in this category was 4.3 years, which was significantly younger than the mean age (5.9 years) of the patients with possible, probable, or definite evidence of abuse (P = .01).

The consistency or correlation of the examination findings was compared with the presenting or referring symptom or sign. Eighty-five patients (54%) had examination findings reflecting the presenting symptom or sign; in this group, 70 (82.4%) of 85 patients had nonspecific findings or a diagnosis other than sexual abuse. **Table 1** summarizes findings in this subgroup. In 21 patients, there were findings consistent with the presenting symptom or sign and abuse (**Table 2**). Of 157 patients, 72 (45.9%) had normal examination findings. Of patients without findings, 50 (69.4%) had presenting symptoms or signs that could have resolved before the examination in the sexual abuse clinic. These symptoms and signs were either acute or transient: irritation or genital redness, bleeding or bruising, lesions, and vaginal discharge. Twenty-six patients were referred for "abnormal examination findings" that included "enlarged," "stretched," and "too big" vaginal or anal opening or "scarring." In all 26 pa-

tients, the results of examinations in the sexual abuse clinic were normal. This group represents a discrepancy of opinion between the referral source and the examiners from the sexual abuse clinic. Of the 26 referrals in this group, 23 were from physicians, 1 was from an attorney, and 2 were from Child Protective Services.

The most common presenting symptom or sign that led to a concern about sexual abuse and referral was anogenital bleeding or bruising (54 complaints [29.3%]). Ten in this group had additional presenting symptoms or signs, including "abnormal examination findings," vaginal discharge, and irritation or redness. The mean (SD) age of patients presenting with bleeding or bruising was 4.7 (2.8) years. Of 54 patients, 42 (78%) had no evidence of abuse. Thirty-two patients (59%) had evidence of bleeding or bruising on examination, and 8 (15%) patients had findings suggestive of abuse. Examples of bleeding or bruising that were nonspecific or consistent with a separate diagnosis include macerated tissue involving the vulva, vestibule, or anus due to group A streptococcal infection or candidiasis (**Figure 1**), failure of midline fusion of the perineal raphe (**Figure 2**), lichen sclerosus, accidental trauma (**Figure 3**), anal fissure, vulvar varicosities, and hemangioma (**Figure 4**). Twenty-two patients (41%) had normal examination findings that may represent resolution of the presenting symptom during the interval between referral and examination in the sexual abuse clinic.

Of the 40 patients presenting with irritation or redness, 13 (32%) had additional symptoms or signs of bleed-



Figure 2. This 10-month-old girl was referred by a private practice physician because of "vaginal tear." A midline perineal defect is seen. This case was reported to authorities by the referring physician for investigation.



Figure 3. This girl, aged 5 years 4 months, was referred by a private practice physician because of vaginal bleeding. When questioned further, the child was observed falling on the sharp edge of a metal container, impaling the perihymenal tissue. A small laceration is seen in the vestibule adjacent to the hymen at the 8-o'clock position (arrow). The pattern of this injury is consistent with sharp penetrating trauma rather than blunt penetrating trauma as seen in sexual abuse injuries. This case was reported to authorities by the referring physician for investigation.

ing or bruising, abnormal examination findings, lesions, or vaginal discharge. The mean (SD) age of patients presenting with irritation or redness was 3.8 (2.1) years. Thirty-eight (95%) of 40 patients had no evidence of abuse. Although 19 patients (48%) had findings of irritation or redness, only 1 (5%) of the 19 had evidence of abuse. Examples of nonspecific findings in this group include vulvar or perianal erythema in diapered children, prominent vascularity within the vestibule, and lichen sclerosus. Twenty-one patients (53%) in this group had normal examination findings, indicating possible resolution of the irritation or redness before the evaluation in the sexual abuse clinic.

Abnormal genital or anal anatomy accounted for 38 (20.6%) of the presenting signs. The mean (SD) age of patients presenting with abnormal examination findings was 3.7 (2.6) years. All 38 patients had no evidence of abuse. Twelve (32%) of the 38 patients had findings consistent with the referring symptom or sign but that were normal variations in anatomy: anal tags, septate hymen, septal remnants, failure of midline fusion of perineal raphe, and anal dilatation associated with encopresis. The remaining 26 patients in this group were referred for "stretched," "too big," "wide," "too open," "very abnormal," "asymmetric," or "enlarged" (**Figure 5** and **Figure 6**) vaginal opening, "piece of skin" (anal tag), or scarring. Three referrals documented measurements of the hymenal (6 cm and 6 × 7 mm) or anal (6 cm) openings. Given the less transient nature of these symptoms, it is likely that this group represents a discrepancy in pro-

fessional opinions between the referring physician and the sexual abuse clinic physician, rather than a resolution of the presenting symptom.

Patients presenting with vaginal discharge constituted 18% of the total. Of the 34 patients with vaginal discharge, 27 (79%) had no evidence of abuse, and 25 (74%) had a vaginal discharge on examination. Patients presenting with vaginal discharge were significantly older (6.2 years) than patients presenting with abnormal examination findings (3.8 years) (P = .03) or irritation or redness (3.8 years) (P = .04). In 23 patients with a vaginal discharge on examination, specimens for culture were initially collected in the sexual abuse clinic and not by the referral source. Of these 18 patients with a vaginal discharge, 12 had cultures negative and 6 had cultures positive for Haemophilus influenzae (2 patients), Shigella species (1 patient), group B streptococci (1 patient), or usual genital flora (2 patients). "Usual genital flora" consisted of 1 or more of the following organisms: Lactobacillus species, α-streptococci, γ-streptococci, coagulase-negative staphylococci, diphtheroids, and Neisseria species (other than gonorrhea). The 7 patients with vaginal discharge and findings consistent with abuse either had cultures positive for Neisseria gonorrhoeae (3 patients), type 2 herpes simplex, and Chlamydia species (1 patient) or had culture-negative, "no hymen" vaginitis (3 patients) (Susan Pokorny, MD, oral communication, March 22, 1991). Two of these patients were referred to the sexual abuse clinic because of culture-proven N gonorrhoeae vaginitis; in the remaining 5 patients, the diagnosis was made when they were evaluated

Case 1:94-cv-00289   Document 52   Filed in TXSD on 01/30/2001   Page 58 of 66



**Figure 7.** *Evidence of sexual abuse. This 7-year-old girl was referred by a family practitioner because of "bumps on the private." She had a culture positive for type 2 herpes simplex virus and a vaginal culture positive for Chlamydia trachomatis. She refused to answer questions regarding abuse. The hymen shows mild thickening and irregularity. The arrow shows the herpetic lesion. This case was not originally reported to Child Protective Services by the family practitioner but was referred to them for investigation when the child was seen in the sexual abuse clinic*

### Table 3. Odds Ratio of Presenting Symptoms or Signs and Likelihood of Examination Findings Consistent With Sexual Abuse

| Symptom or Sign | OR (95% CI)* |
|---|---|
| Abnormal examination finding | 0† (0-0.42) |
| Bleeding or bruising | 1.98 (0.77-5.11) |
| Irritation or redness | 0.22† (0.02-0.95) |
| Vaginal discharge | 1.51 (0.51-4.36) |
| Lesion | 9.88† (2.36-42.99) |
| Other | 0† (0-4.56) |

*OR indicates odds ratio; CI, confidence interval. P<.05.
†Fisher exact test.[10]

signs or symptoms were as likely as patients without these complaints to have examination findings that are suggestive of or probable or definitive for sexual abuse. Only patients seen with lesions had an increased likelihood of a sexual abuse diagnosis compared with those who did not present with lesions.

There were 6 boys in the study ranging in age from 2.2 to 9.0 years (mean, 4.4 years). All had normal examination findings. Three had the presenting symptom of "abnormal examination finding," 2 had bleeding or bruising, and 1 had irritation or redness. Three had findings reflective of the presenting symptom that were normal variations. Presenting symptoms resolved or were absent in 2 patients when they were seen in the sexual abuse clinic. One patient referred with an abnormally large (6-cm) anal opening was found to have normal findings on examination, representing a discrepancy in opinion between the referring physician and sexual abuse clinic practitioners.

### COMMENT

Most (84%) children referred for sexual abuse evaluations because of anogenital symptoms or signs did not have examination findings suggestive or indicative of abuse. This result contrasts with that of another study[4] involving cases of legally confirmed child sexual abuse: 4% had no evidence of abuse, 5% were classified as "possible abuse," 81% were classified as "probable abuse," and 10% were classified as "definite abuse." This difference is attributable to the presence of a sexual abuse history in 94% of the patients in the "probable" category of the study by Adams et al,[4] whereas none of the patients in this study provided a history of abuse at the time of the

examination. Sexual abuse cannot be excluded in any of the children with normal or nonspecific examination findings. Many, if not most, examinations of sexually abused children elicit no abnormalities.[8] Depending on the type of sexual contact, there may be no visible tissue damage. When tissue damage does occur, injuries may heal quickly and completely.[11] Clearly, a child's disclosure is key to the detection and diagnosis of sexual abuse.

The children in this study were predominantly young and female. Vulvovaginal symptoms and signs were far more common than perianal complaints. The average age of all female children evaluated in our clinic is 8.5 years; the children in this study were, on average, younger, although patients with evidence of sexual abuse were significantly older (5.9 years) than those with no evidence of abuse (4.3 years). It is more difficult to effectively interview preschool children for abuse. In the absence of reliable verbal information, physical signs and symptoms may be more important in the assessment of younger children for sexual abuse. In addition, a number of examination findings in this study are seen more commonly in younger children: labial agglutination, candidiasis, and irritation or erythema of the anogenital area. A predisposition to hygiene problems and irritation associated with diaper wearing are more common in younger children.[12] Physiologic changes associated with a reduction in the influence of maternal hormones occur around age 2 years and include increased vascular pattern, thinning, and decreased redundancy in the hymenal membrane.[5] These changes cause the hymen to appear pinker, with the opening becoming more apparent. All of these conditions may be mistakenly attributed to sexual abuse trauma.

Because this study selected patients referred with physical symptoms or signs only, it was an expected result that most referrals would come from medical clinics. This is in contrast to the usual referral pattern to the sexual abuse clinic, in which most referrals come from Child Protective Services or law enforcement. In general, most children are referred to a sexual abuse clinic because they have made a disclosure of abuse. An important finding of this study is that only 4.2% (157/3660) of all patients referred to the sexual abuse clinic were referred on the basis of physical complaints alone.

Most referral sources reported their suspicions of abuse to authorities before evaluation in the sexual abuse clinic. Texas laws mandate reporting when a child "has been or may have been adversely affected by abuse."[13]

# Appearance of the Hymen in Prepubertal Girls

Abbey B. Berenson, MD*; Astrid H. Heger, MD‡; Jean M. Hayes, MD*;
Rahn K. Bailey, MD*; and S. Jean Emans, MD§

ABSTRACT. The recent increase in requests for genital examinations in girls who may have been sexually abused has necessitated detailed information not previously available on normal anatomy of the prepubertal girl. This study was undertaken to document the genital anatomy of 211 girls between the ages of 1 month and 7 years who presented for well child care or nongynecologic complaints and who had no history of sexual abuse. Each child's genitalia was examined and photographed, with findings reported reflecting those observed photographically. The study population consisted of 36% blacks, 33.6% white non-Hispanics, 29.9% Hispanics, and 0.5% Asians. Subjects had a mean age of 21 ± 20.6 (SD) months. Extensive labial agglutination sufficient to obscure the hymen was noted in 5% (10/211) and partial agglutination in an additional 17% (35/211). A significant difference was noted in hymenal configuration by age, with a fimbriated hymen the most common type (45%) in infants aged 12 months or younger and a crescentic hymen the most common (51%) in girls older than 24 months (P ≤ .001). No significant difference was noted in hymen configuration by race. Hymenal bumps (mounds) were observed in 7%, hymenal tags in 3%, vestibular bands in 98%, longitudinal intravaginal ridges in 25%, and external ridges in 15% of subjects in whom the anatomy under study could be visualized. Hymenal notches (clefts) occurred superiorly and laterally on the hymenal rim but none were found inferiorly on the lower half of the hymen. A narrow rounded hymenal ring with a transection was observed in only 1 (0.5%) of 201 subjects and was not considered a normal finding. Transverse hymenal openings measured only in annular and crescentic hymens had a mean which ranged from 2.5 ± 0.8 to 3.6 ± 1.2 mm and varied significantly with age (P ≤ .003). Normal hymenal findings must be recognized by medical professionals so that posttraumatic findings can be diagnosed appropriately. *Pediatrics* 1992;89:387–394; *hymen, hymenal configuration, sexual abuse.*

The recent avalanche of requests for genital examinations in cases of alleged child sexual abuse has increased the need for clinicians to have accurate information on normal anatomy. Research on the appearance of hymens in prepubertal girls has focused primarily on hymenal configurations and vaginal opening diameters.[1–6] Goff et al[5] examined 273

From the *Departments of Obstetrics and Gynecology and Pediatrics, University of Texas Medical Branch, Galveston; ‡Department of Pediatrics, University of Southern California, Los Angeles; and §Department of Pediatrics, Harvard Medical School and Children's Hospital, Boston, MA.
Received for publication Jul 25, 1990; accepted Feb 15, 1991.
Reprint requests to (A.B.B.), Dept of Obstetrics and Gynecology, Route E-67, University of Texas Medical Branch, Galveston, TX 77550.
PEDIATRICS (ISSN 0031 4005). Copyright © 1992 by the American Academy of Pediatrics.

prepubertal girls during their routine health assessment and determined that an opening greater than 4 mm was rare. Emans et al[6] compared 20 genital findings in three groups of girls: sexually abused, symptomatic with other genital complaints, and those with no genital complaints, but normal girls were not photographed for comparison. Congenital findings of the female genitalia, including the hymenal configuration, have recently been described in the newborn.[7,8]

In a study of the photographic findings of the genital anatomy of 93 prepubertal girls selected for nonabuse by parental history, McCann et al[9] noted vestibular erythema, labial adhesions, periurethral bands, midline sparing, and vaginal ridges in many girls. Our study was undertaken to evaluate and document in a larger, triethnic population the anatomy of the young prepubertal girl without a history of abuse or genital trauma. The object was to use the data base established by the newborn study[7] to look for similar structures and hymenal configurations persisting in infants and young girls. Given the importance of an accurate physical examination of the girl with a complaint of alleged sexual abuse, this study aimed at documenting the anatomy of the young girl with no history of abuse.

## MATERIALS AND METHODS

Subjects were recruited from patients between the ages of 1 month and 7 years who presented to the University of Texas Medical Branch public or private pediatric clinics for well child care or nongynecologic complaints between October 17, 1989, and March 1, 1990. Girls with any suspicion of previous sexual abuse were excluded from the study. The examiner asked the parent(s) who brought the child to the clinic whether they suspected that their daughter had been sexually abused. Three parents admitted to a possible history of abuse before photographs were taken, and one expressed suspicion after photographs were taken; these children were excluded from the study. The medical record of each potential subject was also reviewed to determine whether the child had ever been seen in the clinic or emergency room for suspected abuse. No cases of suspected abuse were detected by chart review. Permission was requested from 400 children and their parents; 211 girls met the criteria for inclusion and agreed to participate. With institutional Review Board approval and informed, written parental consent, each child's genitalia was examined and photographed by one of two of the authors (A.B.B. and J.M.H.). Verbal assent was obtained from girls older than age 3 years. One or both parents were present during the examination.

The child was examined in the supine position with her legs flexed and placed on the examining table, in the clinician's lap or in stirrups, depending on the child's age. The legs were held extended upward by a second clinician in infants younger than age 2 years. The examiner grasped the lower portion of the labia majora between the thumb and index fingers and gently pulled outward (labial traction technique).[10] The edges of the hymen were gently teased apart with the examiner's fingertip, if tolerated by the child, when the opening could not be seen.

Case 1:94-cv-00289 Document 52 Filed in TXSD on 01/30/2001 Page 60 of 66

A hand-held Nikon F3 camera with a 105-mm lens kept at a constant focal length, which had an attached extension ring and ring flash, was used for all photographs. A constant focal length was maintained by not altering the focus on the camera lens. The lens was kept fully extended at all times. An average of three slides per child were coded by study number and placed in storage.

Upon conclusion of the study, two coauthors from separate institutions (S.J.E. and A.H.H.) reviewed all slides. Findings reported reflect those observed photographically by both consultants in a group session. Characteristics examined included hymenal configuration, vascular pattern, midline sparing, and labial agglutination and the number, location, and size of hymenal notches, tags, bumps, and vestibular bands. A notch (cleft) was defined as a concave indentation in the hymen border not extending to the junctions between hymen and vestibule; notches were not recorded in the fimbriated hymen because of its fringed nature nor between the 11- and 1-o'clock positions in a crescentic hymen where there is a normal absence of hymenal tissue. A complete transection was defined as an interruption in the hymen extending to the junction between hymen and vestibule. Bumps (mounds) were defined, using the criteria of McCann et al,[7] as a "localized, rounded, and thickened area of tissue on the edge of the hymen." Longitudinal ridges on both the internal and external surfaces of the hymen were noted. When the area concerned was not visible photographically in all subjects, the number of subjects in whom the area could be visualized was reported.

Hymenal features, except as noted, were defined as previously described in the publication on neonates.[7] Location was noted using the face of a clock, with the 12-o'clock position located ventrally under the urethra and the 6-o'clock position dorsally near the posterior fourchette with the subject in the supine position. Midline sparing was defined as an avascular area at the 6-o'clock position on the posterior fourchette.

When visible on photographs, the inferior rim (6 o'clock) from the hymenal edge to the fossa navicularis and the transhymenal horizontal diameter in annular and crescentic hymens were measured. Vertical transhymenal diameters were measured in annular but not in crescentic hymens because of a lack of hymenal tissue superiorly to create a definitive border. No measurements were done on fimbriated hymens because of their redundant appearance. Both transverse and vertical transhymenal diameters were measured on the photograph with the maximum transverse diameter. Measurements of the rim and opening were performed by simultaneously projecting on a screen a slide of the hymen and a metric grid photographed at the same magnification and focal length as that used at examination.

The BMDP Biomedical and analysis of variance statistical packages were used for data analysis. Children were subdivided by their age into four groups for statistical analysis: 12 months or younger, 13 through 24 months, 25 through 48 months, and 49 through 81 months. The likelihood-ratio $x^2$ was used to test whether differences between hymenal characteristics and child's race or age at examination could be due to chance. Asians were not included in the racial analysis as only one patient was in this category. The likelihood-ratio $x^2$ was also used to compare hymenal characteristics by location. $x^2$ Analysis was used to determine whether an association existed between an inferior rim which measured ≤1.0 mm or a history of a vaginal discharge and the presence of hymenal bumps, ridges, or tags. Analysis of variance was used to compare hymenal measurements by the child's age. A significance level of $P < .05$ was the minimal criterion for rejection of the null hypothesis of no difference.

## RESULTS

Two hundred eleven girls were examined. The study population consisted of 36.0% (76/211) blacks, 33.6% (71/211) white non-Hispanics, 29.9% (63/211) Hispanics, and 0.5% (1/211) Asians. Subjects' ages ranged from 1 to 81 months with a mean of 21 ± 20.6 (SD) months.

Labial agglutination extensive enough to obscure the entire hymen was noted in 10 girls, of whom 8 were ≤12 months, one was 14 months, and 1 was 58 months of age. One was reexamined after treatment. Hymenal characteristics are reported in this girl plus the 201 in whom the hymen could be visualized. Partial posterior labial agglutination not obscuring the hymen was observed in 17% (35/201) of the remaining subjects, of whom 77% (27/35) were ≤12 months old.

Three major hymenal configurations were observed: annular, fimbriated, and crescentic (Fig 1, a through c). Other configurations noted included a microperforate, sleeve-like hymen with a small opening beneath the urethra in 18 girls (Fig 1, d) and a septated hymen in one subject. A significant difference was noted in hymenal configuration by age (P < .001) but not by race (Tables 1 and 2).

Subjects with both a redundant or microperforate, sleeve-like configuration were further subdivided according to whether hymenal tissue was present between the 11- and 1-o'clock positions. Twenty-two percent (15/68) of those with a redundant type and 67% (12/18) with a sleeve-like configuration did not have hymenal tissue anteriorly.

No significant difference was noted in the prevalence of notches, external hymenal ridges, and longitudinal intravaginal ridges by race or by age within the four age groups (Tables 1 and 2). Notches occurred in 16 girls with annular or crescentic hymens. Notches were primarily located in annular hymens between the 11- and 1-o'clock positions (P < .001). No notches occurred between the 4- and 8-o'clock positions on the lower rim of the hymen. One 5-year-old girl had a complete transection that extended to the vestibule at the 3-o'clock position in association with a narrow rounded hymen.

An external longitudinal ridge at the 6-o'clock position which extended from the hymenal rim to the fossa navicularis was observed in 23 (11%) subjects (Fig. 1, d) and at the 12-o'clock position from the rim to the urethra in 9 girls (4%). Two had a ridge in both locations. An external ridge was observed in only 1 of 27 children who were examined at greater than 48 months of age.

Longitudinal intravaginal ridges appeared in 25% (51/202) of subjects ranging in age from 1 to 73 months (Fig 2). Eleven subjects had two ridges, one had three, and one had five. Intravaginal ridges appeared evenly around the rim between the 11- and 1-o'clock positions (Table 3). A ridge beneath the urethra at the 12-o'clock position was frequently noted but was not classified as a longitudinal intravaginal ridge.

Additional features less frequently observed included hymenal tags and bumps. Tags, which were found in 5 subjects, appeared inferiorly or superiorly except for one, which was lateral (Table 3). A single bump appeared in 14 subjects and two bumps in 1 subject. Bumps which were white or pink originated from a longitudinal intravaginal ridge in 8 subjects (Fig 2) and from an external ridge in 1 and occurred independently of ridges in 6 subjects. Bumps were distributed around the hymenal edge.

Vestibular bands or ligaments were noted in 98% (155/158) of those in whom the vestibular area could be visualized on the photographs (Fig 3). These occurred in the periurethral area in all 155 girls and 11 of these girls also had bands elsewhere on the hymen.




**1a**




**1b**

Fig 1. Configurations noted include annular (a), fimbriated (b), crescentic (c), and sleeve-like (d). Note the external ridge and vestibular band in the sleeve-like hymen (arrow) and the lacy vascular pattern in all types.

Case 1:94-cv-00289    Document 52    Filed in TXSD on 01/30/2001    Page 62 of 66



**Fig 1. Continued**

The presence of midline sparing and the vascular pattern of the hymen were also noted. A lacy pattern with multiple fine vessels on the hymen was observed in 95% (180/189) of those in whom the vascularity could be observed. The remaining nine had a single vessel superimposed on the lacy pattern on the posterior portion of the hymen, eight of whom were ≥37 months old and one younger than 6 months old. Midline sparing occurred in 4% (3/83) of subjects in whom the posterior fourchette was well visualized on

APR 20 '00  11:32AM TML

P.5

Case 1:94-cv-00289 Document 52 Filed in TXSD on 01/30/2001 Page 63 of 66

**TABLE 1.   Classification of Hymenal Findings in Prepubertal Girls by Race***

| | White Non-Hispanic (n = 69) | Hispanic (n = 58) | Black (n = 74) | Total (n = 201) | P‡ |
|---|---|---|---|---|---|
| Configuration | | | | | NS |
| Annular | 12 (17) | 12 (21) | 20 (26) | 44 (22) | |
| Crescentic | 26 (38) | 21 (36) | 25 (34) | 72 (36) | |
| Fimbriated | 23 (33) | 18 (31) | 25 (34) | 66 (33) | |
| Sleeve | 8 (12) | 7 (12) | 3 (4) | 18 (9) | |
| Septated† | 0 | 0 | 1 (1) | 1 | |
| Notch(es) | 4 (6) | 6 (10) | 6 (8) | 16 (8) | NS |
| External ridge(s) | 11 (16) | 9 (16) | 10 (14) | 30 (15) | NS |
| Longitudinal intravaginal ridge(s) | 14 (20) | 12 (21) | 25 (34) | 51 (25) | NS |
| Bump(s)† | 4 (6) | 6 (10) | 5 (7) | 15 (7) | |
| Tag(s)† | 3 (4) | 2 (3) | 1 (1) | 6 (3) | |

* Values represent number (percent).
† Not included in statistical analysis because of small numbers of observations.
‡ NS, not significant.

**TABLE 2.   Classification of Hymenal Findings in Prepubertal Girls by Age***

| | Age (mo) | | | | Total (n = 202) | P‡ |
|---|---|---|---|---|---|---|
| | 1–12 (n = 92) | 13–24 (n = 47) | 25–48 (n = 37) | 49–81 (n = 26) | | |
| Configuration | | | | | | <.001 |
| Annular | 14 (15) | 9 (19) | 14 (38) | 7 (27) | 44 (22) | |
| Crescentic | 22 (24) | 18 (38) | 13 (35) | 19 (73) | 72 (36) | |
| Fimbriated | 42 (46) | 19 (40) | 6 (16) | 0 | 67 (33) | |
| Sleeve | 13 (14) | 1 (2) | 4 (11) | 0 | 18 (9) | |
| Septated† | 1 (1) | 0 | 0 | 0 | 1 | |
| Notch(es) | 7 (8) | 2 (4) | 5 (14) | 2 (8) | 16 (8) | NS |
| External ridge(s) | 16 (17) | 6 (13) | 7 (19) | 1 (4) | 30 (15) | NS |
| Longitudinal intravaginal ridge(s) | 24 (26) | 12 (26) | 9 (24) | 6 (23) | 51 (25) | NS |
| Bump(s)† | 2 (2) | 5 (11) | 5 (14) | 3 (12) | 15 (7) | |
| Tag(s)† | 4 (4) | 2 (4) | 0 | 0 | 6 (3) | |

* Values represent number (percent).
† Not included in statistical analysis because of small numbers of observations.
‡ NS, not significant.

the photographs. Two of these subjects were 6 years old and one was ≤12 months.

Seven girls had a prior history of a vaginal discharge, with *Candida* diagnosed in two. The discharge resolved without specific therapy in the other girls. A vaginal discharge was found in one subject at examination. One additional mother reported that her daughter had a current vaginal discharge which was not evident on examination. No hymenal characteristics were statistically associated with a previous history of a vaginal discharge. However, of the four girls ≥48 months with a history of vaginal discharge, 100% (4/4) had a crescentic hymen.

The mean transhymenal transverse diameter significantly differed by age ($P = .003$), while no association was noted between age and the vertical diameter (Table 4).

The inferior rim of the nonredundant hymens was >1.0 mm in all but five patients: two black girls aged 18 and 28 months with a thin, translucent hymen inferiorly; one 15-month-old black girl and one 27-month-old white non-Hispanic girl with nontranslucent hymens; and one 5-year-old with a narrow rounded hymen and a transection. Longitudinal in-

travaginal ridges were observed more frequently (80% vs 24%) in the five subjects with a rim ≤1.0 mm compared with the remainder of the study population ($P = .004$). No other hymenal characteristics were statistically associated with a rim ≤1.0 mm in size.

## DISCUSSION

Photographic documentation of genital examinations is performed in many referral centers evaluating child sexual abuse. Photographs provide examiners with a consistent technique for data collection, measurements, and review. The colposcope and the hand-held macrolenses are both accepted techniques for visualizing the hymen and vulva.[11,12] However, interpretation has been limited by a lack of comparison photographs from a normal population.

Previous studies on the appearance of the hymen in prepubertal girls have included subjects referred for genital complaints or have used multiple examiners without photographic documentation. Only one previous study has collected photographs.[9] This study extends those observations to a larger, triethnic population, drawing in the data base established in a newborn population.

Case 1:94-cv-00289   Document 52   Filed in TXSD on 01/30/2001   Page 64 of 66




**Fig 2.** A bump (arrow) is apparent at the 7-o'clock position on the hymen in a 4¹⁄₂-year-old girl where a longitudinal intravaginal ridge met the rim. Note the vestibular bands at the 10- and 11-o'clock positions (arrows).

Anatomical findings reported in this paper are limited to those observed on photographs to allow verification of findings. Although fewer findings may be apparent on photographs than at actual examination, photographic review allows a chance to observe features missed at examination and to reach consensus among experts. Although the number of findings observed may also have been limited by examining patients only in the supine position with traction, most of the girls were too young to assume the knees-chest position and the supine traction position has been demonstrated to open the orifice effectively and expose hymenal features. McCann et al[18] measured hymenal orifice diameters in three different positions and determined that the maximal transverse horizontal spans were obtained with this position while the largest vertical transhymenal diameters occurred in the knees-chest position.

Labial agglutination extensive enough to obscure the hymen was present in 5% of subjects and partial agglutination was observed in an additional 17%. Labial agglutination is commonly found in prepubertal girls and occurred particularly in girls younger than 12 months. Although some case reports have suggested an association between labial adhesions and sexual abuse,[19] the frequent occurrence of this finding in normal subjects precludes its usefulness as a marker of abuse. Midline sparing (not from a labial adhesion) was noted in 4% of girls, in contrast to a figure of 26.2% in the knees-chest position and 15.7% in the supine position reported by McCann et al.[9] However, the association of midline avascular areas with friability and labial adhesions noted in McCann and colleagues' study may indicate that some of the 'midline avascular' areas may possibly have represented the inner surface of a labial

adhesion. In addition, McCann and coworkers' subjects were much older than the subjects in this study; observation of the posterior fourchette area of an older child is easier to accomplish than in the first year of life and the thinning of the mucosa may make midline sparing more apparent.

Infants ≤12 months old had predominately a fimbriated hymen while a crescentic hymen was the most common configuration observed in girls >24 months. The crescentic hymen, with an absence of tissue from the 11- to 1-o'clock positions, is not observed in newborns.[7] It has been hypothesized that girls with an annular hymen and a notch at the 12-o'clock position develop a crescentic configuration as estrogen levels decrease.[7] A coauthor (A.H.H.) has noted that the ventral hymenal tissue appears thin when unestrogenized but may become more apparent during puberty (unpublished). Longitudinal studies are required to understand better the dynamic nature of the hymen's configuration with increasing age and presence or absence of estrogen effect.

**TABLE 3.** Location of Clefts, Ridges, Bumps, and Tags on the Hymen's Rim[a]

| | Location (O'clock) | | | | Total | P[b] |
|---|---|---|---|---|---|---|
| | 11–1 | 2–4 | 5–7 | 8–10 | | |
| Notch(es) | 13 | 1 | 0 | 1 | 15 | <.001 |
| Transection(s) | 0 | 1 | 0 | 0 | 1 | |
| Longitudinal intravaginal ridge(s) | 5 | 17 | 16 | 22 | 60 | NS |
| Bump(s) | 1 | 3 | 8 | 4 | 15 | NS |
| Tag(s) | 3 | 1 | 3 | 0 | 7 | NS |

[a] Values represent numbers.
[b] NS, not significant.





Fig 3. Multiple vestibular bands in a 21-month-old girl at the 9-, 10-, 11-, 1-, and 2-o'clock positions (arrows).

TABLE 4.   Measurements of Inferior Rim and Transhymenal Diameters of Annular and Crescentic Hymens in Prepubertal Girls by Age

| | Age (mo) | | | | P† |
|---|---|---|---|---|---|
| | 1–12 | 13–24 | 25–48 | 49–81 | |
| Horizontal diameter, mm | | | | | |
| No. | 35 | 26 | 27 | 25 | |
| Mean ± SD | 2.5 ± 0.8 | 2.9 ± 1.2 | 2.9 ± 1.0 | 3.6 ± 1.2 | .003 |
| Range | 1.0–3.5 | 1.5–6.5 | 1.0–6.5 | 2–4.8 | |
| Vertical diameter, mm* | | | | | |
| No. | 11 | 8 | 14 | 6 | |
| Mean ± SD | 3.4 ± 1.4 | 2.8 ± 1.0 | 3.6 ± 1.2 | 3.9 ± 2.7 | NS |
| Range | 1.8–6.0 | 1.0–4.3 | 1.0–6.0 | 1.0–8.8 | |
| Inferior rim, mm | | | | | |
| No. | 35 | 26 | 29 | 24 | |
| Mean ± SD | 2.8 ± 0.8 | 2.7 ± 1.1 | 2.7 ± 0.9 | 2.7 ± 0.7 | NS |
| Range | 1.5–4.5 | 0.9–5.0 | 0.9–5.0 | 1.0–3.8 | |

* Includes annular hymens only.
† NS, not significant.

The larger percentage of infants ≤12 months with a redundant hymen reported in this paper as compared to an earlier series of neonates[7] (46% vs 19%) is due to a variation in definition. Almost all newborns have abundant hymenal tissue, which appears folded or redundant. Neonatal hymens were classified into configurations by limiting fimbriated (redundant) hymens to those with at least three separations in the rim resulting in a ruffled edge. In this paper, the fimbriated configuration includes all hymens with persistence of a redundant or fringed nature regardless of whether multiple separations in the rim were present.

The sleeve-like hymen has been described both as an annular hymen with a ventrally displaced orifice in newborns and as a microperforate hymen in older children. It has not, however, routinely been included in recent articles which describe hymenal configurations,[1,2] probably because it is infrequently noted in children older than 1 year old. We noted 13 sleeve-like hymens among 92 (14%) infants ≤12 months but only 5 (5%) in 110 girls examined >12 months of age and only 1 (3%) among 38 children >36 months of age. None were observed in girls >48 months old.

Previous investigators have suggested that hymenal bumps and intravaginal ridges may be suggestive of sexual abuse,[4,5] but this study found that 7% of girls had bumps and 25% intravaginal ridges. These percentages are lower than that of McCann and coworkers' report[9] of 18% for bumps (knee-chest position) and 90.2% for intravaginal ridges, perhaps because the mean age in our study (21 months) was much less than that of McCann and coworkers' subjects

(5.5 years), and therefore our study included more girls with redundant hymens, which make visualization of intravaginal ridges more difficult. Longitudinal intravaginal ridges commonly occur in the newborn and in the young child. Additionally, the intersection of an intravaginal ridge and the rim appeared as a bump in 4% (8/202) of our subjects. If a bump is observed, it is important to determine its origin by examining the hymen's inner surface. Intravaginal ridges and bumps may be observed more easily in a hymen with a narrow rim. This may explain why we noted a higher prevalence of intravaginal ridges in children with a rim ≤1.0 mm.

Notches were noted in 8% of this population compared with 6.6% in McCann and colleagues' study, but the location of notches was not specified in their study. The absence of congenital notches inferiorly at the 6-o'clock position has been previously documented in the newborn.[7] No hymenal notches were observed inferiorly between the 4- and 8-o'clock positions in this population. In contrast, partial and complete transections of the hymen from penetration have been documented to occur most frequently between the 4- and 8-o'clock positions but can occur at other locations (as noted in the one child in this study).[1,14] Thus based on these observations, a prepubertal girl with what appears to be a hymenal "notch" at the 6-o'clock position is unlikely to have a congenital finding but rather a partial transection from trauma and deserves further evaluation.

A transection in a rounded narrow hymen was noted in only one girl. An attempt was made to recall her for an interview and follow-up examination, but the family had returned to Mexico. This subject was probably a victim of prior abuse despite a negative history. Since the history was obtained from the parents and not the subjects, it is possible that other girls had been abused as well. However, the majority of girls were preverbal, with a mean age of 21 months. The young age of the subjects allowed comparison with the anatomical findings established by the newborn study and lessened the cumulative risk of prior abuse having occurred. The absence of any scarring in all 201 girls and the presence of a transection in only 1 (0.5%) of 201 subjects support the significance of these findings in the evaluation of the sexually abused child.

The mean horizontal hymenal openings in this population are consistent with earlier normal studies which have described a small diameter which increases in size with age.[3,10] We also noted that horizontal diameters varied from 1 to 6.5 mm on photographs of annular and crescentic hymens. The significance of vertical opening sizes has been debated,[15] and no trend by age was observed in this study. The amount of hymenal tissue reported inferiorly at the 6-o'clock position should be considered an estimate, even with photographic measurements, since the actual attachment of hymenal tissue at the 6-o'clock position to the vaginal floor cannot be determined visually. However, the usefulness of this measurement deserves further investiga-

tion in cross-sectional and longitudinal studies of normal and sexually abused girls.

## CONCLUSIONS

This study further defines congenital variations in the hymen's appearance. "Notches" between the 4-o'clock and 8-o'clock positions and scarring were not observed in the normal pediatric population. Hymenal bumps, notches on the upper portion of the hymen between the 9- and 3-o'clock positions, tags, vestibular bands, longitudinal intravaginal ridges, and external ridges were all noted frequently enough in a pediatric population to be considered normal findings. Transverse hymenal openings were small but had a wide range of normal which changed with age. An understanding of these findings, when used in combination with the patient's history and examination, will assist medical professionals in diagnosing posttraumatic changes at the time of annual physical examinations and during an evaluation for alleged sexual abuse.

## ACKNOWLEDGMENTS

We thank the University of Texas Medical Branch ambulatory pediatric faculty for their assistance in recruiting subjects, Dr Gregg Wilkinson and Dr Richard Carroll for statistical assistance, and Johnsbelle Hankins for manuscript preparation.

## REFERENCES

1. Herman-Giddens ME, Frothingham TE. Prepubertal female genitalia: examination for evidence of sexual abuse. Pediatrics. 1987;80:203–208.
2. Pokorny SF, Kozinetz CA. Configuration and other anatomic details of the prepubertal hymen. Adolesc Pediatr Gynecol. 1988;1:97–103.
3. Goff CW, Burke KR, Rickenbach C, Buebendorf DP. Vaginal opening measurement in prepubertal girls. AJDC. 1989;143:1366–1368.
4. Clayton RN, Barth KL, Shubin CI. Evaluating child sexual abuse: observations regarding ano-genital injury. Clin Pediatr (Phila). 1989;28:419–422.
5. White ST, Ingram DL. Vaginal introital diameter in the evaluation of sexual abuse. Child Abuse Negl. 1989;13:217–224.
6. Emans SJ, Woods ER, Flagg NT, Freeman A. Genital findings in sexually abused, symptomatic and asymptomatic girls. Pediatrics. 1987;79:778–785.
7. Berenson A, Heger A, Andrews S. Appearance of the hymen in newborns. Pediatrics. 1991;87:458–465.
8. Mor N, Merlob P, Reisner SH. Types of hymen in the newborn infant. Eur J Obstet Gynecol Reprod Biol. 1986;22:225–228.
9. McCann J, Wells R, Simon M, Voris J. Genital findings in prepubertal girls selected for nonabuse: a descriptive study. Pediatrics. 1990;86:428–439.
10. McCann J, Voris J, Simon M, Wells R. Comparison of genital examination techniques in prepubertal girls. Pediatrics. 1990;85:182–187.
11. Ricci LR. Medical forensic photography of the sexually abused child. Child Abuse Negl. 1988;12:305–310.
12. Woodling BA, Heger A. The use of the colposcope in the diagnosis of sexual abuse in the pediatric age group. Child Abuse Negl. 1986;10:111–114.
13. Berkowitz CD, Elvik SL, Logan MK. Labial fusion in prepubescent girls: a marker for sexual abuse? Am J Obstet Gynecol. 1987;156:16–20.
14. Muram D. Child sexual abuse: genital tract findings in prepubertal girls. Am J Obstet Gynecol. 1989;160:328–333.
15. Heger A, Emans SJ. Introital diameter as the criterion for sexual abuse. Pediatrics. 1990;85:222–223.